PATRICK J. CAROME (*pro hac vice* pending)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice* pending)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

PETER G. NEIMAN (*pro hac vice* pending)
peter.neiman@wilmerhale.com
250 Greenwich St., 45 Floor
New York, New York 10007
Telephone: (212) 295-6487
Facsimile: (202) 663-6363

MARK D. FLANAGAN
CA Bar No. 130303
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real #400
Palo Alto, California 94306
Telephone: (650) 858-6047
Facsimile: (650) 858-6100

***Attorneys for Plaintiff***
**TWITTER, INC.**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

(San Francisco Division)

| | |
|---|---|
| TWITTER, INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>KEN PAXTON,<br>in his official capacity as Attorney General of Texas,<br><br>　　　　　　Defendant. | Case No. __3:21-cv-01644__<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Twitter, Inc. ("Twitter") for its Complaint against Ken Paxton, in his official capacity as Attorney General of Texas ("AG Paxton"), hereby alleges as follows:

## INTRODUCTION

1. This is an action for declaratory and injunctive relief. Twitter seeks to stop AG Paxton from unlawfully abusing his authority as the highest law-enforcement officer of the State of Texas to intimidate, harass, and target Twitter in retaliation for Twitter's exercise of its First Amendment rights. The rights of free speech and of the press afforded Twitter under the First Amendment of the U.S. Constitution include the right to make decisions about what content to disseminate through its platform. This right specifically includes the discretion to remove or otherwise restrict access to Tweets, profiles, or other content posted to Twitter. AG Paxton may not compel Twitter to publish such content over its objection, and he may not penalize Twitter for exercising its right to exclude such content from its platform.

2. Twitter operates an online platform where users can share short messages ("Tweets") and other content. Twitter's hundreds of millions of users send hundreds of millions of Tweets each day. To protect the health and safety of the people who use its platform, as well as the integrity of the site, Twitter has established content moderation policies and procedures. Pursuant to these policies and procedures, Twitter must frequently make difficult real-time decisions regarding whether to remove or otherwise restrict content. In particular, in the months surrounding the January 6, 2021 attack on the United States Capitol, Twitter decided to suspend or restrict numerous accounts for violating its policies against glorifying or inciting violence, and against manipulating or interfering in elections or other civic processes. Among the users whose accounts were permanently suspended in the immediate aftermath of the deadly attack was President Donald Trump.

3. AG Paxton has long disagreed with Twitter's content moderation decisions, and made that displeasure widely known. But this disagreement turned to official action against the company after Twitter suspended President Trump's account on January 8, 2021. Just five days later, on January 13, 2021, AG Paxton issued a civil investigative demand ("CID") to Twitter seeking volumes of highly confidential documents concerning Twitter's internal content

moderation processes—the public disclosure of which would undermine their effectiveness, and compromise Twitter's ability to effectively and efficiently moderate content on its platform. Twitter sought for weeks to reach an agreement with AG Paxton that would put reasonable limits on the scope of this demand, but to no avail. Instead, AG Paxton made clear that he will use the full weight of his office, including his expansive investigatory powers, to retaliate against Twitter for having made editorial decisions with which he disagrees. Now Twitter, already targeted because of its protected activity, is left with the untenable choice to turn over highly sensitive documents or else face legal sanction.

4. The First Amendment prohibits such acts. Any "[o]fficial reprisal for protected speech" runs afoul of the Constitution because it "threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal quotation marks omitted). Accordingly, there is "a longstanding, clearly established right . . . to be free from retaliation in the form of threatened legal sanctions and other similar means of coercion, persuasion, and intimidation." *Sampson v. Cty. of Los Angeles by & through Los Angeles Cty. Dep't of Children & Family Servs.*, 974 F.3d 1012, 1020 (9th Cir. 2020). As set forth in this Complaint, AG Paxton's retaliatory investigation and intrusive CID are precisely the sort of "threatened legal sanctions," "coercion," and "intimidation" forbidden by the First Amendment. The investigation and CID unlawfully intrude on Twitter's internal editorial processes and burden its protected activity, and do so solely because Twitter exercised its First Amendment rights in a way disagreeable to AG Paxton. This retaliatory conduct violates the Constitution.

