PATRICK J. CAROME (*pro hac vice* pending)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice* pending)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

PETER G. NEIMAN (*pro hac vice* pending)
peter.neiman@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
250 Greenwich St., 45 Floor
New York, New York 10007
Telephone:  (212) 295-6487
Facsimile:  (202) 663-6363

MARK D. FLANAGAN
CA Bar No. 130303
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6047
Facsimile:  (650) 858-6100

***Attorneys for Plaintiff***
**TWITTER, INC.**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TWITTER, INC.,<br><br>Plaintiff,<br><br>v.<br><br>KEN PAXTON,<br>in his official capacity as Attorney<br>General of Texas,<br><br>Defendant. | Case No. 3:21-CV-01644<br><br>**TWITTER, INC.'S NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Courtroom:<br><br>Judge:<br><br>Date Action Filed: March 8, 2021 |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................... iii

NOTICE OF MOTION AND MOTION.................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .......................... 1

INTRODUCTION...................................................................................... 1

BACKGROUND........................................................................................ 3

    A.    TWITTER'S PLATFORM AND SERVICES ..................................... 3

    B.    AG PAXTON ATTEMPTS TO INFLUENCE TWITTER'S EDITORIAL
        DECISIONS............................................................................ 5

    C.    TWITTER'S PERMANENT SUSPENSION OF PRESIDENT TRUMP FROM
        ITS PLATFORM....................................................................... 6

    D.    AG PAXTON ISSUES THE CID AND COMMENCES AN INVESTIGATION
        INTO TWITTER'S INTERNAL EDITORIAL PROCESSES............... 9

    E.    TWITTER'S SUBSEQUENT INTERACTIONS WITH THE TEXAS
        ATTORNEY GENERAL'S OFFICE ............................................. 10

LEGAL STANDARD ............................................................................... 10

ARGUMENT .............................................................................................. 11

I.    TWITTER IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM ................................... 11

    A.    TWITTER'S CONTENT MODERATION DECISIONS ARE PROTECTED BY
        THE FIRST AMENDMENT....................................................... 12

    B.    THE CID AND ASSOCIATED INVESTIGATION CHILL TWITTER FROM
        CONTINUING TO ENGAGE IN PROTECTED ACTIVITIES ........... 15

    C.    AG PAXTON'S PUBLICLY ANNOUNCED INVESTIGATION AND
        BURDENSOME CID WERE TRANSPARENTLY IN REACTION TO, AND
        MOTIVATED BY, TWITTER'S EDITORIAL DECISIONS ............. 18

II.    PLAINTIFF WOULD BE IRREPARABLY INJURED ABSENT IMMEDIATE
    INJUNCTIVE RELIEF ............................................................................ 19

III.    THE REMAINING EQUITABLE FACTORS FAVOR GRANTING IMMEDIATE
    INJUNCTIVE RELIEF ............................................................................ 21

CONCLUSION.......................................................................................... 23

CERTIFICATE OF SERVICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>

### CASES

Page(s)

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)................................... 10

*American Trucking Associations, Inc. v. City of L.A.*, 559 F.3d 1046 (9th Cir. 2009)................................................................................................................................ 10

*Arizona Students' Association v. Arizona Board of Regents*, 824 F.3d 858 (9th Cir. 2016)........................................................................................................................ 18

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012)........................................................ 22

*Bello-Reyes v. Gaynor*, 985 F.3d 696 (9th Cir. 2021)............................................................ 19

*Bullfrog Films, Inc. v. Wick*, 847 F.2d 502 (9th Cir. 1988).................................................... 18

*College Republicans of University of Washington v. Cauce*, No. 18-CV-189, 2018 WL 804497 (W.D. Wash. Feb. 9, 2018)............................................................................. 21

*Community House, Inc. v. City of Boise*, 490 F.3d 1041 (9th Cir. 2007)................................. 22

*Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir. 2003)....................................................... 17

*Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019)....................................................... 21

*Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621 (E.D. Va. 2019) .......................................... 13

*Doe #1 v. Trump*, 984 F.3d 848 (9th Cir. 2020)..................................................................... 11

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ......................................................................... 22

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ......................................22, 23

*El Dia, Inc. v. Governor Rossello*, 165 F.3d 106 (1st Cir. 1999)............................................. 11

*Elrod v. Burns*, 427 U.S. 347 (1976)...................................................................................... 19

*Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016)............................................................... 17

*Greisen v. Hanken*, 925 F.3d 1097 (9th Cir. 2019)................................................................. 17

*Hartman v. Moore*, 547 U.S. 250 (2006)...........................................................................11, 15

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group*, 515 U.S. 557 (1995) ..................... 12

*In re Anonymous Online Speakers*, 661 F.3d 1168 (9th Cir. 2011).......................................... 12

*Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020) ................................................................................................................ 22

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009) ................................ 22

*Knight First Amendment Institute at Columbia University v. Trump*, 928 F.3d 226 (2d Cir. 2019) .................................................................................................... 13

*La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981 (S.D. Tex. 2017) ....................... 13

*Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) ................................. 15, 17

*Leathers v. Medlock*, 499 U.S. 439 (1991) ............................................................. 12

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) ............................... 16

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ............................................... 22

*Miami Herald v. Tornillo*, 418 U.S. 241 (1974) .............................................. 1, 12, 13

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ................................... 21

*Muir v. Alabama Educucational Television Commission*, 656 F.2d 1012 (5th Cir. 1981) ............................................................................................................ 14, 19

*Mulligan v. Nichols*, 835 F.3d 983 (9th Cir. 2016) ................................................ 17

*Murphy v. Twitter*, 274 Cal. Rptr. 3d 360 (Cal. Ct. App. 2021) .............................. 19

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) ....................................................... 12, 18

*Pinard v. Clatskanie School Distict 6J*, 467 F.3d 755 (9th Cir. 2006) ............... 12, 18

*Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376 (1973) ......................................................................................................... 12

*Prager University v. Google LLC*, 951 F.3d 991 (9th Cir. 2020) ............................. 19

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) ................................ 12

*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990) ..................................... 15

*Sampson v. County of Los Angeles by & through Los Angeles County Department of Children & Family Services*, 974 F.3d 1012 (9th Cir. 2020) ................... 11, 16, 17

*Shoen v. Shoen*, 48 F.3d 412 (9th Cir. 1995) ........................................................ 14

*Smith v. County of Suffolk*, 776 F.3d 114 (2d Cir. 2015) ........................................ 18

*Stuhlbarg Internationl Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ............................................................................................... 10

*Tandon v. Newsom*, No. 20-CV-07108, 2021 WL 411375 (N.D. Cal. Feb. 5, 2021) ................ 21

*Ulrich v. City & County of San Francisco*, 308 F.3d 968 (9th Cir. 2002) ................................ 16

*Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ................................................................................................ 5

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005)...................................................... 20

*Washington Post v. McManus*, 944 F.3d 506 (4th Cir. 2019) .................................................. 13

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000)........................................................ 16, 17

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)..................................... 10

*Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433 (S.D.N.Y. 2014).................................................. 13

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978)................................................................ 14, 23

## DOCKETED CASE

*Exxon Mobil Corp. v. Maura Tracey Healey*, No. 16-CV-00469 (N.D. Tex. Sept. 8, 2016) ..................................................................................... 2, 18, 24

## STATUTES AND RULES

Fed. R. Civ. P. 65 ............................................................................................................ 1

L.R., D. Mass 7-10 ........................................................................................................ 1

L.R., D. Mass 65-1 ........................................................................................................ 1

Tex. Bus. & Com. Code
§17.61(f)................................................................................................................. 22

