MAYER BROWN LLP
ANDREW J. PINCUS (*pro hac vice*)
*apincus@mayerbrown.com*
1999 K Street, NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

MAYER BROWN LLP
DOUGLAS A. SMITH (SBN 290598)
*dougsmith@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, California 90071-1503
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

*Attorneys for* Amicus Curiae *Internet Association*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| TWITTER, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>KEN PAXTON, in his official capacity as Attorney General of Texas<br><br>Defendant. | Case No. 3:21-cv-01644-MMC<br><br>**INTERNET ASSOCIATION'S *AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFF TWITTER'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Hon. Maxine M. Chesney |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

INTEREST OF THE *AMICUS CURIAE* ............................................................................... 1

SUMMARY OF ARGUMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................ 2

    I.    Content Moderation Is Essential To The Functioning Of Social Media Platforms—And Those Moderation Decisions Are Protected By The First Amendment. ............................ 2

        A.    Social Media Companies Utilize Content Moderation To Provide Attractive And Responsible User Experiences By Eliminating Inappropriate And Objectionable Material From Their Platforms. ................................................................................ 2

        B.    Content Moderation Standards And Decisions Are Protected By The First Amendment. ........................................................................................................... 8

CONCLUSION ......................................................................................................................... 9

- i -

INTERNET ASSOCIATION'S AMICUS CURIAE BRIEF IN SUPPORT OF
PLAINTIFF TWITTER'S MOTION FOR A PRELIMINARY INJUNCTION
CASE NO. 3:21-CV-01644-MMC

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ...................................................................................................8

*Bullfrog Films, Inc. v. Wick*,
  847 F.2d 502 (9th Cir. 1988) ......................................................................................8

*Goldblum v. Nat'l Broad. Corp.*,
  584 F.2d 904 (9th Cir. 1978) ......................................................................................8

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) ...............................................................................................2, 8

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) ...................................................................................................8

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
  928 F.3d 226 (2d Cir. 2019) .......................................................................................8

*Med. Lab'y Mgmt. Consultants v. Am. Broad. Companies, Inc.*,
  306 F.3d 806 (9th Cir. 2002) ......................................................................................8

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974) ...............................................................................................2, 8

*Nieves v. Bartlett*,
  139 S. Ct. 1715 (2019) ...............................................................................................9

*Reno v. ACLU*,
  521 U.S. 844 (1997) ...................................................................................................8

*Turner Broadcasting System, Inc. v. FCC*,
  512 U.S. 622 (1994) ...................................................................................................8

**Other Authorities**

Account and Community Restrictions - Do Not Post Sexual of Suggestive Content
  Involving Minors, REDDIT, INC., https://www.reddithelp.com/hc/en-us/articles/
  360043075352 ............................................................................................................4

Alison Grace Johansen, *Deepfakes: What they are and why they're threatening*,
  NORTONLIFELOCK, https://us.norton.com/internetsecurity-emerging-threats-
  what-are-deepfakes.html ............................................................................................7

Community Guidelines - Developing Policies, YOUTUBE, https://www.youtube.
  com/howyoutubeworks/policies/community-guidelines/#developing-policies ......................... 4

Community Guidelines, SNAP, INC., https://www.snap.com/en-
  US/communityguidelines ................................................................................................. 3

Community Standards – Account Integrity & Authentic Identity, FACEBOOK,
  https://www.facebook. com/communitystandards/misrepresentation ................................. 4

Community Standards – Bullying & Harassment, FACEBOOK, https://www.
  facebook.com/communitystandards/bullying ............................................................... 3, 5

Community Standards - Authenticity, AIRBNB, INC., https://www.airbnb.com/trust/
  standards ........................................................................................................................ 5

Community Standards, AIRBNB, https://www.airbnb.com/trust/standards ................................. 4

Daisy Soderberg-Rivkin, *Five myths about online content moderation, from a
  former content moderator*, R STREET INSTITUTE (Oct. 30, 2019),
  https://www.rstreet.org/2019/10/30/five-myths-about-online-content-
  moderation-from-a-former-content-moderator .............................................................. 3

*Daly Kos: Rules of the Road*, KOS MEDIA, LLC, https://www.dailykos.com/rules-
  of-the-road ..................................................................................................................... 5

*Facebook by the Numbers*, OMNICORE,
  https://www.omnicoreagency.com/facebook-statistics ................................................... 6

General Guidelines and Policies - Abusive Behavior, TWITTER, INC.,
  https://help.twitter.com/en/rules-and-policies/ abusive-behavior .................................... 3

