KATIE TOWNSEND (SBN 254321)
    *Counsel of Record*
GABE ROTTMAN*
MAILYN FIDLER*
ktownsend@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
* *Of counsel*

*Counsel for Amici Curiae*
*Additional counsel listed on signature page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TWITTER, INC.** | Case No. 3:21-CV-01644 |
| **Plaintiff,** | |
| **v.** | **BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, CENTER FOR DEMOCRACY AND TECHNOLOGY, ELECTRONIC FRONTIER FOUNDATION, MEDIA LAW RESOURCE CENTER, INC., AND PEN AMERICA AS AMICI CURIAE IN SUPPORT OF PLAINTIFF** |
| **KEN PAXTON, in his official capacity as Attorney General of Texas,** | |
| **Defendant.** | |
| | Judge: Maxine Chesney |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... iii

INTEREST OF THE AMICI CURIAE ....................................................1

SUMMARY OF ARGUMENT ...............................................................3

DISCUSSION ...................................................................................6

I.    The *Tornillo* rule is a crucial protection for the free flow of information. .........6

II.   The DTPA poses a significant risk of censorship if used to investigate or
      enforce the government's conception of viewpoint neutrality online...............11

CONCLUSION ................................................................................16

1

2

# TABLE OF AUTHORITIES

3

**Cases**

*Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987) ...................................... 14

*Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459 (Tex. App. 1990) .................................. 13

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ..................................................... 14

*Bullfrog Films, Inc. v. Wick*, 847 F.2d 502 (9th Cir. 1988) .......................................... 3

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94 (1973) ............. 4

*Connick v. Myers*, 461 U.S. 138 (1983) ....................................................................... 3

*e-ventures Worldwide, LLC v. Google, Inc.*, No. 2:14-cv-646, 2017 WL 2210029
   (M.D. Fla. Feb. 8, 2017) ........................................................................................... 8

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) ... 8, 9

*Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433 (S.D.N.Y. 2014) ............... 4, 7, 8, 9

*La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981 (S.D. Tex. 2017) ......................... 9

*Langdon v. Google, Inc.*, 474 F. Supp. 2d 622 (D. Del. 2007) ................................... 9

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) ................................ *passim*

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983)
   .................................................................................................................................. 14

*Murphy v. Twitter, Inc.*, 274 Cal. Rptr. 3d 360 (Cal. Ct. App. 2021) ........................ 13

*N.A.A.C.P. v. Button*, 371 U.S. 415 (1963) ................................................................ 10

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ................................................... 9, 10

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ................................................. 6

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) .............................................. 7

*Prager Univ. v. Google LLC*, 951 F.3d 991 (9th Cir. 2020) ...................................... 13

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .............................................................. 8

*Reno v. ACLU*, 521 U.S. 844 (1997) ............................................................................. 7

*Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457, 2003 WL 21464568
   (W.D. Okla. May 27, 2003) ........................................................................................ 8

*Snyder v. Phelps*, 562 U.S. 443 (2011) ......................................................................... 3

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ................................................. 8

28

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) ................................................................................................. 11

**Statutes**

15 U.S.C. § 1125 ............................................................................................ 13

15 U.S.C. § 45 ............................................................................................... 12

47 U.S.C. § 230 ............................................................................................... 5

**Other Authorities**

Anthony Lewis, *Nixon and a Right of Reply*, N.Y. Times, Mar. 24, 1974, https://perma.cc/2W2J-AJ65 ................................................................... 7

Exec. Order No. 13,925, 85 Fed. Reg. 34,079 (May 28, 2020) ................. 13

Leah Nylen et al., *Trump Pressures Head of Consumer Agency to Bend on Social Media Crackdown*, Politico (Aug. 21, 2020), https://perma.cc/7FLH-WDYP ....... 13

Lucas A. Powe, Jr., The Fourth Estate and the Constitution (1992) ......................... 6, 7

News Release, AG Paxton Issues Civil Investigative Demands to Five Leading Tech Companies Regarding Discriminatory and Biased Policies and Practices (Jan. 13, 2021), https://perma.cc/YWJ2-3DFQ ............................................................. 12