5. For these and other reasons discussed below, Twitter respectfully requests that this Court declare the CID and Defendant's investigatory efforts unlawful, and enjoin AG Paxton from initiating any action to enforce the CID issued on January 13, 2021, or otherwise pursuing the investigation of Twitter's internal decisionmaking processes that AG Paxton announced on January 13, 2021.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

1        7.     This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and by its general legal and equitable powers.

      8.     This Court has personal jurisdiction over Defendant under Federal Rule of Criminal Procedure 4(k)(1)(A) and California Civil Procedure Code § 410.10. The claim in this case arises from multiple actions that AG Paxton purposefully directed toward the Northern District of California with the intent of causing injury in, and changing behavior in, the Northern District of California, *see* Paragraphs 23-29, 41-57 *infra,* including transmitting the CID to Twitter in the Northern District of California, where the company's headquarters are located. The CID and retaliatory investigation have already forced and will continue to force Twitter to incur financial costs and divert employee time in the Northern District of California to comply with the CID. In addition, the purpose of the CID and retaliatory investigation is to punish Twitter for, and to compel Twitter to change, editorial decisions regarding platform content that were and are supervised and directed by employees in the Northern District of California.

      9.     AG Paxton also consented, and waived any objection, to jurisdiction and venue in the Northern District of California by agreeing to the Twitter User Agreement, which provides that "All disputes related to these Terms or the Services" will be litigated "solely in the federal or state courts located in San Francisco County, California, United States." The Texas Attorney General's Office has had authorization and use over a Twitter account since 2009, which has been used to post Tweets as recently as March 6, 2021. AG Paxton has separately held a Twitter account since 2009, currently operated under the display name "Attorney General Ken Paxton," which he regularly uses to comment on political issues. He used that account to announce that he would "fight" Twitter with "all I've got" after Twitter permanently suspended President Trump's account, and the account has been used to post Tweets as recently as March 8, 2021. The CID and retaliatory investigation relate to Twitter's Terms and Services.

      10.    Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to this claim occurred in the Northern District of California. This is where AG Paxton directed and served the retaliatory CID, and his threatening

Tweets and press statements, and it is where Twitter engaged in the targeted protected First Amendment activity. The harm Twitter will suffer as a result of AG Paxton's actions has and will continue to be felt in the Northern District of California.

## PARTIES

11. Twitter is a Delaware corporation with its principal place of business at 1355 Market Street, San Francisco, CA. Twitter operates a global platform for self-expression and communication, with the mission of giving everyone the power to create and share ideas and information instantly. Twitter's more than 190 million daily active users use the platform to connect with others, express ideas, and discover new information. Hundreds of millions of short messages are posted on Twitter every day. Twitter provides these services at no charge to its users.

12. Ken Paxton is the Attorney General of the State of Texas. He is sued in his official capacity. He is the chief law enforcement officer of the State of Texas.

## FACTS

### A. Twitter's Platform and Services

13. Twitter operates an Internet communications platform that allows hundreds of millions of people around the world to share views and track current events.

14. People engage on Twitter's platform by, among other things, reading and posting "Tweets," short messages limited to 280 characters. The brevity of the messages and the ability to react instantaneously to political, cultural, and social events have made Twitter one of the world's most popular online platforms. Twitter aims to serve the public conversation by providing a platform, open to a broad variety of voices. Twitter is also committed to protecting the health and safety of its users and fostering an environment for "safe, inclusive, and authentic conversations." Healthy Conversations, Twitter https://tinyurl.com/mcs28acx.