## OTHER AUTHORITIES

Barrett, Paul M. & J. Grant Sims, *False Accusation: The Unfounded Claim that Social Media Companies Censor Conservatives,* NYU Stern Center for Business and Human Rights (Feb. 2021), https://tinyurl.com/yeekmz2a ...................... 14

Crossroads with Joshua Philipp, *CPAC 2021: Attorney Gerneral Ken Paxton on Immigration Lawsuit, and Protecting Constitution Against Federal Orders* (Feb. 27, 2021), https://www.youtube.com/watch?v=Mw4JzxYuoOo .......................... 9

Dorsey, Jack (@jack) Twitter (January 13, 2021), https://tinyurl.com/2zdusb2e........................ 7

Fung, Brian and Tony Romm, *Inside the Private Justice Department Meeting That Could Lead to New Investigations of Facebook, Google and Other Tech Giants*, WASHINGTON POST (Sept. 25, 2018), https://tinyurl.com/3ddvxvuw ....................................................................... 5

*Healthy Conversations*, Twitter, https://tinyurl.com/mcs28acx ................................................ 3

Leatherby, Lauren, et. al., *How a Presidential Rally Turned Into a Capitol Rampage*, NEW YORK TIMES (Jan. 12, 2021), https://tinyurl.com/5dv528s7 .................. 6

Lerman, Rachel, *Trump says Twitter is Trying to 'Silence' Conservatives.  His Growing Number of Followers Suggests Otherwise*, WASHINGTON POST (May 28, 2020), https://tinyurl.com/nsbd55t5 ................................................................. 5

Lindell, Chuck, *Paxton at Trump rally: While Texas fought, Georgia surrendered*, AUSTIN AMERICNA-STATESMAN (Jan. 6, 2021), https://tinyurl.com/2fhmu5su .................................................................................. 6

Mukerjee, Subhayan, et al., *Our Study Found Little Evidence that Twitter is Biased Against Conservative Opinion Leaders*, WASHINGTON POST (July 9, 2020), https://tinyurl.com/j5cyathm .......................................................... 14

Nicas, Jack and Davey Alba, *Amazon, Apple and Google Cut Off Parler, an App That Drew Trump Supporters*, NEW YORK TIMES (Jan. 13, 2021), https://tinyurl.com/34bjx3u7 ................................................................................ 7

Office of the Attorney General of Texas, First Assistant AG Jeff Mateer to FTC: Big Tech Companies Must Comply with State Deceptive Trade Practices Law (June 12, 2019), https://tinyurl.com/2wezcd28 ...................................................... 5

Office of the Attorney General of Texas, Ken Paxton letter to Marlene Dortch Re: RM-11862 Communications Act of 1934 Section 230 (Sept. 2, 2020), https://tinyurl.com/8fbkpv8 .................................................................................... 5

Paxton, Ken,  *Texas AG Ken Paxton: Trump is Right and Twitter 'Fact Check' is Wrong—Mail-In Ballot Fraud is a Real Problem*, Fox News (May 27, 2020), https://tinyurl.com/tnth74fy ...................................................................... 5

*President Trump Discussion on President Trump Discussion on Social Media*, C-SPAN (Sept. 23, 2020), https://tinyurl.com/a9ed9frv ................................................... 6

*Transparency: Rules Enforcement, Latest Data: Accounts Actioned*, Twitter, https://tinyurl.com/2cjxr8mb.................................................................................... 3

Selyukh, Alina, *DOJ Probe Into Bias at Tech Companies Should Include Democrats, California AG Says*, NPR (Sept. 11, 2018), https://tinyurl.com/2mevuyp4 ............................................................................. 5

Spangler, Todd, *Twitter Has Flagged 200 of Trump's Posts as 'Disputed' or Misleading Since Election Day. Does It Make a Difference?* VARIETY (Nov. 27, 2020), https://tinyurl.com/rpm5uja9............................................................. 6

*See, e.g.*, Twitter, *Coronavirus: Staying safe and informed on Twitter* (January 12, 2021), https://tinyurl.com/633y4dy4 ............................................................. 4

Twitter, *Permanent suspension of @realDonaldTrump* (Jan. 8, 2021), https://tinyurl.com/33e2ud2w ............................................................. 6

*The Twitter Rules*, Twitter, https://tinyurl.com/wry9thc2.....................................................4, 21

Twitter Safety (@TwitterSafety), Twitter (Jan. 6, 2021, 7:02 PM), https://tinyurl.com/a7byztnn ............................................................. 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, at the earliest practical date to be set by the Court, Plaintiff Twitter, Inc. ("Twitter") will and hereby does move this Court *ex parte*, pursuant to Local Rules 7-10 and 65-1 and Federal Rule of Civil Procedure 65, for (1) a Temporary Restraining Order and (2) an Order to Show Cause Why a Preliminary Injunction Should Not Issue restraining Defendant Ken Paxton, in his official capacity as the Attorney General of Texas, from enforcing the Civil Investigative Demand issued by AG Paxton to Twitter on January 13, 2021 or otherwise pursuing the investigation of Twitter's internal editorial processes that AG Paxton publicly announced on January 13, 2021. This Motion is based upon the Complaint in this action, this Notice of Motion, the Memorandum of Points and Authorities filed herewith, the Proposed Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, and the Declarations of Matthew Williams, Hayden Schottlaender, and Anuradha Sivaram filed herewith along with their accompanying exhibits.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In the wake of the deadly attack on the U.S. Capitol on January 6, 2021, Twitter made the decision to permanently suspend the account of President Donald Trump out of concern that his activity on the service would create a risk of further incitement of violence. Under the First Amendment, the decision to suspend President Trump's account was unquestionably Twitter's decision to make, without fear of government reprisal. For if the First Amendment means anything, it means that government officials may not dictate to private actors whose views they must or must not disseminate. *Miami Herald v. Tornillo*, 418 U.S. 241, 257-258 (1974).

The Attorney General of Texas, Ken Paxton ("AG Paxton"), has nonetheless unlawfully retaliated against Twitter for that protected exercise of its editorial judgment, purporting to launch an investigation into perceived bias in Twitter's content moderation and demanding that Twitter produce thousands of sensitive internal documents, including its internal policies and procedures governing how it moderates content on its own platform. This motion seeks to immediately halt

AG Paxton's ongoing efforts to use the power of his office to retaliate against Twitter, in direct violation of Twitter's First Amendment rights.

Just one day after Twitter permanently suspended President Trump's account, AG Paxton—a long-time political ally of Mr. Trump—declared he would "fight" Twitter "with all I've got." Three days later, he delivered on that threat, sending a civil investigative demand ("CID") to Twitter's headquarters in California. The CID recites that AG Paxton is conducting "an investigation of possible violations. . . of the [Texas Deceptive Trade Practices Act]" and demands an expansive set of highly sensitive internal communications and policies. In a press release announcing the CID and broader investigation, AG Paxton explicitly linked his investigation to what he called the "discriminatory" and "unprecedented step of removing and blocking President Donald Trump from online media platforms." Williams Decl. Ex. B.

AG Paxton's CID is a transparent attempt to intimidate Twitter and silence free speech. As AG Paxton has himself recognized, CIDs from state attorneys general can chill and punish the exercise of First Amendment rights. He said this publicly in an *amicus* brief he filed supporting Texas-based Exxon Corporation's First Amendment challenge in federal court in Texas to a CID from the Massachusetts Attorney General. In that brief, AG Paxton wrote:

> "The[] [First Amendment] protections afforded by the Constitution . . . [are] threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air. Thus, not only is Massachusetts attempting to silence Exxon through the issuance and threat of compelling a response to the CID, this very action harms everyone[.]"