Guidelines for Traveler Reviews, TRIPADVISOR, LLC,
  https://www.tripadvisorsupport.com/hc/en-us/articles/200614797-Our-
  guidelines-for-traveler-reviews ....................................................................................... 5

Jason A. Gallo & Clare Y. Cho, CONG. RSCH. SERV. R46662, SOCIAL MEDIA:
  MISINFORMATION AND CONTENT MODERATION ISSUES FOR CONGRESS 1
  (2021), https://crsreports.congress.gov/product/pdf/R/R46662 .................................... 7

Laura Hanu, James Thewlis & Sasha Haco, *How AI Is Learning To Identify Toxic
  Online Content*, SCIENTIFIC AMERICAN (2021) ............................................................... 6

LinkedIn Professional Community Policies, LINKEDIN, https://www.linkedin.
  com/help/linkedin/answer/34593/linkedin-professional-community-policies .............. 4

Mind-Blowing LinkedIn Statistics and Facts, KINSTA, INC.: KINSTA BLOG (Mar 18,
  2021), https://kinsta.com/blog/linkedin-statistics ........................................................ 6

Pew Research Center, Social Media Fact Sheet,
   https://www.pewresearch.org/internet/fact-sheet/social-media/#social-media-
   use-over-time (last visited Mar. 24, 2021) ..................................................................................1

Platform Manipulation and Spam Policy, General Guidelines and Policies,
   TWITTER, INC., https://help.twitter.com/en/rules-and-policies/platform-
   manipulation .............................................................................................................................5

Professional Community Policies, LINKEDIN,
   https://www.linkedin.com/legal/professional-community-policies .......................................3, 5

PwC, The quest for truth: content moderation in action,
   https://www.pwc.com/us/en/-industries/tmt/library/content-moderation-quest-
   for-truth-and-trust.html (last visited Mar. 24, 2021) .................................................................7

Reddit Content Policy, REDDIT,
   https://www.redditinc.com/policies/contentpolicy-1 .................................................................4

Trust & Safety - Community Standards, AIRBNB, INC.,
   https://www.airbnb.com/trust/ standards ..................................................................................3

YouTube For Press, YOUTUBE: OFFICIAL BLOG, https://blog.youtube.com/press/ .........................6

## INTEREST OF THE *AMICUS CURIAE*[1]

Internet Association ("IA") represents the interests of the Nation's leading internet companies and their customers. Its members include companies whose products and services enable people throughout the country and the world to express themselves, both privately and publicly.[2]

IA seeks to protect internet freedom and free speech, promote innovation and economic growth, and empower customers and users. *Amicus*'s members serve as platforms for communications and services for billions of users, and the success of these online businesses—and the vitality of online media generally—depends on their ability to adopt and enforce robust community standards governing the content of their websites, which are tailored to the purposes of the website and the needs of its users. *Amicus* and its members have a substantial interest in whether the First Amendment permits government officials to use their authority to investigate, second guess, or penalize decisions by online services regarding the removal of specific content on their platforms or suspension of specific users from their websites, particularly if that government action is in retaliation for such decisions made by an online services provider.

## SUMMARY OF ARGUMENT

Seventy-two percent of American adults use some type of social media.[3] "For many users, social media is part of their daily routine," with more that 40% of the users of leading platforms visiting the sites daily and more than seventy percent visiting weekly.[4] With such ubiquitous use, many Americans turn to social media to receive their news; engage in commentary; maintain relationships with family, friends, coworkers, and members of their communities—whether

---

[1] No counsel for a party authored this brief in whole or in part. No party, no party's counsel, and no person other than *Amicus* or its counsel made a monetary contribution intended to fund the preparation or submission of this brief. Plaintiff consents to the filing of this brief and Defendant does not oppose the filing of this brief.

[2] A complete list of Internet Association members is available at http://internetassociation.org/our-members/.

[3] Pew Research Center, Social Media Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/social-media/#social-media-use-over-time (last visited Mar. 24, 2021).

[4] *Id.*

- 1 -

neighbors, fellow members of a sports league, or other members of their church; and inform their everyday decisions. From determining what products or services to purchase or which local events to attend on a weekend, social media is integrated into every facet of life.

To ensure a quality user experience, internet companies exercise editorial discretion in the form of content moderation. This includes setting and enforcing rules against inappropriate, objectionable, and inaccurate material on their platforms, and—sometimes—temporarily or permanently suspending users who persist in violating the platforms' community standards. The rules adopted by internet companies vary from company to company and represent a judgment about what types of content are appropriate for the nature of a specific service, its target audience, and concerns about the impact of online content on offline conduct.