News Release, First Assistant AG Jeff Mateer to FTC:  Big Tech Companies Must Comply with State Deceptive Trade Practices Law (June 12, 2019), https://perma.cc/D83P-QF68 ............................................................. 12

Office of the Att'y Gen., Consumer Prot. Div., Civil Investigative Demand (Jan. 13, 2021), https://perma.cc/ 4FNL-Z47B ...................................................................................... 13

Zechariah Chafee, Government and Mass Communications (1947) ........................... 8

**INTEREST OF THE AMICI CURIAE**

The Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated non-profit association.  The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.   Today, its attorneys provide *pro bono* legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

Center for Democracy & Technology ("CDT") is a non-profit public interest organization.  For more than 25 years, CDT has represented the public's interest in an open, decentralized internet and worked to ensure that the constitutional and democratic values of free expression and privacy are protected in the digital age.  CDT regularly advocates in support of the First Amendment and protections for online speech before legislatures, regulatory agencies, and courts.

The Electronic Frontier Foundation ("EFF") is a non-profit, member-supported civil liberties organization working to protect digital rights.  Founded in 1990 and based in San Francisco, California, EFF has more than 37,000 active donors and dues-paying members.  EFF represents the interests of technology users in both court cases and broader policy debates surrounding the application of law in the digital age.

The Media Law Resource Center, Inc. ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues.  These include news and analysis of legal, legislative and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings.  The MLRC also works with its membership to respond to legislative and policy proposals, and speaks to the press and public on media law and First Amendment issues.  It counts as members over 125 media companies, including newspaper, magazine and book publishers, TV and radio broadcasters, and digital platforms, and over 200 law firms working in the media law field.  The MLRC was founded in 1980 by leading American publishers and broadcasters to assist in defending and protecting free press rights under the First Amendment.

PEN American Center, Inc. (PEN America or PEN) is a nonprofit organization that represents and advocates for the freedom to write and freedom of expression, both in the United States and abroad.  PEN America is affiliated with more than 100 centers worldwide that comprise the PEN International network.  Its Membership includes more than 7,500 journalists, novelists, poets, essayists, and other professionals.  PEN America stands at the intersection of journalism, literature, and human rights to protect free expression.  PEN champions the freedom of people everywhere to write, create literature, convey information and ideas, and express their

views, recognizing the power of the word to transform the world.  PEN America supports the First Amendment and freedom of expression in the United States.

Amici collectively represent the First Amendment interests of media outlets and communications platforms across all technologies.  Amici file this brief because they are concerned about the implications of Defendant Paxton's actions not just for a single social media site but for the fundamental First Amendment principles that animate public debate across all media.

## SUMMARY OF ARGUMENT

Any government effort to enforce what it deems viewpoint neutrality on a communications platform carries the temptation to compel platforms to carry speech perceived as favorable to the government, or, at the very least, that speech platforms would not otherwise carry.  As such, these efforts pose a profound threat to First Amendment guarantees, including a free and unfettered press.  Amici the Reporters Committee and MLRC take no position on Twitter's content moderation policies or practices; other Amici have expressed an array of views on the public policy implications of Twitter's decision to block President Donald Trump's access to the platform.  Amici are, however, united in their position that the choice to curate content in this way is fully protected by the First Amendment.  Here, Texas Attorney General Ken Paxton explicitly cited Twitter's and other platforms' decisions to label or block political content as the basis for initiating an investigation under Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"), and the Office of the

Attorney General in Texas has previously expressed support for using deceptive practices laws to police perceived viewpoint discrimination by online platforms.

Accordingly, Amici write to address the following two points in support of Plaintiff.

*First*, government efforts to use deceptive practices laws, or other similar regulatory schemes, to investigate perceived "bias" in content moderation would contravene the rule articulated by the Supreme Court in *Miami Herald Publishing Co. v. Tornillo*—that "governmental regulation" of "editorial control and judgment" cannot be "exercised consistent with First Amendment guarantees of a free press." 418 U.S. 241, 258 (1974); *see also Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 510 (9th Cir. 1988) ("The danger inherent in government editorial oversight, even in the interest of 'balance,' is well established.").[1]  Under *Tornillo*, it would be improper for the government, regardless of motive, to mandate that a private editor "publish that which reason tells [it] should not be published."  418 U.S. at 256 (internal quotation marks omitted).  In its investigation, however, the Office of the Attorney General claims the authority to intervene in political content curation online, in the name of holding platforms to assertions of impartiality or neutrality in that curation.  If