15. Twitter achieves that goal through content moderation policies, practices, and techniques that, among other things, are designed to minimize the reach of harmful or misleading information—especially when intended to disrupt civic processes or cause offline harm. *Id.*

16. Twitter actively enforces its content moderation policies. To "limit behaviors that discourage others from expressing themselves or place them at a risk of harm," in 2019, Twitter

removed content over 4.7 million times, and took action on over 3.8 million unique accounts, including suspending over 1.5 million accounts. Rules Enforcement, Accounts Actioned, https://tinyurl.com/2cjxr8mb.

17. Twitter strives to be transparent in its content moderation decisions. For example, it publishes the standards governing conduct on the platform, and requires all users to consent to those terms. Those standards, which Twitter continuously refines, include prohibitions on glorifying or inciting violence, and on using Twitter's services to manipulate or interfere in elections or other civil processes. *See* The Twitter Rules, https://tinyurl.com/wry9thc2.

18. Twitter regularly publishes blog posts containing detailed explanations for its adoption of certain moderation policies. Twitter also regularly publishes blog posts containing detailed explanations for its adoption of certain moderation policies. *See, e.g.*, Twitter, *Coronavirus: Staying safe and informed on Twitter* (Apr. 3, 2020), https://tinyurl.com/633y4dy4.

19. While Twitter strives for as much transparency as possible, it cannot practically make every aspect of its content moderation practices public because some confidentiality is vital to the effective functioning of its platform. Public disclosure of all Twitter's internal content moderation procedures would, among other things, provide a roadmap for bad-faith actors to design their content to carefully evade Twitter's scrutiny, undermining the company's ability to remove content that negatively affects the security and integrity of the platform and the health of the conversation on the platform.

20. Disclosure also threatens Twitter's editorial discretion. Twitter exercises its editorial judgment by creating and implementing moderation procedures that reflect sensitive internal deliberations over what discourse appears on the platform and in what manner. These moderation policies and procedures are functionally equivalent to the internal editorial decision-making processes of news organizations: just as newspapers and magazines carefully guard their internal deliberations about what news they see as fit to print or what op-eds they will publish, so too does Twitter guard its internal deliberations and procedures for making editorial judgments.

21. Twitter is aware that the outcome of those internal deliberations—including decisions to remove or retain certain content or speakers—may sometimes generate public

discussion and debate. But Twitter's ability to freely make its own decisions as to what content to include on its platform is impeded by the persistent threat that government actors who disagree with those decisions may wield their official authority to retaliate, such as by issuing a burdensome CID or commencing an intrusive investigation.

### B. AG Paxton Attempts To Influence Twitter's Editorial Decisions

22. Complaints that Twitter and other social media companies are biased against conservatives have proliferated among certain groups, even as President Trump's Twitter account attracted tens of millions of followers. *See* Rachel Lerman, *Trump says Twitter is trying to 'silence' conservatives. His growing number of followers suggests otherwise.*, WASHINGTON POST (May 28, 2020), https://tinyurl.com/nsbd55t5.)

23. Over the past three years, AG Paxton, in particular, has expressed interest in using the powers of his office to address this supposed bias. In 2018, he attended a "listening session" called by then-U.S. Attorney General Jeff Sessions to discuss possible strategies for doing so. Brian Fung and Tony Romm, *Inside the private Justice Department meeting that could lead to new investigations of Facebook, Google and other tech giants*, WASHINGTON POST (Sept. 25, 2018), https://tinyurl.com/3ddvxvuw.

24. After the meeting, AG Paxton disseminated through his press secretary a statement supporting scrutiny of social media platforms, knowing it would reach Twitter and other tech companies in California. Alina Selyukh, *DOJ Probe Into Bias at Tech Companies Should Include Democrats, California AG Says*, NPR (Sept. 11, 2018), https://tinyurl.com/2mevuyp4 (quoting Paxton's spokesperson as saying Paxton was looking forward to the "discussion regarding growing concerns that conservative voices are being suppressed on several social media platforms").