Brief for Texas *et al.* as Amici Curiae ("Paxton Am. Br."), *Exxon Mobil Corp. v. Healey*, No. 4:16-cv-00469-K (N.D. Tex. Sept. 8, 2016), Dkt. No. 63-2, at 6 (Sivaram Decl. Ex. A).

Twitter agrees: abusive CIDs or government-issued subpoenas are a powerful tool for government censors to express their disapproval of speech, and such retaliatory censorship "harms everyone." Sivaram Decl. Ex. A at 6. In the present case, that harm is clear and substantial. The CID and the investigation it launches directly target Twitter's editorial judgments, thereby chilling Twitter's right and ability to rid its platform of content Twitter deems to be dangerous—particularly content that, like President Trump's Tweets, may inspire others to replicate violent acts. The right to say what you wish, without fear of government reprisal, is a central requirement

1  of democracy.  But that freedom is imperiled if government actors can subject each such choice to
2  burdensome investigation.
3  This Court should not permit AG Paxton to continue his unconstitutional campaign against
4  Twitter.   Instead, the Court should immediately restrain temporarily, and following a hearing
5  enjoin, his enforcement of the CID and his retaliatory investigation.

## BACKGROUND

7  AG Paxton's CID and investigation is an attempt to pressure Twitter to change how it
8  exercises editorial discretion over what content to disseminate or not disseminate through its
9  platform.

### A.  TWITTER'S PLATFORM AND SERVICES

11  Twitter operates an Internet communications platform that allows hundreds of millions of
12  people around the world to share views and follow current events.  People engage on the platform
13  by, among other things, reading and posting "Tweets," short messages limited to 280 characters.
14  The brevity of the messages and the ability to react instantaneously to political, cultural, and social
15  events have made Twitter one of the world's most popular online platforms.  Twitter aims to serve
16  the public conversation by providing a platform that is open to a broad variety of voices.  Twitter
17  is committed to protecting the health and safety of the people who use its platform by fostering an
18  environment for "safe, inclusive, and authentic conversations." *Healthy Conversations*, Twitter,
19  https://tinyurl.com/mcs28acx (Sivaram Decl. Ex. B).  It does this through content moderation
20  policies, practices, and techniques that, among other things, are designed to minimize the reach of
21  harmful or misleading information—especially when intended to disrupt civic processes or cause
22  offline harm. *Id.* To "limit behaviors that discourage others from expressing themselves or place
23  them at a risk of harm," in 2019, Twitter removed content over 4.7 million times, and took action
24  on over 3.8 million unique accounts, including by suspending over 1.5 million of those accounts.
25  *Transparency, Rules Enforcement, Latest Data: Accounts Actioned*, Twitter
26  https://tinyurl.com/2cjxr8mb (Sivaram Decl. Ex. C).
27  Twitter strives to be transparent about its content moderation decisions.  For example, it
28  publishes the standards governing conduct on the platform, and requires all users to consent to

1   those terms.   Those standards, which Twitter continuously refines, include prohibitions on

2   glorifying or inciting violence, and on using Twitter's services to manipulate or interfere in

3   elections or other civic processes.  *See The Twitter Rules*, Twitter https://tinyurl.com/wry9thc2

4   (Sivaram Decl. Ex. D).   Twitter also regularly publishes blog posts containing detailed

5   explanations for its adoption of certain moderation policies.  *See, e.g.*, Twitter, *Coronavirus:*

6   *Staying safe and informed on Twitter* (Jan. 12, 2021), https://tinyurl.com/633y4dy4 (explaining

7   Twitter's efforts to ensure reliable COVID-19 information is disseminated) (Sivaram Decl. Ex. E).

8        While Twitter strives for as much transparency as possible, it cannot practically make every

9   aspect of its content moderation practices public because some confidentiality is vital to the

10  effective functioning of its platform.  Public disclosure of all Twitter's internal content moderation

11  procedures would, among other things, provide a roadmap for bad actors to design their content to

12  carefully evade Twitter's scrutiny, undermining the company's ability to remove content that

13  negatively affects the security and integrity of the platform and the health of the conversation on

14  the platform.  Williams Decl. ¶ 17.

15       And the problem of disclosure is more than practical—it strikes at the heart of Twitter's

16  editorial discretion.   Twitter exercises its editorial judgment by creating and implementing

17  moderation procedures that reflect sensitive internal deliberations over what discourse appears on

18  the platform and in what manner.  *Id.* ¶¶ 12-13.  These moderation policies and procedures are

19  functionally equivalent to the internal editorial decision making processes of news organizations:

20  just as newspapers and magazines rightfully guard their internal deliberations about what news

21  they see as fit to print or what op-eds they will publish, so too does Twitter guard its internal

22  deliberations and procedures for making editorial judgments.[1]  *Id.* ¶¶ 15, 17. The outcome of

23  those internal deliberations—including decisions to remove or retain certain content or speakers—

24  may sometimes result in public scrutiny.  But the First Amendment demands that Twitter be

25

26  ───────────────

27  [1] Section 230 of the Communications Act of 1934, upon which this case does not rest, protects
    Twitter from liability for the content that ultimately passes through its moderation procedures. The
    analysis of Twitter's status under section 230 is distinct from the analysis of the protections to

28  which it is entitled under the First Amendment.

allowed to freely make its own decisions as to what content to include on its platform without the persistent threat that government actors who disagree with those decisions may wield their official authority to retaliate, such as by issuing a burdensome CID or commencing an intrusive investigation.

### B. AG PAXTON ATTEMPTS TO INFLUENCE TWITTER'S EDITORIAL DECISIONS

Complaints that Twitter and other social media companies are biased against conservatives have proliferated among certain groups, even as President Trump's Twitter account attracted tens of millions of followers. *See* Lerman, *Trump Says Twitter is Trying to 'Silence' Conservatives. His Growing Number of Followers Suggests Otherwise,* WASHINGTON POST (May 28, 2020), https://tinyurl.com/nsbd55t5.[2]

Over the past three years, AG Paxton, in particular, has met with U.S. Attorney General Jeff Sessions and other state attorneys general about regulating "anticonservative bias" in social media, issued statements directed at Twitter "regarding growing concerns that conservative voices are being suppressed," wrote an op-ed accusing Twitter of "ideologically driven" content moderation, and urged the Federal Communications Commission to undermine legal protections important to Twitter's business.[3]   In September 2020, AG Paxton and nine other Republican attorneys general met with President Trump at the White House to discuss the alleged suppression of conservative voices on social media, including on Twitter.   At the meeting, President Trump

---

[2] This Court may take judicial notice of this article and the other media accounts cited below. *See Von Saher v. Norton Simon Museum of Art at Pasadena,* 592 F.3d 954, 960 (9th Cir. 2010) (taking judicial notice of newspaper articles "as an indication of what information was in the public realm at the time").

[3] *See, e.g.*, Fung and Romm, *Inside the Private Justice Department Meeting that Could Lead to New Investigations of Facebook, Google and Other Tech Giants,* WASHINGTON POST (Sept. 25, 2018), https://tinyurl.com/3ddvxvuw; Selyukh, *DOJ Probe Into Bias at Tech Companies Should Include Democrats, California AG Says,* NPR (Sept. 11, 2018), https://tinyurl.com/2mevuyp4; Office of the Attorney General of Texas, *First Assistant AG Jeff Mateer to FTC: Big Tech Companies Must Comply with State Deceptive Trade Practices Law* (June 12, 2019), https://tinyurl.com/b3tswysw (Sivaram Decl. Ex. F); Ken Paxton, *Texas AG Ken Paxton: Trump is right and Twitter 'fact check' is wrong—mail-in ballot fraud is a real problem,* FOX NEWS (May 27, 2020), https://tinyurl.com/tnth74fy; Office of the Attorney General of Texas, Ken Paxton letter to Marlene Dortch , Re: RM-11862 Section 230 of the Communications Act of 1934 (September 2, 2020), https://tinyurl.com/8fbkpv8 (Sivaram Decl. Ex. G).

threatened that state attorneys general would take "concrete legal action" in response to Twitter's decision to "restrict posts … from a President of the United States." *President Trump Discussion on Social Media*, C-SPAN (Sept. 23, 2020), https://tinyurl.com/a9ed9frv.