As with any decision that requires the exercise of judgment, there is room for healthy debate over those decisions. But where there is no room for debate is that such decisions are protected by the First Amendment—as the Supreme Court has held in a variety of contexts. *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) ("[t]he selection of contingents to make a parade"); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 251 (1974) (newspaper). The Texas AG's investigation violates this fundamental Constitutional safeguard.

## ARGUMENT

**I.   Content Moderation Is Essential To The Functioning Of Social Media Platforms—And Those Moderation Decisions Are Protected By The First Amendment.**

**A. Social Media Companies Utilize Content Moderation To Provide Attractive And Responsible User Experiences By Eliminating Inappropriate And Objectionable Material From Their Platforms.**

*Amicus*'s members provide online platforms through which users can share news and opinions, advertise goods, rate and review service businesses and vendors, search for housing, and interact with individuals around the globe. To offer these and myriad other services, these providers depend heavily on their right to regulate the content on their platforms, including by filtering, screening or otherwise preventing third-party users from posting material that violates the provider's content rules, which are sometimes referred to as "community standards."

Content moderation "provides a healthy and safe environment where users can upload their own products, posts or comments and comfortably engage with others.  It's a tool to improve user experience, ensure that platforms adhere to local and global laws, and helps users trust that they can interact through a platform or use a service without fear of being deceived."[5]

These community standards can vary enormously depending on a website's functions and goals, and may include, for example, prohibiting hate speech, requiring sellers to provide accurate information about their products, or penalizing users for artificially amplifying the significance of their posts (*e.g.*, by using fake accounts to increase the number of times a post is "liked").  Without the ability to prevent unwanted or offensive content, the services that *Amicus*'s members provide could become unsafe, unreliable, and therefore unattractive to users.

Thus, online providers have issued community standards prohibiting various categories of objectionable material from their websites, including:

- "Hate speech," such as content attacking someone based on race, ethnicity, national origin, religious affiliation, sexual orientation, caste, sex, gender, gender identity, and serious disease or disability.[6]

- "Bullying," "harassment," or "threats," such as conveying an intent to release "personally identifiable information" about another.[7]

- "Violent," "graphic," or "sexual" content.[8]

---

[5] Daisy Soderberg-Rivkin, *Five myths about online content moderation, from a former content moderator*, R STREET INSTITUTE (Oct. 30, 2019), https://www.rstreet.org/2019/10/30/five-myths-about-online-content-moderation-from-a-former-content-moderator/.

[6] Community Guidelines, SNAP, INC., https://www.snap.com/en-US/communityguidelines.

[7] Community Standards – Bullying & Harassment, FACEBOOK, https://www.facebook.com/communitystandards/bullying; General Guidelines and Policies - Abusive Behavior, TWITTER, INC., https://help.twitter.com/en/rules-and-policies/ abusive-behavior; Trust & Safety - Community Standards, AIRBNB, INC., https://www.airbnb.com/trust/standards.

[8] Professional Community Policies, LINKEDIN, https://www.linkedin.com/legal/professional-community-policies.

- Impersonating others, such as by creating a misleading profile assuming "to be or speak for another person or entity."[9]

In addition to these and other broad categories, providers have also adopted community standards prohibiting more targeted types of content, including material that sexually exploits or endangers children,[10] supports terrorism,[11] misrepresents commercial listings,[12] or artificially amplifies the apparent significance of content (*e.g.*, by manipulating the number of "votes," "likes," or "follows" a post receives).[13] These community standards are easily accessible through providers' websites and, in general, users must accept them as a pre-condition to posting content or otherwise accessing the platform.

Typically, platform operators are also clear about why they have adopted their respective community standards, which are often tailored to achieve the specific goals of their platforms and "developed in partnership with a wide range of external industry and policy experts" as well as based on direct feedback from users.[14] For example, LinkedIn does not "allow content that attacks, denigrates, intimidates, dehumanizes, incites or threatens hatred, violence, prejudicial or discriminatory action against individuals or groups because of their actual or perceived race, ethnicity, national origin, caste, gender, gender identity, sexual orientation, religious affiliation, or

---

[9] Community Standards – Account Integrity & Authentic Identity, Facebook, https://www.facebook.com/communitystandards/misrepresentation.