---

[1]     Plaintiff's Complaint and Motion are based on a claim of First Amendment retaliation. Amici write to emphasize that Twitter's content moderation decisions are protected by the First Amendment and to highlight their concern that even non-retaliatory government inquiries into a private entity's curation of lawful content—particularly with respect to political speech—raise profound First Amendment concerns.  *Cf. Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983))).

allowed to proceed, this inquiry could therefore have the effect of undermining the protections for public discourse established in *Tornillo*.  *Cf. Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 144–45 (1973) (Stewart, J., concurring) (noting concern that requiring broadcast licensees to carry paid editorial advertising could erode editorial autonomy of print media).  Further, and cognizant of the importance of the *Tornillo* rule to the free flow of information to the public, courts have extended that rule to online communications platforms such as search engines and social media.  *See, e.g.*, *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 443 (S.D.N.Y. 2014) ("In short, Plaintiffs' efforts to hold [search engine] Baidu accountable in a court of law for its editorial judgments about what political ideas to promote cannot be squared with the First Amendment.").

***Second***, the constitutional right at issue here—the discretion of a private entity to disseminate or not disseminate lawful content without government intervention—is particularly vulnerable to regulatory interference, even in service of what would otherwise be an appropriate exercise of governmental regulatory authority.  Further, deceptive practices laws pose special concerns when they trench on decisions by private actors to control political content on their platforms, especially when the government claims the authority to impose a standard of viewpoint neutrality—as it sees it—under the guise of consumer protection.  Were the government able to deploy consumer protection laws in this way, it would invariably seek to favor viewpoints perceived as supportive and disfavor viewpoints perceived as critical.

For these reasons, Amici urge the Court to grant Plaintiff's Motion.

## DISCUSSION

### I.   The *Tornillo* rule is a crucial protection for the free flow of information.

Private curation of lawful content online—especially content related to public affairs and government officials—is an inextricable component of modern public discourse.[2]  Such private curation necessarily entails making decisions about what material is allowed or disallowed on a platform.  In 1974, the Supreme Court unanimously affirmed that the First Amendment forbids governmental interference in editorial decisions by the press when it held unconstitutional Florida's "right of reply" statute, which "grant[ed] a political candidate a right to equal space to reply to criticism and attacks on his record by a newspaper."  *Tornillo*, 418 U.S. at 243, 258. The Court in *Tornillo* made clear that government regulation of the "choice of material" to include in a newspaper cannot be "exercised consistent with First Amendment guarantees."  *Id.* at 258.  This conclusion applies when such decisions deal with the "treatment of public issues and public officials—whether fair or unfair." *Id*.  Indeed, press autonomy in decisions "about what and what not to publish" has been described as "absolute."  *See* Lucas A. Powe, Jr., The Fourth Estate and the Constitution 277 (1992) ("Because editorial autonomy is indivisible, it must be

---

[2]     Amici submit that the express object of the Attorney General's Office's investigation—the labeling and blocking of third-party political speech—receives direct protection under the First Amendment.  Amici therefore do not address the application of 47 U.S.C. § 230 in this brief.

absolute."); *see also Tornillo*, 418 U.S. at 259 (White, J., concurring) ("According to our accepted jurisprudence, the First Amendment erects a virtually insurmountable barrier between government and the print media so far as government tampering, in advance of publication, with news and editorial content is concerned." (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971))).  Notably, the unanimous *Tornillo* decision came at the height of fallout from Watergate and shortly after a request by President Richard Nixon that the Justice Department explore the need for a federal right of reply statute.  Anthony Lewis, *Nixon and a Right of Reply*, N.Y. Times, Mar. 24, 1974, at E2, https://perma.cc/2W2J-AJ65 ("Overhanging the debate is the reality of Watergate, where a vigorous press broke through repeated official White House denials of wrongdoing.").