25. The following year, one of AG Paxton's top deputies, Texas First Assistant Attorney General Jeff Mateer, attended a Federal Trade Commission roundtable in which he discussed Twitter's decisionmaking, voicing concern that Twitter was designing its platform to "limit the visibility of prominent Republicans in search results." Office of the Attorney General of Texas, First Assistant AG Jeff Mateer to FTC: Big Tech Companies Must Comply with State Deceptive Trade Practices Law (June 12, 2019), https://tinyurl.com/b3tswysw.

26. In May 2020, Twitter publicly announced that it was modifying its "Civic Integrity Policy," and as a result would begin to "label or remove false or misleading information about how to participate in an election or other civic process." Civic Integrity Policy, Twitter Help Center, (May 27, 2020), https://tinyurl.com/nmajvvsm.

27. Thereafter, President Trump repeatedly violated this policy, posting misleading information regarding election administration. For instance, on May 26, 2020, referring to California's election processes, President Trump Tweeted, "The Governor of California is sending Ballots to millions of people" when ballot applications were being mailed. President Donald J. Trump (@realDonaldTrump), Twitter (May 26, 2020), https://tinyurl.com/dp5yss.

28. Pursuant to its Civic Integrity Policy, Twitter labelled some of these Tweets as misleading, consistent with its disclosed policy. This label stated "Get the facts about mail-in ballots" and linked to official, governmental sources about mail-in voting. Elizabeth Dwoskin, *Twitter labels Trump's tweets with a fact check for the first time*, WASHINGTON POST (May 27, 2020), https://tinyurl.com/93x3ex5t. Twitter explained that it applied the label because, in its view, the "Tweet[] could confuse voters about what they need to do to receive a ballot and participate in the election process." Twitter Safety (@TwitterSafety), Twitter (May 27, 2020), https://tinyurl.com/b9mzu734.

29. In near-immediate reaction to Twitter's first such labeling action, AG Paxton issued an opinion piece on Fox News, which he knew would reach Twitter's leadership in California, criticizing Twitter for adding these labels, accusing Twitter's "fact-checkers" of being politically biased, and "strongly urg[ing] . . . Twitter [to] reconsider its selective—and apparently ideologically driven—'fact check' of President Trump's statements about mail balloting." Ken Paxton, *Texas AG Ken Paxton: Trump is right and Twitter 'fact check' is wrong—mail-in ballot fraud is a real problem*, FOX NEWS (May 27, 2020), https://tinyurl.com/tnth74fy.

30. On September 3, 2020, AG Paxton, in his official capacity, filed a comment with the Federal Communications Commission urging it to construe a provision of federal law relevant to Twitter's business (Section 230 of the Communications Decency Act) in a manner unfavorable to Twitter, because in his view Twitter had engaged in "online censorship" by flagging certain of

President Trump's Tweets regarding mail-in ballots. Ken Paxton, Re: RM-11862 Section 230 of the Communications Act of 1934 (September 2, 2020), https://tinyurl.com/8fbkpv8.

31. Two weeks later, AG Paxton and nine other Republican attorneys general met with President Trump at the White House to discuss the alleged suppression of conservative voices on social media, including on Twitter. At the meeting, President Trump threatened that state attorneys general would take "concrete legal action" in response to Twitter's decision to "restrict posts . . . from a President of the United States." *President Trump Discussion on Social Media*, C-SPAN (Sept. 23, 2020), https://tinyurl.com/a9ed9frv.