### C. TWITTER PERMANENTLY SUSPENDS PRESIDENT TRUMP FROM ITS PLATFORM

AG Paxton immediately acted following Twitter's decision to permanently suspend President Trump from its platform.  In the weeks following the November 2020 U.S. election, Twitter added warning labels to about 200 Tweets or Retweets by President Trump about the election, flagging them as containing "false, disputed or misleading information."  Spangler, *Twitter Has Flagged 200 of Trump's Posts as 'Disputed' or Misleading Since Election Day. Does It Make a Difference?*, VARIETY (Nov. 27, 2020), https://tinyurl.com/rpm5uja9.   On January 6, 2021, as Congress met to certify the results of the presidential election, President Trump spoke to a crowd of supporters, repeatedly insisting that the election was "stolen" and encouraging the crowd to march to the Capitol Building.  AG Paxton was in attendance and Tweeted about the event.  Lindell, *Paxton at Trump rally: While Texas fought, Georgia surrendered*, AUSTIN AMERICNA-STATESMAN (Jan. 6, 2021), https://tinyurl.com/2fhmu5su.  Shortly thereafter, a large mob stormed the United States Capitol, breaking barricades and breaching the building, leading to multiple deaths.  Leatherby, et. al., *How a Presidential Rally Turned Into a Capitol Rampage*, NEW YORK TIMES (Jan. 12, 2021), https://tinyurl.com/5dv528s7.

During and after the riot, President Trump issued three Tweets from his Twitter account that Twitter judged had the potential to encourage violence.  Twitter locked President Trump's account for 12 hours and required that he delete three Tweets that violated its policies.  At the time, Twitter made it clear that any further violations of its policies would result in permanent suspension.  Twitter Safety (@TwitterSafety), Twitter (Jan. 6, 2021, 7:02 PM), https://tinyurl.com/a7byztnn. (Sivaram Decl. Ex. H).  The President was undeterred.  He continued to post Tweets that Twitter judged to be in violation of their policies.  Twitter, *Permanent Suspension of @realDonaldTrump* (Jan. 8, 2021), https://tinyurl.com/33e2ud2w (Sivaram Decl. Ex. I).  After closely reviewing Tweets from the President's account sent on January 8, 2021, and others from the President's account, Twitter made the decision to permanently suspend President

Trump from its platform, citing repeated violations of its Glorification of Violence policy. *Id.* Exercising its editorial judgment, Twitter concluded that Trump's Tweets "must be read in the context of broader events in the country and the ways in which the President's statements can be mobilized by different audiences, including to incite violence, as well as in the context of the pattern of behavior from [his] account in recent weeks." *Id.* Twitter explained that the President's Tweets could "encourage and inspire people to replicate the criminal acts that took place at the U.S. Capitol on January 6, 2021." *Id.* Referencing the decision, Twitter's CEO, Jack Dorsey, explained that although he "d[id] not celebrate or feel pride" in having to ban the President from Twitter, the company was finally forced to do so "based on threats to physical safety on and off Twitter." Jack Dorsey (@jack), Twitter (January 13, 2021, 7:16 PM), https://tinyurl.com/2zdusb2e (Sivaram Decl. Ex. J). He elaborated, "Offline harm as a result of online speech is demonstrably real, and that is what drives our policy and enforcement above all." *Id.*

Other prominent online platforms subsequently ook action against content that they perceived to be glorifying or promoting violence on their platforms. Facebook and YouTube each suspended President Trump's accounts on their platforms on January 7, and January 12, respectively. Wakabayashi, *YouTube Suspends Trump's Channel for at Least 7 Days*, NEW YORK TIMES (Jan. 12, 2021), https://tinyurl.com/vux3cap9. And on January 9, Apple and Google banned Parler—a social media platform that describes itself as "the world's premier free speech platform"—from their app stores for failing to remove content that promoted violence, and Amazon banned Parler from its web-hosting service, citing repeated violations of its rules. Nicas and Alba, *Amazon, Apple and Google Cut Off Parler, an App That Drew Trump Supporters*, NEW YORK TIMES (Jan. 13, 2021), https://tinyurl.com/34bjx3u7. Twitter took no to suspend Parler, or otherwise require removal of content from Parler's account. Indeed, Parler continues to maintain its own account on Twitter to this day.

AG Paxton did not agree with these content moderation decisions. On January 9, he posted a Tweet, which he well knew would be viewed by Twitter's leadership in California:





Williams Decl. Ex. D.  AG Paxton closed his Tweet by declaring: "As AG, *I will fight them with all I've got.*"  *Id.* (emphasis added).

### D.  AG PAXTON ISSUES THE CID AND COMMENCES AN INVESTIGATION INTO TWITTER'S INTERNAL EDITORIAL PROCESSES

On January 13, 2021, four days after Twitter's permanent suspension of President Trump's account, AG Paxton issued civil investigative demands to five leading technology companies, including Twitter and the three other technology companies that he had just pledged to "fight" with "all I've got."  Williams Decl. Ex. D.  The CID to Twitter declares on its face that AG Paxton had opened an investigation regarding Twitter's "policies and procedures relating to content moderation."  Compl. Ex. 1 at 8.  The CID seeks, among other things, "all . . . policies and procedures related to content moderation on your platform, including any policies or procedures that limit the reach or visibility of content intended for public viewers." *Id.*  The CID also demands that Twitter produce "a copy of all communications, internal and to third parties, you have had, between January 1, 2019, and the present regarding the social media platform Parler.com or Parler Inc."  *Id.*  The CID had a response date of February 2, 2021.  *Id.*

AG Paxton issued a press release along with the CID ("Press Release"), which he disseminated using his Twitter account, knowing it would reach Twitter in California.  The Press Release expressly links the issuance of the CID to Twitter's suspension of President Trump's account.  Williams Decl. Ex. B.  The Press Release states,

> For years, these Big Tech companies have silenced voices in the social media sphere and shut down competing companies and platforms. It has only grown worse in recent months. And just last week, this discriminatory action included the unprecedented step of removing and blocking President Donald Trump from online media platforms.

*Id.* After issuing the CID, AG Paxton continued to make his motive plain. In an interview at the 2021 Conservative Political Action Conference, he stated that his office is undertaking "an investigation . . . related to the whole issue of the president being de-platformed," and described his goal of ensuring that content moderation decisions made by online platforms—including Twitter—be "regulated." *See* Crossroads with Joshua Philipp, *CPAC 2021: AG Ken Paxton on Immigration Lawsuit, and Protecting Constitution Against Federal Orders* (Feb. 27, 2021), https://www.youtube.com/watch?v=Mw4JzxYuoOo. On January 14, 2021, AG Paxton's office purported to serve the CID on Twitter's headquarters in San Francisco by certified mail. Williams Decl. Ex. E. At the time, Twitter's headquarters remained closed to all but a few necessary employees due in part to threats of violent protests in the vicinity of its offices arising from its content moderation decisions during and after the attack on the U.S. Capitol. Williams Decl. ¶ 7.