[10] Account and Community Restrictions - Do Not Post Sexual of Suggestive Content Involving Minors, REDDIT, INC., https://www.reddithelp.com/hc/en-us/articles/ 360043075352.

[11] LinkedIn Professional Community Policies, LINKEDIN, https://www.linkedin.com/help/linkedin/answer/34593/linkedin-professional-community-policies? lang=en.

[12] Community Standards, AIRBNB, https://www.airbnb.com/trust/standards.

[13] Reddit Content Policy, REDDIT, https://www.redditinc.com/policies/contentpolicy-1.

[14] Community Guidelines - Developing Policies, YOUTUBE, https://www.youtube.com/howyoutubeworks/policies/community-guidelines/#developing-policies.

disability status."[15]  This and other rules in its "Professional community policies" are designed to make the LinkedIn "community a place where everyone is respectful, compassionate, and honest."[16]

The community standards adopted by online providers reflect the diversity of the internet itself, with each online provider adopting standards specifically tailored to the diverse needs of its particular community of users.  Social network platforms may implement protections to prevent harassment of younger users given that such content can "have more of an emotional impact on minors." [17] Retail and rental platforms may prohibit users from posting inaccurate product information given the importance of buyers knowing what they are purchasing.[18]  Platforms that compile user reviews may prohibit users from posting anonymous or irrelevant reviews, or may prevent users from reviewing their own, friends' or relatives' businesses. [19] And platforms frequented by influential figures may prohibit users from misleadingly impersonating such figures, which could deceive other users or disrupt financial markets.[20]  Indeed, a platform could have as its purpose only the dissemination of particular views on public policy or political questions.[21]

---

[15] Professional Community Policies, LINKEDIN, https://www.linkedin.com/legal/professional-community-policies.

[16] *Id.*

[17] Community Standards - Bullying and Harassment, FACEBOOK, https://www.facebook.com/communitystandards/bullying.

[18] Community Standards - Authenticity, AIRBNB, INC., https://www.airbnb.com/trust/ standards.

[19] Guidelines for Traveler Reviews, TRIPADVISOR, LLC, https://www.tripadvisorsupport.com/hc/en-us/articles/200614797-Our-guidelines-for-traveler-reviews.

[20] Platform Manipulation and Spam Policy, General Guidelines and Policies, TWITTER, INC., https://help.twitter.com/en/rules-and-policies/platform-manipulation.

[21] *See, e.g.*, *Daly Kos: Rules of the Road*, KOS MEDIA, LLC, https://www.dailykos.com/rules-of-the-road ("This is a site for Democrats. That's the fundamental premise underlying all expectations about posting, commenting, and interacting with other site users").

Further, *Amicus*'s members employ a multitude of general-purpose technologies to support their content moderation efforts, such as providing users with "report abuse" buttons and other mechanisms to flag problematic content or contact the companies with complaints. Members also devote significant staff and resources to monitoring, analyzing and enforcing compliance with their respective community guidelines. In addition, providers have invested significant resources in developing sophisticated software and algorithms to detect and remove harmful content. In many instances, they have shared these technologies to help others eradicate that harmful content as well. Social media platforms rely on "thousands of human reviewers" [22]—to enhance their ability to provide quick responses to evolving problems.

Flexibility has played a critical role in enabling platforms to experiment and thereby refine their approaches to content moderation over time. Moderating content is not easy given the almost unfathomable volumes of content online and the need to make sometimes-nuanced distinctions. For example:

- YouTube has over 2 billion users and over a billion hours of video viewed on its platform every day.
- Facebook has more than 2.6 billion users, who send 3 million messages every 20 seconds.
- LinkedIn has nearly 740 million members worldwide, with users who frequently engage with the platform, which has more than 1 billion interactions every month.[23]

Given the sheer number of decisions that need to be made, there are necessarily divergent views among the public and outside interested parties about content moderation decisions.

---

[22] Laura Hanu, James Thewlis & Sasha Haco, *How AI Is Learning To Identify Toxic Online Content*, SCIENTIFIC AMERICAN (2021), https://www.scientificamerican.com/article/can-ai-identify-toxic-online-content/.

[23] YouTube For Press, YOUTUBE: OFFICIAL BLOG, https://blog.youtube.com/press/; *Facebook by the Numbers*, OMNICORE, https://www.omnicoreagency.com/facebook-statistics/; Mind-Blowing LinkedIn Statistics and Facts, KINSTA, INC.: KINSTA BLOG (Mar 18, 2021), https://kinsta.com/blog/linkedin-statistics/.