Chief Justice Burger's opinion for the Court in *Tornillo* rested on two inevitable consequences of permitting the government to mandate access to print media, which would "bring[] about a confrontation with the express provisions of the First Amendment and the judicial gloss on that Amendment developed over the years." *Tornillo*, 418 U.S. at 254.  First, the specter of a "government [fairness] umpire," Powe, *supra* at 283, would chill public discourse by prompting the news media to "conclude that the safe course is to avoid controversy," *Tornillo*, 418 U.S. at 257.  Second, an enforceable right of access poses the threat of direct press censorship:

1
2
3
4
5

> "[L]iberty of the press is in peril as soon as the government tries to
> compel what is to go into a newspaper.  A journal does not merely print
> observed facts the way a cow is photographed through a plateglass
> window.  As soon as the facts are set in their context, you have
> interpretation and you have selection, and editorial selection opens the
> way to editorial suppression.  Then how can the state force abstention
> from discrimination in the news without dictating selection?"

6
7
8

*Id.* at 258 n.24 (quoting Zechariah Chafee, Government and Mass Communications

633 (1947)).

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

    While the *Tornillo* Court confronted these issues in the context of print media,

the Supreme Court has since extended full First Amendment protection to the internet

as a communications medium.  *Reno v. ACLU*, 521 U.S. 844, 870 (1997); *see also*

*Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (holding

unconstitutional a governmental ban on access to social media, and finding that

"social media users employ these websites to engage in a wide array of protected

First Amendment activity").  The Court has also recognized the application of

*Tornillo* "well beyond the newspaper context."  *Jian Zhang*, 10 F. Supp. 3d at 437.

For example, the Court extended First Amendment protection to cable programmer

and operator decisions about "which stations or programs to include in its repertoire"

in *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 636 (1994) (citation

omitted).[3]  And, as the Court has since explained, "a private speaker does not forfeit

25
26
27
28

---

[3]    While the Court in *Turner* applied intermediate, rather than strict, scrutiny to the specific
regulations at issue there, central to the Court's reasoning was the fact the regulations did not
discriminate based on content.  *See Turner*, 512 U.S. at 644.  By contrast, efforts to impose what the
government perceives as viewpoint neutrality on a private communications platform are,

constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech."  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569–70 (1995).

Applying those principles, courts have held that online platform decisions about what lawful content to host on their sites receive First Amendment protection. *See Jian Zhang*, 10 F. Supp. 3d at 438 (applying protection to search engine judgments about "what information (or kinds of information) to include in the results and how and where to display that information"); *e-ventures Worldwide, LLC v. Google, Inc.*, No. 2:14-cv-646, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017) (same, "no matter the motive"); *Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457, 2003 WL 21464568, at *2–4 (W.D. Okla. May 27, 2003) (search rankings are protected opinion).  Further, these protections apply equally to decisions to remove or exclude content.  *See, e.g.*, *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (finding Facebook could decide whether to take down or leave up a post because of "Facebook's First Amendment right to decide what to publish and what not to publish on its platform"); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622,

---

necessarily, viewpoint discrimination *by the government*.  *See Jian Zhang*, 10 F. Supp. 3d at 440 (distinguishing *Turner* because plaintiffs sought to punish platform for "conscious decision to . . . favor certain expression on core political subjects over other expression on those same political subjects").  Since *Turner*, the Supreme Court has also made clear that viewpoint-neutral but content-based regulations are subject to strict scrutiny.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015).

629–30 (D. Del. 2007) (finding First Amendment right extends to decisions to exclude content from search platform). Crucially, these protections apply irrespective of the government's intention in seeking to intervene in these decisions. *See Jian Zhang*, 10 F. Supp. 3d at 438 ("Put simply, '[d]isapproval of a private speaker's statement'—no matter how justified disapproval may be—'does not legitimize use of the [government's] power to compel the speaker to alter the message by including one more acceptable to others.'" (quoting *Hurley*, 515 U.S. at 581)).