### C.   Twitter's Permanent Suspension Of President Trump From Its Platform

32. President Trump posted misleading and inaccurate information with increasing frequency after the November 3, 2020 election. President Trump's activity on Twitter is voluminous and a matter of public record and we will not describe it here in full. In one example, however, hours after polls closed, he Tweeted that Democrats were trying to "STEAL" the election. Todd Spangler, Twitter, *Facebook Slap Warning Labels on Trump's Tweet Charging Democrats With Trying to 'Steal' Election*, VARIETY (Nov. 3, 2020), https://tinyurl.com/6228kaez. On Thanksgiving Day, Trump tweeted that "This was a 100% RIGGED ELECTION." Todd Spangler, Twitter, *Twitter Has Flagged 200 of Trump's Posts as 'Disputed' or Misleading Since Election Day. Does It Make a Difference?*, VARIETY (Nov. 27, 2020), https://tinyurl.com/6228kaez. Days later, he assured his followers that "the 2020 Election was a total scam, we won by a lot (and will hopefully turn over the fraudulent result)." *Id*.

33. In the weeks immediately following the November 2020 presidential election, Twitter added warning labels to about 200 such Tweets or Retweets about the election by President Trump, flagging them as containing "false, disputed or misleading information." *Id*.

34. On January 6, 2021, as Congress met to count the votes of the Electoral College, President Trump spoke to a crowd of supporters that included AG Paxton, Ken Paxton (@KenPaxtonTX), Twitter (Jan. 5, 2021) https://twitter.com/KenPaxtonTX/status/1346533137879347200, repeatedly insisting that the election was "stolen" and encouraging the crowd to march to the Capitol Building. President Trump stated, "We fight like hell. And if you

don't fight like hell, you're not going to have a country anymore." *What Trump Said to Supporters on Jan. 6 Before Their Capitol Riot*, WALL STREET JOURNAL (Jan. 12, 2021), https://tinyurl.com/z729wmb4.

35. Shortly thereafter, a large mob of individuals, some of whom were armed, stormed the United States Capitol, breaking barricades and breaching the building, leading to multiple deaths. Lauren Leatherby, et. al., *How a Presidential Rally Turned Into a Capitol Rampage*, NEW YORK TIMES (Jan. 12, 2021), https://tinyurl.com/5dv528s7.

36. During and after the riot, President Trump issued three Tweets from his Twitter account that Twitter judged had the potential to encourage violence. Twitter locked President Trump's account for 12 hours and required that he delete the three Tweets that violated its policies. At the time, Twitter made it clear that any further violations of its policies would result in permanent suspension. Twitter Safety (@TwitterSafety), Twitter (Jan. 6, 2021, 7:02 PM), https://tinyurl.com/a7byztnn.

37. President Trump nonetheless continued to use Twitter to spread misinformation about the outcome of the election in the aftermath of the insurrection. On January 8, 2020, he Tweeted:



And shortly thereafter, he Tweeted,

> **Donald J. Trump** @realDonaldTrump
>
> To all of those who have asked, I will not be going to the Inauguration on January 20th.
>
> 3:44 PM · Jan 8, 2021

38. After closely reviewing these Tweets and others from the President's account, on January 8, 2021, Twitter decided to permanently suspend President Trump from its platform, citing repeated violations of its Glorification of Violence policy. Permanent suspension of @realDonaldTrump, Twitter Blog (January 8, 2021), https://blog.twitter.com/en_us/topics/company/2020/suspension.html. Twitter explained that the President's Tweets could "encourage and inspire people to replicate the criminal acts that took place at the U.S. Capitol on January 6, 2021." *Id.*

39. Twitter concluded that Trump's Tweets "must be read in the context of broader events in the country and the ways in which the President's statements can be mobilized by different audiences, including to incite violence, as well as in the context of the pattern of behavior from [his] account in recent weeks." *Id.* It explained that the President's Tweets could "encourage and inspire people to replicate the criminal acts that took place at the U.S. Capitol on January 6, 2021." *Id.*

40. Referencing the decision, Twitter's CEO, Jack Dorsey, explained that although he "d[id] not celebrate or feel pride" in having to ban the President from Twitter, the company was finally forced to do so "based on threats to physical safety on and off Twitter." Jack Dorsey (@jack), Twitter (January 13, 2021), https://tinyurl.com/2zdusb2e. He elaborated, "Offline harm as a result of online speech is demonstrably real, and that is what drives our policy and enforcement above all." *Id.*