### E. TWITTER'S SUBSEQUENT INTERACTIONS WITH THE TEXAS ATTORNEY GENERAL'S OFFICE

Despite believing the CID was improper and retaliatory, Twitter made a good faith effort to engage with AG Paxton's office in an attempt to narrow the scope of the CID and retained external counsel ("Counsel") to meet with AG Paxton's staff and formulate its response to the CID. Williams Decl. ¶ 8. Counsel arranged for extension of the CID's response date to March 2, 2021, and participated in telephonic meet-and-confers with AG Paxton's office on February 8 and February 24, 2021, to clarify the scope of the CID. Schottlaender Decl. ¶¶ 4-12. During the February 24 meeting, lawyers from Paxton's office declined Counsel's request to narrow the CID. *Id.* at ¶¶ 12-14 . When Twitter pointed out that the CID sought *all* of Twitter's internal content moderation policies, including policies on such subjects as suicide and self harm—whereas the press release focused solely on  political bias—AG Paxton's office did not agree to narrow their request. *Id.* at ¶ 13. With respect to the CID's demand for Twitter documents mentioning Parler,

Twitter's counsel pointed out that Twitter had not taken any steps to suspend Parler's Twitter or otherwise taken any content moderation actions with respect to Parler. *Id.* at ¶ 12. Nevertheless, lawyers from AG Paxton's Office still pressed for Twitter to produce more than two years of communications—both external and internal, without limitation by topic—related to Parler. *Id.* This meant that the mere mention of the word "Parler" had the potential to bring a document within the realm of the CID.

Thus far, Twitter has made three voluntary productions in response to the CID, totaling roughly 1,800 pages, including its: Terms of Service, Privacy Policies, rules regarding participation on its platform, advertising policies, blog posts, and written testimony to Congress regarding its content moderation policies. *Id.* at ¶¶ 5-10. AG Paxton's office nonetheless continues to demand from Twitter volumes of highly confidential, internal documents concerning Twitter's content moderation policies and practices and "all" communications regarding the social media platform Parler—even though Twitter has a clear First Amendment right to make its own content moderation decisions and has *never* suspended Parler's Twitter account or required Parler to remove content from the Twitter platform. Williams Decl. ¶ 22.

Counsel sought a further extension of Twitter's time to respond to the CID, but AG Paxton's Office declined to grant any extension beyond March 8, 2021—the date that Twitter has commenced this lawsuit and filed the present motion for emergency injunctive relief. *Id.* at ¶ 8.

## LEGAL STANDARD

To obtain a temporary restraining order or preliminary injunction, a plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 21 (2008)); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (standards for preliminary injunction and temporary restraining order are "substantially identical"). In this Circuit, "[t]he elements of [this] test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

1131 (9th Cir. 2011).  "For example, a stronger showing of irreparable harm to [a] plaintiff might offset a lesser showing of likelihood of success on the merits." *Id.*  Similarly, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction [or temporary restraining order], so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135; *accord Doe #1 v. Trump*, 984 F.3d 848, 870 (9th Cir. 2020).

## ARGUMENT

"Official reprisal for protected speech offends the Constitution" because it "threatens to inhibit exercise of the protected right."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal quotation marks omitted).  So courts have long recognized a "clearly established right under the First Amendment to be free from retaliation in the form of *threatened* legal sanctions and other similar means of coercion, persuasion, and intimidation."  *Sampson v. Cty. of Los Angeles by & through Los Angeles Cty. Dep't of Children & Family Servs.*, 974 F.3d 1012, 1020 (9th Cir. 2020) (emphasis added); *see also El Dia, Inc. v. Governor Rossello*, 165 F.3d 106, 109 (1st Cir. 1999) (calling it "obvious" that efforts "to punish political speech by members of the press and to attempt to coerce commentary favorable to the government would run afoul of the First Amendment").  AG Paxton's abusive investigation and CID are exactly that—an "official reprisal" against Twitter for engaging in content moderation decisions protected by the First Amendment, specifically designed to intrude on Twitter's internal editorial processes.

Twitter thus seeks a temporary restraining order and preliminary injunction to stop AG Paxton from continuing his unlawful conduct until Twitter's constitutional claim can be fully briefed and heard.  Twitter would be irreparably injured in the absence of such relief, whereas AG Paxton's legitimate interests would not be measurably affected by the delay.  And the public's interest in the freedom to speak without government interference unquestioningly weighs in favor of relief.

## I.  TWITTER IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM

Twitter's retaliation claim is straightforward.  Twitter made content moderation decisions that AG Paxton did not like (including the decision to permanently suspend President Trump's

Twitter account), and AG Paxton decided to use his official law enforcement authority to punish Twitter, presumably in the hope that Twitter would back down and shy away from restricting content he prefers. This is precisely what the First Amendment forbids.

To prevail on a claim for First Amendment retaliation, a plaintiff must show that it "(1) was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006). Once a plaintiff makes such a showing, "the defendant can prevail only by showing that the [conduct at issue] would have been initiated without respect to retaliation." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019). AG Paxton's retaliatory investigation easily meets each prong of this test.

### A. TWITTER'S CONTENT MODERATION DECISIONS ARE PROTECTED BY THE FIRST AMENDMENT

When Twitter makes decisions about the content that appears on its platform—including when it suspends an account or restricts a Tweet—it engages in classic First Amendment activity. Just like a newspaper or bookstore, Twitter provides a platform for disseminating ideas. And, just like a newspaper editor or bookstore owner, Twitter makes decisions about what content to disseminate or not disseminate through its platform. The First Amendment protects this "exercise of editorial control and judgment." *Tornillo*, 418 U.S. at 257-258; *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 391 (1973) ("[W]e reaffirm unequivocally the protection afforded to editorial judgment."). The Supreme Court has affirmed the right to exercise such editorial judgment in a wide-range of contexts, from parade organizers, *see Hurley v. Irish-American Gay, Lesbian & Bisexual Group*, 515 U.S. 55, 559 (1995), to cable television operators, *see Leathers v. Medlock*, 499 U.S. 439 (1991).

The same principle applies online. As the Ninth Circuit has emphasized, "online speech stands on the same footing as other speech." *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011); *accord Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997) (holding that there is "no basis for qualifying the level of First Amendment scrutiny that should be applied

1    to" the Internet); *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237

2    (2d Cir. 2019) ("As a general matter, social media is entitled to the same First Amendment

3    protections as other forms of media."). The case of *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433

4    (S.D.N.Y. 2014), is particularly instructive. The court in *Baidu* considered whether a search

5    engine's alleged decision "to favor certain expression on core political subjects over other

6    expression on those same political subjects" was protected by the First Amendment. *Id.* at 440.

7    The answer was obvious: the court found that in deciding what results it would serve, the search

8    engine was "exercis[ing]" precisely the sort of "editorial discretion" the Supreme Court held was

9    protected in *Tornillo*. *Id.* at 439-441. Twitter's First Amendment right to moderate content is at

10   least as strong as that of the search engine in *Baidu*.

11       AG Paxton's CID and investigation take direct aim at precisely this type of protected

12   editorial judgment. For years, and just before launching the investigation and issuing the CID

13   itself, AG Paxton announced that Twitter should stop blocking so-called conservative content.

14   And as he stated in the accompanying press release, his CID and investigation were prompted by

15   a high-profile moderation decision: Twitter's decision to "deplatform[]" President Trump.