Providers learn from, adapt, and update their approaches over time and have remained flexible in deciding what content is objectionable and how to prevent it from being posted. For example, many technology companies have been incorporating algorithms into their content moderation, such as Google's Jigsaw that aims to detect "toxic comments online."[24] And some social media companies have relatively recently banned "deepfake" videos, which use artificial intelligence to alter videos to mislead someone into thinking that the video's subject said or did something that in fact they did not.[25]

Content moderation decisions can be controversial. "[P]latform companies . . . have to make Solomon-like decisions about the veracity of this information. If they publish content that is clearly untrue, consumer backlash would likely be swift, threatening revenue and reputation. On the other hand, if platforms refuse to publish certain content, they may be accused of censorship, bias or having a political agenda."[26] A recent Congressional Research Service frames the dilemma posed by content moderation, stating that "[s]ome Members of Congress are concerned about social media dissemination of misinformation . . . and are exploring how social media platform operators can stop or slow that dissemination via content moderation," but "[o]ther Members' interest in content moderation relates to concerns that platform operators are moderating content that should not be restricted."[27] That highlights the dilemma that online services confront every day.

---

[24] *See supra* note 22.

[25] *See* Alison Grace Johansen, *Deepfakes: What they are and why they're threatening*, NORTONLIFELOCK, https://us.norton.com/internetsecurity-emerging-threats-what-are-deepfakes.html.

[26] PwC, The quest for truth: content moderation in action, https://www.pwc.com/us/en/industries/tmt/library/content-moderation-quest-for-truth-and-trust.html (last visited Mar. 24, 2021).

[27] Jason A. Gallo & Clare Y. Cho, CONG. RSCH. SERV. R46662, SOCIAL MEDIA: MISINFORMATION AND CONTENT MODERATION ISSUES FOR CONGRESS 1 (2021), https://crsreports.congress.gov/product/pdf/R/R46662.

### B. Content Moderation Standards And Decisions Are Protected By The First Amendment.

"[W]hatever the challenges of applying the Constitution to ever–advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)). The Supreme Court has held that its decisions "provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium [the Internet]." *Reno v. ACLU*, 521 U.S. 844, 870 (1997). Thus, "social media is entitled to the same First Amendment protections as other forms of media." *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019).

For decades, the Supreme Court and the Ninth Circuit have recognized that the First Amendment protects a speaker's decisions about which speech or speakers to include when creating a compilation of others' speech. *See Hurley*, 515 U.S. at 570 (parade); *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) (cable provider's selection of channels); *Med. Lab'y Mgmt. Consultants v. Am. Broad. Companies, Inc.*, 306 F.3d 806, 825 (9th Cir. 2002) (television program); *Goldblum v. Nat'l Broad. Corp.*, 584 F.2d 904, 907 (9th Cir. 1978) (television program). Indeed, "[t]he danger inherent in [such] government . . . oversight, even in the interest of 'balance,' is well established." *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 510 (9th Cir. 1988).

When internet companies select the content for their platforms and the providers of that content, they are exercising "editorial control and judgment" over the "material" on their platforms, including the "treatment of public issues and public officials." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). While those editorial judgments may be perceived as "fair or unfair" depending on the prevailing political winds and "risk that occasionally debate on vital matters will not be comprehensive and that all viewpoints may not be expressed," "governmental regulation of this crucial process [cannot] be exercised consistent with First Amendment guarantees of a free press." *Id.* at 258, 260 (White, J., concurring).

An investigation into the editorial judgments of internet companies therefore triggers First

Amendment protection. And an investigation undertaken in retaliation for particular speech would be prohibited by the First Amendment. *See, e.g., Nieves v. Bartlett*, 139 S. Ct. 1715 (2019).

**CONCLUSION**

For the foregoing reasons, the Court should grant Twitter's motion for a preliminary injunction.

Dated:  March 26, 2021

Respectfully submitted,

MAYER BROWN LLP

By: */s/ Douglas A. Smith*
     Douglas A. Smith

DOUGLAS A. SMITH (SBN 290598)
*dougsmith@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, California  90071-1503
Telephone: (213) 229-9500
Facsimile:  (213) 625-0248

ANDREW J. PINCUS (*pro hac vice*)
*apincus@mayerbrown.com*
1999 K Street, NW
Washington, DC  20006-1101
Telephone: (202) 263-3000
Facsimile:  (202) 263-3300

*Attorneys for* Amicus Curiae *Internet Association*