The animating concern in *Tornillo*—that the power to compel or silence speech on a communications medium would allow the government to improperly skew public discussion of its policies through chill or direct suppression—applies when the government seeks to dictate how private entities moderate lawful content online. Government intrusion into such decisions "dampens the vigor and limits the variety of public debate." *Tornillo*, 418 U.S. at 257 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964)). As much of that public debate has moved to the internet, the application of federal and state regulatory regimes like tax, and, as here, consumer protection laws must be appropriately calibrated to preserve the "breathing space" it needs to survive. *Sullivan*, 376 U.S. at 272 (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 433 (1963)). Indeed, a key rationale behind the preservation of "breathing space" for public discourse is to ensure that private platforms that carry third-party speech are not discouraged from doing so. *Cf. id.* at 266 (recognizing that the threat of civil liability for the choice to print lawful content in editorial print advertisements

could "shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities—who wish to exercise their freedom of speech even though they are not members of the press").

In short, if a major purpose of the First Amendment is to allow public discourse to "serve as a powerful antidote to any abuses of power" and as a way for "keeping officials elected by the people responsible to all the people whom they were selected to serve," *Tornillo*, 418 U.S. at 260 (White, J., concurring) (citation omitted), the First Amendment must protect how private actors—especially, but not exclusively, the press—choose to relay the speech of the public regarding those elected officials, as well as the speech of the elected officials themselves.

## II. The DTPA poses a significant risk of censorship if used to investigate or enforce the government's conception of viewpoint neutrality online.

Although Amici do not dispute that the regulation of deceptive commercial practices serves a legitimate and important government purpose, amici do however contest the specific use of consumer protection laws to hold speakers to claims of politically impartial curation.  The Supreme Court has emphasized that the permissible regulation of false or misleading commercial speech flows from certain attributes of that speech, including, for instance, that "truth of commercial speech . . . may be more easily verifiable," and that such speech displays "greater objectivity and hardiness."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n.24 (1976); *cf. id.* at 777 (Stewart, J., concurring) ("[The press] must

often attempt to assemble the true facts from sketchy and sometimes conflicting sources under the pressure of publication deadlines, [while] the commercial advertiser generally knows the product or service he seeks to sell and is in a position to verify the accuracy of his factual representations . . . .").

Here, the Office of the Attorney General of Texas has explicitly stated that the focus of its investigation is whether online platforms have exercised bias in curating lawful speech.  It launched the investigation a week after several technology companies, including Twitter, blocked President Trump's access to their platforms, and specifically pointed to those actions in its news release announcing the issuance of the civil investigative demand Twitter challenges.  *See* News Release, AG Paxton Issues Civil Investigative Demands to Five Leading Tech Companies Regarding Discriminatory and Biased Policies and Practices (Jan. 13, 2021), https://perma.cc/ YWJ2-3DFQ ("[J]ust last week, this discriminatory action [by "Big Tech companies"] included the unprecedented step of removing and blocking President Donald Trump from online media platforms.").  Further, Texas First Assistant Attorney General Jeff Mateer has, in the recent past, expressly claimed the authority to regulate under the DTPA what he terms "bias"—by which he meant political bias—in "big tech."  *See* News Release, First Assistant AG Jeff Mateer to FTC:  Big Tech Companies Must Comply with State Deceptive Trade Practices Law (June 12, 2019), https://perma.cc/D83P-QF68 ("If big tech companies are not living up to their commitments and representations regarding being open to all political viewpoints and

free of bias and restrictions on the basis of policy preference, then they should be held accountable for their false, misleading and deceptive trade practices.").  And the Twitter civil investigative demand itself states that it is "relevant to the subject matter of an investigation of possible violations of . . . the DTPA in Twitter's representations and practices regarding what can be posted on its platform."  Office of the Att'y Gen., Consumer Prot. Div., Civil Investigative Demand (Jan. 13, 2021), https://perma.cc/ 4FNL-Z47B.

But "bias" in content curation will necessarily be in the eye of the beholder, and claims of "impartiality" in online moderation practices are not subject to objective verification by government enforcers or courts in the same way as truly false or misleading commercial speech about a used car or a health tonic.  Then-Chair of the Federal Trade Commission, Joe Simons, effectively said as much in testimony before the Senate Commerce Committee in August 2020, in response to questions regarding President Trump's executive order directing the FTC to consider whether "bias" online constituted an unfair or deceptive trade practice subject to regulation under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.  *See* Exec. Order No. 13,925, 85 Fed. Reg. 34,079 (May 28, 2020).  "Our authority focuses on commercial speech, not political content curation," Simons said.  "If we see complaints that are not within our jurisdiction, then we don't do anything."  *See* Leah Nylen et al., *Trump Pressures Head of Consumer Agency to Bend on Social Media Crackdown*, Politico (Aug. 21, 2020), https://perma.cc/7FLH-WDYP.