41.     Other major platforms also took action against content that they perceived to be glorifying or promoting violence on their platforms. Facebook and YouTube each suspended then-President Trump's accounts on their platforms on January 7, and January 12, respectively. Daisuke Wakabayashi, *YouTube Suspends Trump's Channel for at Least 7 Days*, New York Times (Jan. 12, 2021), https://tinyurl.com/vux3cap9. On January 9, Apple and Google banned Parler—a social media platform that describes itself as "the world's premier free speech platform"—from their app stores for failing to remove content that promoted violence, and Amazon banned Parler from its web-hosting service, citing repeated violations of its rules. Jack Nicas and Davey Alba, Amazon, Apple and Google Cut Off Parler, an App That Drew Trump Supporters, New York Times (Jan. 13, 2021), https://tinyurl.com/34bjx3u7. Twitter took no action against Parler, which continues to maintain its own account on Twitter.

42.     AG Paxton did not agree with these content moderation decisions. On January 9, he posted a Tweet, which he knew would be viewed by Twitter's leadership in California:



Attorney General Ken Paxton (@KenPaxtonTX), Twitter (January 9, 2021, 2:58 P.M.), https://tinyurl.com/ud9t39p7. AG Paxton closed his Tweet by declaring: "*As AG, I will fight them with all I've got.*" *Id.* (emphasis added).

### D.  AG Paxton Issues The CID And Commences An Investigation Into Twitter's Internal Editorial Processes

43. On January 13, 2021, AG Paxton issued CIDs to five leading technology companies, including Twitter and the three other companies that he had vowed to "fight" with "all I've got" just four days earlier. Ex. 1.

44. The CID AG Paxton issued to Twitter declares on its face that he had opened an investigation regarding Twitter's "policies and procedures relating to content moderation." The CID seeks, among other things, "all . . . policies and procedures related to content moderation on your platform, including any policies or procedures that limit the reach or visibility of content intended for public viewers. *Id.* It also demanded that Twitter produce "a copy of all communications, internal and to third parties, you have had, between January 1, 2019, and the present regarding the social media platform Parler.com or Parler Inc." *Id.*

45. The CID had an initial response date of February 2, 2021. *Id.*

46. AG Paxton issued a press release along with the CID ("Press Release"), which he then disseminated using his Twitter account, knowing that it would reach Twitter in California. The Press Release expressly links the issuance of the CID to Twitter's suspension of then-President Trump's account. Ex. 1.

47. The Press Release states in part:

> For years, these Big Tech companies have silenced voices in the social media sphere and shut down competing companies and platforms. It has only grown worse in recent months. And just last week, this discriminatory action included the unprecedented step of removing and blocking President Donald Trump from online media platforms.

48. On January 14, 2021, AG Paxton's office served the CID on Twitter's headquarters in San Francisco, California by certified mail. At the time, Twitter's headquarters remained closed to all but a few necessary employees due in part to threats of violent protests in the vicinity of its offices arising from its content moderation decisions during and after the attack on the U.S. Capitol.

49. After issuing the CID, AG Paxton continued to make his motive plain. In an interview at the 2021 Conservative Political Action Conference, he stated that his office is

undertaking "an investigation . . . related to the whole issue of the president being de-platformed," and described his goal of ensuring that content moderation decisions made by online platforms—including Twitter—be "regulated." *See* Crossroads with Joshua Philipp, *CPAC 2021: AG Ken Paxton on Immigration Lawsuit, and Protecting Constitution Against Federal Orders* (Feb. 27, 2021), https://www.youtube.com/watch?v=Mw4JzxYuoOo.

50. Despite believing the CID was improper and retaliatory, Twitter made a good faith effort to engage with AG Paxton's office in an attempt to narrow the scope of the CID in an appropriate manner. Thus, Twitter engaged external counsel ("Counsel") to formulate its response.