16   Williams Decl. Ex. B. But "the very choice of material" to display on Twitter "garners

17   independent constitutional protection," just as the First Amendment bars laws "forc[ing] news

18   publishers to speak in a way they would not otherwise." *Washington Post v. McManus*, 944 F.3d

19   506, 518 (4th Cir. 2019). Courts have routinely applied this principle to the kinds of content

20   moderation decisions targeted by the CID and investigation. *See, e.g.*, *La'Tiejira v. Facebook,*

21   *Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (observing that Facebook has a "First Amendment

22   right to decide what to publish and what not to publish on its platform"); *Davison v. Facebook,*

23   *Inc.*, 370 F. Supp. 3d 621, 629 (E.D. Va. 2019) ("Facebook has, as a private entity, the right to

24   regulate the content of its platforms as it sees fit."), *aff'd*, 774 F. App'x 162 (4th Cir. 2019).

25       The First Amendment also casts an especially dim view on efforts by law enforcement to

26   probe the particular sorts of documents demanded by the CID—documents reflecting and

27   revealing Twitter's internal editorial policies and procedures. As the Supreme Court has

28   explained, courts must carefully police even legitimate investigations to ensure they do not "deter

1   normal editorial and publication decisions." *Zurcher v. Stanford Daily*, 436 U.S. 547, 566 (1978).

2   In *Zurcher*, that risk was avoided because the search warrant under review sought specific, narrow

3   evidence (photographs of an individual crime scene) and thus would not offer "any occasion or

4   opportunity for officers to rummage at large in newspaper files." *Id.*  This CID, in contrast, is a

5   fishing expedition designed to let AG Paxton "rummage at large" within Twitter's most sensitive

6   policies and procedures, "intrud[ing] into" and "deter[ring] normal editorial and publication

7   decisions." *Id.*; *see also Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) (recognizing the "[t]he

8   threat of administrative and judicial intrusion into the newsgathering and editorial process," in

9   light of the First Amendment interests at stake (internal quotation marks omitted) (alterations in

10  original)).  And AG Paxton has not agreed to narrow the CID in any way.

11      AG Paxton's professed intent to probe whether there is political bias in Twitter's

12  moderation decisions only bolsters the conclusion that his investigation has no legitimate purpose

13  and represents unconstitutional retaliation.  In fact, Twitter does not moderate content on the basis

14  of politics.[4]  Rather, it strives to restrict or remove what it judges to be harmful content in an

15  impartial fashion.  *Supra*, at 3.  But if Twitter's content moderation decisions were not politically

16  neutral, that would be an especially protected editorial judgment because such a decision would

17  itself be *political* speech—the very pinnacle of what the First Amendment protects.  *See, e.g.*,

18  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) ("[P]olitical expression . . .

19  occupies the core of the protection afforded by the First Amendment." (internal quotation marks

20  omitted)); *Muir v. Alabama Educ. Television Comm'n*, 656 F.2d 1012, 1023 (5th Cir. 1981), *on*

21  *reh'g*, 688 F.2d 1033 (5th Cir. 1982) (holding that a broadcaster has a First Amendment right to

22  make "'political' programming decisions").  The First Amendment obviously does not require

23  neutrality from individual newspapers, websites or others disseminating content.  Rather, it

24

25  ────────────────

    [4] The claim that Twitter is biased against conservatives has been repeatedly debunked.  *See, e.g.,*

26  Barrett & Sims, *False Accusation:  The Unfounded Claim that Social Media Companies Censor
    Conservatives*, NYU Stern Ctr. for Bus. and Human Rights (Feb. 2021),

27  https://tinyurl.com/yeekmz2a; Mukerjee, et al., , *Our Study Found Little Evidence that Twitter is
    Biased Against Conservative Opinion Leaders*, WASHINGTON POST (July 9, 2020),

28  https://tinyurl.com/j5cyathm.

1  precludes *the government* from investigating whether they are neutral, or from imposing

2  consequences if they are not.

3  **B.   THE CID AND ASSOCIATED INVESTIGATION CHILL TWITTER FROM**

4  **CONTINUING TO ENGAGE IN PROTECTED ACTIVITIES**

5      AG Paxton's conduct meets the second prong of the retaliation test because his public

6  announcement and commencement of an investigation directed at Twitter, and his issuance of a

7  highly burdensome and intrusive CID, "would chill or silence a person of ordinary firmness from

8  future First Amendment activities." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 916 (9th Cir. 2012).

9  To prove this factor, Twitter "need not show [its] 'speech was actually inhibited or suppressed.'"

10  *Id.* Nor is some final, formal punishment required. Indeed, official actions that "might well be

11  unexceptionable if taken on other grounds" can be the basis for a retaliation claim when motivated

12  by a plaintiff's protected activity. *Hartman*, 547 U.S. at 256. "[A]n act of retaliation as trivial as

13  failing to hold a birthday party for a public employee," "when intended to punish her for exercising

14  her free speech rights," may suffice. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 n.8

15  (1990).

16      AG Paxton's conduct here would clearly "chill or silence a person of ordinary firmness

17  from future First Amendment activities." *Lacey*, 693 F.3d at 916. He has repeatedly stated his

18  intent to aggressively investigate perceived "anticonservative bias" at Twitter and the rest of "Big

19  Tech." Shortly after Twitter permanently suspended President Trump from its platform, moreover,

20  AG Paxton said he was ready to "fight" Twitter with "all I've got." *Supra*, at 8. Because AG

21  Paxton is Texas's chief law enforcement officer, "all he's got" is quite a bit. The CID is AG

22  Paxton's first move—but he has publicly declared that the full machinery of his office is targeted

23  at Twitter, with the transparent intention of pressuring the company (and others similarly situated)

24  into making moderation decisions that align with his political views. Faced with the force of such

25

26

27

28

an investigation, "a person of ordinary firmness" would feel constrained from future exercises of the protected activity that prompted AG Paxton's assault.[5]

Consider a City Attorney aggrieved by the *San Francisco Chronicle*'s decision to stop carrying her favorite (liberal) columnist. Were the City Attorney to respond with subpoenas for the newspaper's policies and procedures for determining who populates its op-ed page, surely the City Attorney could not defend her conduct by saying it was unlikely her probing would actually lead to changed editorial decisions. The First Amendment forbids putting editors in fear that judgments resented by powerful politicians will lead to their deliberative processes being laid open before a hostile official with a large public megaphone and the power to prosecute. That bedrock principle controls here. Indeed, it applies with the greatest possible force here, where the motivation for the retaliation is not only political in nature, but also aimed at chilling Twitter's editorial decision to remove a speaker whose Tweets it reasonably determined could contribute to further violence.

The fact that AG Paxton has only served the CID and has not yet sued to enforce it does not matter. The First Amendment protects against "retaliation in the form of *threatened* legal sanctions and other similar means of coercion, persuasion, and intimidation." *Sampson*, 974 F.3d at 1020 (emphasis added). In *Ulrich v. City & County. of San Francisco*, 308 F.3d 968 (9th Cir. 2002), for example, the court held that an investigation of a doctor that did not yet impose—but implicitly carried the threat of—revocation of his clinical privileges was actionably adverse, *id.* at 977. The investigation here, with its threat of an enforcement action under Texas's consumer protection laws, is no different. Similarly, the Ninth Circuit has held that an investigation by agency officials "unquestionably chilled the plaintiffs' exercise of their First Amendment rights," even though the officials "did not ban or seize the plaintiffs' materials, and . . . ultimately decided not to pursue either criminal or civil sanctions against them." *White v. Lee*, 227 F.3d 1214, 1228

---

[5] The CID also imposes direct financial costs on Twitter, because it calls for a costly, large-scale production of documents. *See infra*, at 10; Williams Decl. ¶ 10. A person of "ordinary firmness" would think twice about speaking if, after she did so, she had to hire outside counsel to review and produce thousands of documents. *See supra*, at 10; Williams Decl. ¶ 8.