The U.S. Court of Appeals for the Ninth Circuit recently addressed a related question—whether a platform's representations regarding openness are sufficiently factual and verifiable to state a false advertising claim under the Lanham Act.  In *Prager University v. Google LLC*, the Ninth Circuit held that "braggadocio about [a platform's] commitment to free speech" is "classic, non-actionable opinion[] or puffery," and therefore cannot support a claim under 15 U.S.C. § 1125.  *See* 951 F.3d 991, 999–1000 (9th Cir. 2020); *see also Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 462 (Tex. App. 1990) (noting puffery or opinion non-actionable under the DTPA). Such statements do not constitute "commercial advertising or promotion," the court held, but were made to "explain a user tool."  *Prager Univ.*, 951 F.3d at 999–1000. Plaintiff in that case did not allege any facts to "overcome the commonsense conclusion" that statements related to Defendant YouTube's content moderation policies are not "advertisements or a promotional campaign."  *Id.* at 1000; *see also Murphy v. Twitter, Inc.*, 274 Cal. Rptr. 3d 360, 382 (Cal. Ct. App. 2021) ("No reasonable person could rely on proclamations that '[w]e believe in free expression and think every voice has the power to impact the world,' that Twitter was the 'free speech wing of the free speech party,' or that Twitter's mission 'is to give everyone the power to create and share ideas and information instantly without barriers,' as a promise that Twitter would not take any action to self-regulate content on its platform.").

It is well-settled that even non-retaliatory regulatory efforts such as selective taxation can violate the First Amendment if they burden the free flow of information to the public. *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987) (finding that discriminatory taxation against the press or against certain members of the press can burden First Amendment rights with "no evidence of an improper censorial motive"); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983) ("We have long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment."). "This is because selective taxation of the press . . . poses a particular danger of abuse by the State." *Ark. Writers' Project*, 481 U.S. at 228; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) ("We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief.").

That danger is compounded where, as here, the target of such regulation has been identified by the regulator for perceived "bias" in political content curation. For public officials, the temptation to suppress criticism of their own or political allies' actions is strong, and so are the means by which the government may seek to tamp down that criticism, including significant civil exposure and, under other state deceptive practices laws, potential criminal liability. While one may disagree with how online platforms curate lawful content, there can be no role for the government in enforcing its conception of political orthodoxy. *Cf. Tornillo*, 418 U.S. at 256 ("A

responsible press is an undoubtedly desirable goal, but press responsibility is not

mandated by the Constitution and like many other virtues it cannot be legislated.").

The DTPA serves laudable goals, but it may not be used to mandate what public

officials conceive to be a standard of truth in the realm of political discourse.

## CONCLUSION

For these reasons, Amici urge the Court to grant Plaintiff's Motion.

Dated: March 24, 2021

/s/ Katie Townsend
KATIE TOWNSEND (SBN 254321)
*Counsel of Record*
GABE ROTTMAN*
MAILYN FIDLER*
ktownsend@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
* *Of counsel*

DAVID GREENE (SBN 160107)
davidg@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94019
Telephone: (415) 436-9333 x.143

*(continued on the next page)*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SAMIR JAIN*
CAITLIN VOGUS*
CENTER FOR DEMOCRACY &
TECHNOLOGY
1401 K Street NW, Suite 200
Washington, D.C. 20005
*Of counsel

NORA BENAVIDEZ*
PEN AMERICA
588 Broadway, Suite 303
New York, NY 10012
(212) 334-1660
*Of counsel

*Counsel for Amici Curiae*

**AMICI CURIAE BRIEF IN SUPPORT OF PLAINTIFF (Case No. 3:21-CV-01644)**

## <u>CERTIFICATE OF SERVICE</u>

I, Katie Townsend, hereby certify that on March 24, 2021, I served the attached document via this Court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

DATED: March 24, 2021

/s/ Katie Townsend
KATIE TOWNSEND (SBN 254321)
*Counsel of Record*
ktownsend@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

*Counsel for Amici Curiae*