51. The CID is an official demand from a state official and expressly threatened legal action in the event of noncompliance. Thus, Twitter expected that noncompliance would result in an enforcement action or even in AG Paxton filing suit against Twitter under the Texas statutes named in the CID.

### E. Twitter's Subsequent Interactions With The Texas Attorney General's Office

52. Counsel arranged for an extension of the response date to March 2, 2021, and participated in telephonic meet-and-confers with AG Paxton's office on February 8 and 24, 2021.

53. During the February 24, 2021 meeting, lawyers from AG Paxton's office declined to narrow the CID. When Twitter pointed out that the CID sought *all* of Twitter's internal content moderation policies, including policies on such subjects as suicide and self harm—whereas the press release addressed only political bias—AG Paxton's office declined Counsel's request to narrow the CID.

54. With respect to the CID's demand for Twitter documents mentioning Parler, Twitter's Counsel pointed out that Twitter had not taken any steps to suspend Parler's Twitter account or otherwise required Parler to remove any content from Twitter's platform. Nevertheless, AG Paxton's office still pressed for Twitter to produce more than two years of communications—both external and internal, without limitation by topic—related to Parler.

55. Thus far, Twitter has made three voluntary productions in response to the CID, totaling roughly 1,800 pages, that included public-facing documents: Terms of Service, Privacy

Policies, rules regarding participation on its platform, advertising policies, blog posts, and Twitter's written testimony to Congress regarding its content moderation policies.

56. AG Paxton's office nonetheless continues to demand from Twitter volumes of highly confidential, internal documents concerning Twitter's content moderation policies and practices and "all" communications regarding the social media platform Parler—even though Twitter has a clear First Amendment right to make its own content moderation decisions and has *never* suspended Parler's Twitter account or required Parler to remove content from the Twitter platform.

57. These productions forced several Twitter employees to redirect time and effort that would have been spent on valuable operational tasks.

58. In subsequent communications, AG Paxton's office agreed to short extensions of Twitter's time to respond to the CID, but they refused to grant any extension beyond March 8, 2021.

## CLAIM FOR RELIEF

### Count One

**(U.S. Const. amend. I; U.S. Const. amend. XIV;**

**U.S. Const. amend. XIV; Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)**

**THE FIRST AMENDMENT BARS THE ATTORNEY GENERAL'S RETALIATORY INVESTIGATION AND CIVIL INVESTIGATIVE DEMAND**

59. Plaintiff herein incorporates by reference paragraphs 1-58 as if set forth fully herein.

60. AG Paxton violated the First Amendment, applicable against him through the Fourteenth Amendment, by initiating an investigation and issuing a CID aimed at Twitter's internal editorial procedures in retaliation for Twitter's exercise of its First Amendment rights.

61. AG Paxton initiated the investigation and issued the CID in order to use his official authority to punish Twitter for making content moderation decisions that he did not like, in the hope that Twitter would exercise its editorial discretion in a manner consistent with AG Paxton's

preferences going forward. The First Amendment forbids this use of government authority to penalize and inhibit Twitter's speech.

62. To prevail on a claim for First Amendment retaliation, a plaintiff must show that "(1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006). Once a plaintiff makes such a showing, "the defendant can prevail only by showing that the [conduct at issue] would have been initiated without respect to retaliation." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019). AG Paxton's retaliatory investigation easily meets each prong of this test.

63. *First*, Twitter's content moderation decisions, including its suspension or restriction of a Tweet, constitute First Amendment activity. *See Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433 (S.D.N.Y. 2014). Just like a newspaper or bookstore, Twitter provides a platform for disseminating ideas. And, just like a newspaper editor or bookstore owner, Twitter must make decisions about the content that is and is not presented through its platform. The First Amendment protects this "exercise [of] editorial control and judgment." *Miami Herald v. Tornillo*, 418 U.S. 241, 257-258 (1974); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 391 (1973).