1   (9th Cir. 2000).[6]  Taken together, the CID, investigation, and associated public pressure are just

2   like the "unwarranted criminal investigations" or "campaigns of harassment and humiliation" the

3   Ninth Circuit has held to be actionable retaliation.  *Coszalter v. City of Salem*, 320 F.3d 968, 975

4   (9th Cir. 2003); *see also Greisen v. Hanken*, 925 F.3d 1097, 1114 (9th Cir. 2019) ("[R]etaliatory

5   speech may serve as the basis for a First Amendment retaliation claim when it intimates that some

6   form of punishment or adverse regulatory action would follow." (internal quotation marks and

7   alterations omitted)).[7]

8        AG Paxton himself has—when it suited his political views—fully endorsed this position.

9   When the Democratic Attorney General of Massachusetts served a CID on Texas-based Exxon,

10   AG Paxton did not hesitate to go into federal court in Texas to explain how it would chill the First

11   Amendment rights of one of the largest and most powerful companies in the world.  In AG

12   Paxton's words:  "the issuance and threat of compelling a response to [a] CID" will "silence" the

13   recipient and "chill the expression of points of view." Sivaram Decl. Ex. A at 1, 6.  Having said

14   that of a CID directed to Exxon documents reflecting its understanding of climate change, AG

15   Paxton cannot today suggest that his threat to "fight" Twitter with all he has, immediately in the

16   wake of Twitter's decision to permanently suspend the Trump account, and his service of a CID

17   demanding highly sensitive documents about its editorial judgments, is somehow harmless.

18   Rather, AG Paxton's prior statements confirm that he knew his actions would have a chilling

19   effect; that is why he took them.

20

21

22

23

24   [6] *White* did not involve a retaliation claim, but courts frequently rely on the decision's discussion
     of the chilling effect of investigations in this context.  *See, e.g.*, *Mulligan v. Nichols*, 835 F.3d 983,
     989 n.5 (9th Cir. 2016); *Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012).

25   [7] The Fifth Circuit's decision in *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016), finding a

26   challenge to an administrative subpoena premature before the state had sought to enforce it, is not
     binding, and is inconsistent with this Circuit's precedents confirming that defendants may sue to

27   challenge the "coercion, persuasion and intimidation" resulting from threatened enforcement
     action.  *Sampson v. Cty. of Los Angeles by & through Los Angeles Cty. Dep't of Children & Family*

28   *Servs.*, 974 F.3d 1012, 1020 (9th Cir. 2020).

1
2
3

### C.   AG PAXTON'S PUBLICLY ANNOUNCED INVESTIGATION AND BURDENSOME CID WERE TRANSPARENTLY IN REACTION TO, AND MOTIVATED BY, TWITTER'S EDITORIAL DECISIONS

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

Finally, Twitter will be able to show that its protected editorial judgments were "a substantial or motivating factor in [AG Paxton's] conduct." *Pinard*, 467 F.3d at 770.  Retaliation cases sometimes involve difficult causation questions.  Not this one.  The CID and accompanying Press Release specifically mention Twitter's protected activities, including its internal content moderation policies and practices, discussions about those policies and practices, and the decision to permanently suspend President Trump's account.   Williams Decl. Ex. B.  This kind of direct evidence of retaliatory motive is strong proof of causation. *See Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 870-871 (9th Cir. 2016) (statements of government board members criticizing political activity of plaintiffs supported causation).  Further, the CID was issued just four days after Twitter permanently suspended President Trump's Twitter account—itself a protected act, *see supra*, at 12-14—which again strongly evinces retaliatory intent. *Arizona Students' Ass'n*, 824 F.3d at 870 ("[A] plaintiff may rely on evidence of temporal proximity between the protected activity and alleged retaliatory conduct to demonstrate that the defendant's purported reasons for its conduct are pretextual or false."); *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) ("A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action."). [8]

21
22
23
24
25
26

AG Paxton cannot defend the CID on a theory that it was issued to advance a legitimate investigation.  "Bias" in the media is not a legitimate subject of law enforcement scrutiny.  The First Amendment protects the right to decide what to disseminate whether or not others perceive those choices as biased, as they inevitably will. *See, e.g.*, *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 510 (9th Cir. 1988) ("The danger inherent in government editorial oversight, even in the

27
28

---

[8] For these same reasons, Twitter will ultimately be able to prove that its protected activity was the but-for cause of the retaliatory CID and investigation. *See Nieves v. Bartlett,* 139 S. Ct. 1715, 1722 (2019).

1  interest of 'balance,' is well established."); *Washington Post*, 944 F.3d at 513-514; *Muir*, 656 F.2d

2  at 1023.  And AG Paxton cannot avoid this bedrock principle by pretending to investigate not bias

3  itself, but the purported accuracy of Twitter's public statements about whether it is biased.  Such

4  an inquiry of Twitter would be no more legitimate than an investigation of statements by traditional

5  media outlets such as newspapers or cable news networks regarding their editorial philosophies

6  (for example, that they are "Fair and Balanced" or deliver "All the News That's Fit to Print").

7  Investigation of such statements are plainly pretextual, aimed not at probing deception but proving

8  bias in a disfavored speaker, something the government simply may not do.  "[B]raggadocio about

9  [a platform's] commitment to free speech . . . are classic, non-actionable opinions or puffery."

10  *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020); *see also Murphy v. Twitter*, 74

11  Cal. Rptr. 3d 360, 382, (Cal. Ct. App. 2021) ("Twitter's general declarations of commitment to

12  free speech principles cannot support a fraud claim.").

13        In all events, any claim AG Paxton might make about a legitimate investigative purpose

14  would carry little weight when considered against the overwhelming evidence of retaliatory motive

15  identified above.  It is not enough for him to identify a state law under which a legitimate

16  investigation could theoretically proceed.  *Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir.

17  2021) (holding that state actors "must show more than that they *could* have" taken the same action

18  "in the absence of the protected speech" (internal quotation marks omitted).  Instead, AG Paxton

19  would have to prove that he "*would* have" taken the same investigatory steps in the absence of

20  Twitter's protected activity.  *Id* So as AG Paxton himself proclaimed in challenging the legitimacy

21  of Massachusetts' CID to Exxon, the Court need not defer to his "claim[ed] . . . interest in consumer

22  protection," but can instead see the demand for what it is: an attempt to retaliate against Twitter

23  for its speech.  Paxton Am. Brief at 4.

24  **II.   PLAINTIFF WOULD BE IRREPARABLY INJURED ABSENT IMMEDIATE INJUNCTIVE RELIEF**

25        Twitter has already suffered irreparable injury as a result of AG Paxton's unlawful

26  retaliation and will suffer additional and immediate, irreparable harm absent a TRO.  "[T]he loss

27  of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

28  irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  For this reason, "under the law of

this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-1002 (9th Cir. 2005). Here, Twitter's First Amendment claim is not just colorable: it is substantial. AG Paxton transparently retaliated for Twitter's core First Amendment conduct—including the decision to permanently suspend President Trump's account—and did so in a way AG Paxton himself has recognized is particularly likely to chill free speech. So long as AG Paxton's investigation continues and his CID demands remain pending, Twitter will be forced to weigh the burdens of facing further intimidation tactics by government actors—including the resource expenditure and other costs that those tactics impose—each time it makes an editorial determination that fails to meet AG Paxton's preferences. That alone is sufficient to establish irreparable injury.