64. *Second*, the CID and associated investigation chill Twitter's speech, and "would chill or silence a person of ordinary firmness from future First Amendment activities." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 916 (9th Cir. 2012) (quoting *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)). The Attorney General has repeatedly stated his intent to aggressively investigate perceived "anticonservative bias" at Twitter and the rest of "Big Tech." He has publicly declared that the full machinery of his office is targeted at Twitter, with the transparent intention of pressuring the company (and others similarly situated) into making different decisions about what content to display. Faced with the force of such an investigation, "a person of ordinary firmness" would feel constrained from future exercises of the protected activity that prompted AG Paxton's assault.

65. AG Paxton's retaliatory investigation and CID have already infringed upon Twitter's exercise of editorial discretion. Twitter is already bearing the costs of complying with AG Paxton's improper investigation, imposed as punishment for its speech. It is already being forced to weigh the consequence of a burdensome investigation every time it contemplates taking action based on a rules violation by a user that AG Paxton favors. And AG Paxton's conduct to this point has already put Twitter to the unconstitutional choice of disclosing documents related to its internal editorial decisions or potentially facing sanctions in state court.

66. *Third*, AG Paxton's publicly announced investigation and burdensome CID were transparently in reaction to, and motivated by, Twitter's protected editorial activities. The CID and accompanying Press Release specifically target Twitter's protected activities, including its internal content moderation policies and practices, discussions about those policies and practices, and the decision to permanently suspend President Trump's account. This kind of direct evidence of retaliatory motive provides strong proof of causation. *See Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 870-871 (9th Cir. 2016). Further, the CID was issued just five days after President Trump's Twitter account was permanently suspended—itself a protected act, *see supra*, at 63—which again strongly evinces retaliatory intent. *Id*. at 870.

67. For the foregoing reasons, the Court should enjoin Defendant from taking any further action to enforce the CID or further its investigation into Twitter. Such relief is warranted under the First Amendment of the United States Constitution.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully seeks the following relief:

68. Declare that the First Amendment bars AG Paxton's January 13, 2021 CID and the investigation into Twitter's internal editorial policies publicly announced on that same date, because they are unlawful retaliation against Twitter for its moderation of its platform, including its decision to permanently suspend President Trump's account.

69. Issue a temporary restraining order enjoining AG Paxton, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction from initiating any action to enforce the CID or to

further the unlawful investigation into Twitter's internal editorial policies and practices publicly announced on January 13, 2021.

70. Preliminarily and permanently enjoin AG Paxton, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction from initiating any action to enforce the CID or to further the unlawful investigation into Twitter's internal editorial policies and practices publicly announced on January 13, 2021.

71. Any and all other such relief as the Court may deem appropriate.

| | |
|---|---|
| DATED: March 8, 2021 | Respectfully submitted, |
| | /s/ Mark D. Flanagan |
| | Mark. D. Flanagan |

| | |
|---|---|
| PATRICK J. CAROME (*pro hac vice* pending)<br>patrick.carome@wilmerhale.com<br>ARI HOLTZBLATT (*pro hac vice* pending)<br>ari.holtzblatt@wilmerhale.com<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>1875 Pennsylvania Avenue, NW<br>Washington, D.C. 20006<br>Telephone: (202) 663-6000<br>Facsimile: (202) 663-6363<br><br>PETER G. NEIMAN (*pro hac vice* pending)<br>peter.neiman@wilmerhale.com<br>250 Greenwich St., 45 Floor<br>New York, New York 10007<br>Telephone: (212) 295-6487<br>Facsimile: (202) 663-6363 | MARK D. FLANAGAN<br>CA Bar No. 130303<br>mark.flanagan@wilmerhale.com<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>2600 El Camino Real #400<br>Palo Alto, California 94306<br>Telephone: (650) 858-6047<br>Facsimile: (650) 858-6100<br><br>***Attorneys for Plaintiff***<br>**TWITTER, INC.** |