And here, the sting of retaliation is sharpened by the unconstitutional choice that AG Paxton has thrust on Twitter. AG Paxton demands, among other things, copies of all of Twitter's internal "policies and procedures related to content moderation on your platform, including any policies or procedures that limit the reach or visibility of content intended for public viewers." *See* Williams Decl. Ex. E. These content moderation documents are confidential for good reason: confidentiality permits the company's employees to speak freely in deliberations on sensitive issues that arise while enforcing the company's User Agreement and prevents bad-faith actors from flouting the company's techniques for identifying and restricting access to dangerous or otherwise prohibited conduct. Williams Decl. ¶ 17. Just as permitting law enforcement to dissect the minutes of a newspaper's editorial board meetings would inhibit its editorial process, permitting AG Paxton to view the details of Twitter's internal content practices would inhibit its editorial discretion. And there is no guarantee that disclosure of Twitter's internal content moderation policies and procedures would be limited to AG Paxton. While Texas law provides some confidentiality protections for produced materials, those protections are far less than those afforded to federal grand jury material. *See* Fed. R. Crim. Proc. 6(e). The rules permit AG Paxton to use produced materials "as [he] determines necessary," and to file them in open court, and requires court permission to do so only if the materials are "trade secrets." Tex. Bus. & Com.

Code § 17.61(f).  Yet, AG Paxton's office has refused to commit to any more robust confidentiality protections.  Schottlaender Decl. ¶ 14.

Twitter thus faces an untenable choice.  Either turn over highly sensitive, confidential materials or face legal sanction from a state's highest-ranking law enforcement official for refusing to do so.  Either option threatens to inhibit Twitter's editorial discretion in practice.  A "chill on . . . free speech rights—even if it results from a *threat* of enforcement rather than actual enforcement—constitutes irreparable harm."  *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (emphasis added).  And because Twitter's injury arises from being put to the choice, rather than from the consequences of any particular decision, the choice itself must be enjoined to prevent constitutional injury.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 380-381 (1992) (irreparable harm where entity "faced with a Hobson's choice": "violate the . . . law and expose themselves to potentially huge liability" or "suffer the injury of obeying the law"); *Coll. Republicans of Univ. of Washington v. Cauce*, No. 18-CV-189, 2018 WL 804497, at *3 (W.D. Wash. Feb. 9, 2018) (forcing plaintiffs to "choose whether to cancel [a rally] or face the prospect of a fee" constitutes irreparable First Amendment injury).

Twitter understands that its decisions to either remove or place context around content on its service in accordance with the Twitter Rules will sometimes lead to public attention and debate.  Williams Decl. ¶ 12.   But Twitter should not have to weigh—in making decisions regarding whether to allow content that may incite offline violence—the prospect that whenever government officials disagree with those judgments, they will be able to punish Twitter by imposing the costs and risks of responding to burdensome subpoenas or being subject to intrusive investigations.  An injunction is necessary to prevent that ongoing and unconstitutional injury.

## III.   THE REMAINING EQUITABLE FACTORS FAVOR GRANTING IMMEDIATE INJUNCTIVE RELIEF

When evaluating the balance of equities and the public's interests in a case where a government entity is a party, the "analysis of these two factors merges."  *Tandon v. Newsom*, No. 20-CV-07108, 2021 WL 411375, at *41 (N.D. Cal. Feb. 5, 2021) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).  Yet a showing of harm to the government does

not "command[] the conclusion that the public interest weighs entirely in favor of whichever outcome the government seeks." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020). The Ninth Circuit has "consistently balanced the public interest on the side of the plaintiffs against the public interest on the side of the government to determine where the public interest lies." *Id.*

In weighing the respective equities and interests in First Amendment cases, specifically, "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012). "[S]erious First Amendment questions compel a finding that the balance of hardships tips sharply in the plaintiffs' favor," *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (internal quotation marks omitted), and "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d at 990, 1002 (9th Cir. 2012) (internal quotation marks omitted); *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (balance of equities favor party "whose First Amendment right are being chilled"); *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (recognizing the "significant public interest" in upholding free speech principles) (internal quotation marks omitted).

Under this standard, it is clear that both the equities and public interest strongly favor Twitter. As described above, the pendency of AG Paxton's CID not only significantly impairs Twitter's ability to engage in constitutionally protected activity, but also works real and significant harms on the organization. Absent a TRO, the very threat that Twitter might be forced to disclose its sensitive, internal editorial judgments to AG Paxton would color every decision the company makes about content moderation. Williams Decl. ¶¶ 12-14. Twitter would no longer have the freedom to make its own judgments about what content should appear on the platform; those judgments would be hampered by fear that some disgruntled state actor would issue a burdensome CID to punish that judgment. *Id.* The loss of that freedom, even for limited periods of time, is a First Amendment injury. *See supra, at* 19-20.

1   AG Paxton's purported interests in investigating Twitter's content moderation policies for

2   compliance with Texas deceptive advertising laws are wholly insufficient to overcome the

3   significant concerns weighing in favor of a TRO—even if they were not entirely pretextual.  In

4   any event, the public interest is not served by allowing him to interpret and enforce those laws in

5   an unconstitutional manner—namely one that would enable him to use his law enforcement powers

6   to intrude on Twitter's editorial decisions.  Such an interpretation would undermine the public

7   interest by running afoul of the First Amendment.  *See Zurcher*, 436 U.S. at 566 (search warrant

8   would not permit law enforcement to "intrude into or to deter normal editorial and publication

9   decisions").

10      Any claim that AG Paxton's CID and investigation are motivated by a desire to protect

11  Texas consumers is undermined by his own statements confirming that his office sought Twitter's

12  internal content moderation policies out of concern that Twitter is politically biased.  *See supra* at

13  18-19.  The far-reaching scope and breadth of AG Paxton's demands, too, call into question any

14  professed consumer-protection motivation, as do the constitutional and legal limitations on his

15  ability to conduct an investigation into Twitter's content moderation practices.  *See supra* at 16.

16  On balance, therefore, the equities and the public interest tip heavily in favor of Twitter.

## CONCLUSION

18      As AG Paxton himself publicly professed, "[t]he authority attorneys general have to

19  investigate fraud does not allow them to encroach on the constitutional freedom of others."

20  Sivaram Decl. Ex. A at 5.  He also declared, "[r]egrettably, history is embroiled with examples

21  where the legitimate exercise of law enforcement is soiled with political ends rather than legal

22  ones."  *Id.* at 9.  That is plainly the situation before the Court today.  The Court should grant

23  Twitter's application for a temporary restraining order and enjoin AG Paxton's enforcement of the

24  CID and retaliatory investigation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

___/s/_ Mark D. Flanagan_____

PATRICK J. CAROME (*pro hac vice* pending)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice* pending)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

PETER G. NEIMAN (*pro hac vice* pending)
peter.neiman@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
250 Greenwich St., 45 Floor
New York, New York 10007
Telephone: (212) 295-6487
Facsimile: (202) 663-6363

MARK D. FLANAGAN
CA Bar No. 130303
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

***Attorneys for Plaintiff***
**TWITTER, INC.**

1

## **CERTIFICATE OF SERVICE**

2        I, Mark D. Flanagan, herby certify that on March 8, 2021, I served the attached document

3  via electronic mail upon the following address, per consent of all parties.

4

5        Brad.schuelke@oag.texas.gov

6

7  DATED: March 8, 2021          /s/ Mark D. Flanagan

8                      Mark D. Flanagan

MARK D. FLANAGAN (CA Bar No. 130303)
9                  mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
10               HALE AND DORR LLP
2600 El Camino Real, Suite 400
11               Palo Alto, California 94306
Telephone:  (650) 858-6047
12               Facsimile:  (650) 858-6100

13               ***Attorney for Plaintiff***
**TWITTER, INC.**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28