1  **OFFICE OF THE ATTORNEY GENERAL OF TEXAS**
   PATRICK K. SWEETEN (*pro hac vice*)
2      Email: patrick.sweeten@oag.texas.gov
   WILLIAM T. THOMPSON (*pro hac vice*)
3      Email: will.thompson@oag.texas.gov
   RYAN D. WALTERS (*pro hac vice*)
4      Email: ryan.walters@oag.texas.gov
   P.O. Box 12548 (MC-009)
5  Austin, Tx 78711-2548
   Tel.: 512.936.1414
6  Fax: 512936.0545

7  **LEWIS BRISBOIS BISGAARD & SMITH** LLP
   Michael K. Johnson, SB#130193
8      Email: michael.johnson@lewisbrisbois.com
   2185 N. California Blvd., Suite 300
9  Walnut Creek, CA 94596
   Tel.: 925.357.3456
10 Fax: 925.478.3260

11 Attorneys for Defendant KEN PAXTON IN HIS OFFICIAL CAPACITY AS  ATTORNEY GENERAL OF TEXAS

12                    UNITED STATES DISTRICT COURT

13        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

14 TWITTER, INC.,                        CASE NO: 3:21-cv-1644-MMC

15              Plaintiff,               **DECLARATION OF JOSEPH SHANEYFELT
                                         IN   SUPPORT   OF   DEFENDANT   KEN
16          v.                           PAXTON'S RESPONSE IN OPPOSITION TO
                                         TWITTER'S MOTION FOR PRELIMINARY
17 KEN PAXTON, in his official capacity as   INJUNCTION**
   Attorney General of Texas,
18                                       **Date:      May 7, 2021**
              Defendant.                 **Time:      9:00 a.m.**
19                                       **Crtrm:     7, 19th floor**

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4834-6387-9139.1                                          Case No. 3:21-cv-1644-MMC
DECLARATION OF JOSEPH SHANEYFELT IN SUPPORT OF DEFENDANT KEN PAXTON'S RESPONSE IN
OPPOSITION TO TWITTER'S MOTION FOR PRELIMINARY INJUNCTION

**DECLARATION OF JOSEPH SHANEYFELT**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.     I am the Law Fellow for the Special Litigation Unit at the Office of the Texas Attorney General. I am over age 18 and competent to make this declaration. The facts set forth in this Declaration are based on my personal knowledge, and I would testify to these facts in open court if called upon to do so. This Declaration is submitted in support of Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the July 17, 2018 written Witness Statement of Nick Pickles, Senior Strategist, Public Policy, Twitter, Inc., before the United States House of Representatives Committee on the Judiciary for the hearing titled "Facebook, Google and Twitter: Examining the Content Filtering Practices of Social Media Giants" obtained from the official website of the House Committee on Energy and Commerce on March 29, 2021 located at the following web location: https://docs.house.gov/meetings/JU/JU00/20180717/108546/HHRG-115-JU00-Wstate-PicklesN-20180717.pdf.

3.     Attached hereto as Exhibit 2 is a true and correct copy of the October 28, 2020 written Testimony of Jack Dorsey, Chief Executive Officer, Twitter, Inc., to the United States Senate Committee on Commerce, Science, and Transportation for the hearing titled "Does Section 230's Sweeping Immunity Enable Big Tech Bad Behavior?" obtained from the Committee's official website on March 29, 2021 at the following web location: https://www.commerce.senate.gov/services/files/7A232503-B194-4865-A86B-708465B2E5E2.

4.     Attached hereto as Exhibit 3 is a true and correct copy of the November 17, 2020 written Testimony of Jack Dorsey, Chief Executive Officer, Twitter, Inc., to the United States Senate Committee on the Judiciary for the hearing titled "Breaking the News: Censorship, Suppression, and the 2020 Election" obtained from the Committee's official website on March 29, 2021 located at the following web location: https://www.judiciary.senate.gov/imo/media/doc/Dorsey%20Testimony.pdf.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4834-6387-9139.1          1          Case No. 3:21-cv-1644-MMC

DECLARATION OF JOSEPH SHANEYFELT IN SUPPORT OF DEFENDANT KEN PAXTON'S RESPONSE IN OPPOSITION TO TWITTER'S MOTION FOR PRELIMINARY INJUNCTION

5.      Attached hereto as Exhibit 4 is a true and correct copy of the Dorsey Response

Questions For The Record of Jack Dorsey, Chief Executive Officer, Twitter, Inc., to the

United States Senate Committee on the Judiciary for the hearing titled "Breaking the

News: Censorship, Suppression, and the 2020 Election" obtained from the Committee's

official website on March 29, 2021 at the following web location:

https://www.judiciary.senate.gov/imo/media/doc/Dorsey%20Response%20QFRs.pdf.

6.      Attached hereto as Exhibit 5 is a true and correct copy of the March 25, 2021 Written

Testimony of Twitter CEO Jack Dorsey (@jack) to the Subcommittee on Communications

and Technology and the Subcommittee on Consumer Protection and Commerce of the United

States House of Representatives Committee on Energy and Commerce for the joint hearing

titled "Disinformation Nation: Social media's Role in Promoting Extremism and

Misinformation" obtained from the official website of the House Committee on Energy and

Commerce   on   March   29,   2021   at   the   following   web   location:

https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/docume

nts/Witness_Testimony_Dorsey_CAT_CPC_2021.03.25.pdf.

7.      Attached hereto as Exhibit 6 is a true and correct copy of the January 13, 2021,

Press Release of Ken Paxton, Attorney General of Texas, titled "AG Paxton Issues Civil

Investigative Demands to Five Leading Tech Companies Regarding Discriminatory and

Biased Policies and Practices", obtained from the Attorney General of Texas's official

website on March 27, 2021, located at the following web location:

https://www.texasattorneygeneral.gov/news/releases/ag-paxton-issues-civil-investigative-

demands-five-leading-tech-companies-regarding-discriminatory.

8.      Attached hereto as Exhibit 7 is a true and correct copy of the January 5, 2018

statement by Twitter titled "World Leaders on Twitter" obtained from Twitter's website on

March   27,   2021,   located   at   the   following   web   location:

https://blog.twitter.com/en_us/topics/company/2018/world-leaders-and-twitter.html.

9.      Attached hereto as Exhibit 8 is a true and correct copy of The Santa Clara Principles

on Transparency and Accountability in Content Moderation, proposed on May 7, 2018,

DECLARATION OF JOSEPH SHANEYFELT IN SUPPORT OF DEFENDANT KEN PAXTON'S RESPONSE IN
OPPOSITION TO TWITTER'S MOTION FOR PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

obtained on March 24, 2021 at the following web location: https://santaclaraprinciples.org/.

10.     Attached hereto as Exhibit 9 is a true and correct copy of the September 14, 2018 *Vox* article "Twitter CEO Jack Dorsey talked to NYU's Jay Rosen for an hour, on the record. Read and listen to the full interview here," containing the imbedded audio file of the interview,

https://dcs.megaphone.fm/VMP7446863596.mp3?key=66e078e184c6b20b26ff47ee14374a68

, obtained on March 23, 2021 located at the following web location: https://www.vox.com/2018/9/14/17857486/twitter-jack-dorsey-nyu-jay-rosen-bias-neutrality-presence-politics-recode-media-podcast.


I declare under penalty of perjury that the foregoing is true and correct. Executed on this 29th day of March 2021 in Wichita Falls, Texas.

_____*/s/ Joseph Shaneyfelt*_____
Joseph Shaneyfelt

DECLARATION OF JOSEPH SHANEYFELT IN SUPPORT OF DEFENDANT KEN PAXTON'S RESPONSE IN OPPOSITION TO TWITTER'S MOTION FOR PRELIMINARY INJUNCTION

**CERTIFICATE OF SERVICE**
***Twitter Inc. v. Ken Paxton, et. al.***
USDC-ND, San Francisco Division, Case No. 3:21-cv-1644-MMC

STATE OF CALIFORNIA, COUNTY OF SACRAMENTO

At the time of service, I was over 18 years of age and not a party to the action. My business address is 2020 West El Camino Avenue, Suite 700, Sacramento, CA 95833. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On March 29, 2021, I served the following document:

**DECLARATION OF JOSEPH SHANEYFELT IN SUPPORT OF DEFENDANT KEN PAXTON'S RESPONSE IN OPPOSITION TO TWITTER'S MOTION FOR PRELIMINARY INJUNCTION, w/ Exhibits 1 through 9**

The document was served by the following means:

☒ **(BY COURT'S CM/ECF SYSTEM)** Pursuant to Local Rule, I electronically filed the document with the Clerk of the Court using the CM/ECF system, which sent notification of that filing to all persons registered by the Court to receive Notifications of Electronic Filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  March 29, 2021                  _/s/ Sandra Hayes_
                                        Sandra Hayes



4834-6387-9139.1                                         Case No. 3:21-cv-1644-MMC
DECLARATION OF JOSEPH SHANEYFELT IN SUPPORT OF DEFENDANT KEN PAXTON'S RESPONSE IN OPPOSITION TO TWITTER'S MOTION FOR PRELIMINARY INJUNCTION

*Twitter Inc. v. Ken Paxton, et. al.*
USDC-ND, San Francisco Division, Case No. 3:21-cv-1644-MMC

# EXHIBIT 1

**(Copy of the July 17, 2018 written Witness Statement of Nick Pickles, Senior Strategist, Public Policy, Twitter, Inc.)**

**Statement of Nick Pickles**
**Senior Strategist, Public Policy, Twitter, Inc.**

**Before the Committee on the Judiciary**
**United States House of Representatives**

**July 17, 2018**

Chairman Goodlatte, Ranking Member Nadler, and Members of the Committee:

Thank you for the opportunity to appear here today. We appreciate the Committee's inquiries about Twitter's content moderation policies, and we are pleased to be here to share our story.

We are delighted that in the United States, all 100 senators, 50 governors and almost every member of the House of Representatives have official Twitter accounts, which are used to engage in local, national, and global conversations on a wide range of issues of civic importance. We also partner with news organizations on a regular basis to live-stream congressional hearings and political events, giving users a front-row seat to history from their smartphones or computer screens.

Our purpose is to serve the public conversation.

As part of that, there are certain responsibilities we consider core to our company. We must ensure that all voices can be heard. We must make it so that everyone feels safe participating in the conversation − whether they are speaking or simply listening. And we must ensure people can trust in the credibility of the conversation and those taking part.

Our commitment to this work is at the very heart of why people come to Twitter.

We are also committed to improving the health of the public conversation and the health of the conversation on Twitter. Consistent with that effort, we have made more than 30 policy and product changes since the beginning of last year aimed at improving health on our platform. Our data show we are making progress in advancing this goal.

We are also seeking to collaborate with outside experts to better define and measure the health of the public conversation. We have requested proposals and will be announcing the outcome of

that process soon. And we are committed to sharing the results of our collaboration so that other organizations can benefit from that work.

Threats of violence, abusive conduct, and harassment can have the effect of bullying voices into silence, thereby robbing other Twitter users of valuable perspectives and threatening the freedom of expression that Twitter seeks to foster. We want to ensure that Twitter continues to be a safe space for our users to share their viewpoints with the broader Twitter community.

To do that, we must keep Twitter safe for all viewpoints and opinions, even those viewpoints and opinions that some of our users may find objectionable or with which they vehemently disagree – so long as the content is not in violation of the Twitter Rules. We do not believe that censorship will solve political or societal challenges or that removing certain content could resolve disagreements or address prejudices. We are committed to protecting speech and promoting the health of the public conversation on our platform.

Accordingly, the Twitter Rules prohibit certain types of behavior on our platform. Because abusive activity – and the challenge of detecting and curtailing it – is not static and has evolved over time, those rules continue to be developed and refined over the years as well.

Our rules are laid out in detailed and plain language in our Help Center, which can be found at help.twitter.com. They are not based on ideology or a particular set of beliefs. Instead, the Twitter Rules are based on behavioral contexts. For example, our rules prohibit making specific threats of violence or wishing for the serious physical harm, death, or disease of an individual or group of people.

Our rules also govern other abusive activity on the platform. For example, we prohibit malicious automation, spam, impersonation accounts, and the use of multiple accounts for overlapping purposes. Again, all of these rules are based on problematic behaviors, not the content of the Tweets or any ideology.

We also have stringent rules and policies that govern advertising on the platform. Advertising on Twitter generally takes the form of promoted Tweets, which advertisers can use to reach new users. Because promoted Tweets are presented to users from accounts they have not yet chosen to follow, Twitter applies a robust set of policies that prohibit, among other things, ads for illegal goods and services, ads making misleading or deceptive claims, ads for drugs or drug paraphernalia, ads containing hate content, sensitive topics, and violence, and ads containing offensive or inflammatory content. These policies are laid out at twitter.com/adspolicy.

2

We see a range of groups across the political spectrum use our advertising products to promote content about a variety of issues ranging from immigration to tax reform. Like any account that uses our advertising products, those groups are all bound by the same Twitter ads policies and Twitter Rules.

Both organic and promoted content can be reported by our users. We address such reports with a combination of technology and human review approaches. Machine learning improvements are enabling us to be more proactive in finding those who are being disruptive, but user reports are still a highly valuable part of our work. When evaluating these reports, we take into account a variety of factors and context, including whether the behavior is directed at an individual, a group, or a protected category of people. We also take into account whether the user has a history of violating our policies as well as the severity of the violation.

Accounts that violate our policies and the Twitter Rules can be subject to a range of enforcement actions, including temporary and, in some cases, permanent suspension. We recognize that a lack of transparency in enforcement actions can lead to a lack of public understanding about what an individual may have done to warrant action, and we have taken meaningful steps to address this where possible. For example, where appropriate, users are now notified of the specific Tweet that we determined to be in violation of our rules; we also alert those users to the specific rule they violated.

Our Safety Center houses information about our rules, tools, philosophy, and partnerships to further explain our work in this area. We explain our approach to enforcement in greater detail here: help.twitter.com/en/rules-and-policies/enforcement-philosophy.

Because our enforcement process typically relies on both automated and manual human review, we often have to make tough calls, and we do not always get things right – especially given the scope and scale of a platform such as Twitter, where users collectively post hundreds of millions of Tweets each day. When we make a mistake, we acknowledge it and strive to learn from it. We are committed to being direct and engaged with our users and the public – including elected officials – when we get things wrong.

Where we identify suspicious account activity (*e.g.*, exceptionally high-volume Tweeting with the same hashtag, or mentioning the same @handle without a reply from the account being addressed), we automatically send the account owner a test to confirm he or she is still in control of the account. These automated tests vary depending on the type of suspicious activity we detect, and may involve the account owner completing a simple reCAPTCHA challenge or a password reset request. We do not immediately remove content as part of these automated tests, but limit its visibility until the test is passed.

3

This approach has proven effective in helping us address malicious automation and spam on our platform. In May 2018, for example, our systems identified and challenged more than 9.9 million potentially spammy or automated accounts per week. That is an increase from 6.4 million in December 2017, and 3.2 million in September.

Due to technology and process improvements during the past year, we are now removing 214 percent more accounts for violating our spam policies on a year-on-year basis.

At the same time, the average number of spam reports we received through our reporting flow continued to drop − from an average of approximately 25,000 per day in March, to approximately 17,000 per day in May. We've also seen a 10 percent drop in spam reports from search as a result of our recent changes.

These metrics demonstrate our progress, but our work will never be complete. Bad actors change their behavior and we are constantly evaluating new threats and behavior. Among other things, we rely on our detection tools to identify people who have been suspended from the platform and who have created a new Twitter account or those who use multiple accounts for the same purpose.

We have also taken additional proactive steps recently to make follower counts more meaningful and accurate by removing locked accounts from follower counts globally. This step is a reflection of our ongoing commitment to the health of Twitter and a desire to ensure indicators that users rely on to make judgements about an account are as accurate as possible. Our process applies to all accounts active on the platform, regardless of the content they post.

Another critical part of our commitment to health is changing how we think about the areas on Twitter where our systems curate how information is presented. In places like search and conversations where we try to present content we believe you are most likely to find interesting, we are increasingly relying on behavior to help us make those determinations.

To help us do that, we recently took steps to more effectively address behaviors and activity on the platform that do not necessarily violate our policies, but that distort and detract from the public conversation. Most significantly, this approach enables us to improve the overall health of the conversation without needing to remove content from Twitter. Ultimately, everyone's comments and perspectives are available, but those who are simply looking to disrupt the conversation will not be rewarded by having their Tweets placed at the top of the conversation or search results.

Early results demonstrated that this approach has a positive impact, resulting in a four percent decrease in abuse reports from search and eight percent fewer abuse reports from conversations.

Some critics have described the sum of all of this work as a banning of conservative voices. Let me make clear to the Committee today that these claims are unfounded and false. In fact, we have deliberately taken this approach as a robust defense against bias, as it requires us to define and act upon bad conduct, not a specific type of speech. Our purpose is to serve the conversation, not to make value judgments on personal beliefs.

Our success as a company depends on making Twitter a safe place for free expression and a place that serves healthy public conversation. We know that Twitter plays an increasingly vital role in the world, and we know there is much work for us to do to make it even better.  And we are committed to continue to improve transparency and visibility to the people using our service. Thank you again, and I look forward to your questions.

*Twitter Inc. v. Ken Paxton, et. al.*
USDC-ND, San Francisco Division, Case No. 3:21-cv-1644-MMC

# EXHIBIT 2

**(Copy of the October 28, 2020 written Testimony of Jack Dorsey, Chief Executive Officer, Twitter, Inc.,to the United States Senate Committee on Commerce, Science, and Transportation for the hearing titled "Does Section 230's Sweeping Immunity Enable Big Tech Bad Behavior?")**

**United States Senate Committee on Commerce, Science, and Transportation**

**Testimony of Jack Dorsey**
**Chief Executive Officer**
**Twitter, Inc.**

**October 28, 2020**

Chairman Wicker, Ranking Member Cantwell, and Members of the Committee:

Thank you for the opportunity to appear before the Committee and speak with the American people. Section 230 is the Internet's most important law for free speech and safety. Weakening Section 230 protections will remove critical speech from the Internet.

Twitter's purpose is to serve the public conversation. People from around the world come together on Twitter in an open and free exchange of ideas. We want to make sure conversations on Twitter are healthy and that people feel safe to express their points of view. We do our work recognizing that free speech and safety are interconnected and can sometimes be at odds. We must ensure that all voices can be heard, and we continue to make improvements to our service so that everyone feels safe participating in the public conversation—whether they are speaking or simply listening. The protections offered by Section 230 help us achieve this important objective.

As we consider developing new legislative frameworks, or committing to self-regulation models for content moderation, we should remember that Section 230 has enabled new companies—small ones seeded with an idea—to build and compete with established companies globally. Eroding the foundation of Section 230 could collapse how we communicate on the Internet, leaving only a small number of giant and well-funded technology companies.

We should also be mindful that undermining Section 230 will result in far more removal of online speech and impose severe limitations on our collective ability to address harmful content and protect people online. I do not think anyone in this room or the American people want less free speech or more abuse and harassment online. Instead, what I hear from people is that they want to be able to trust the services they are using.

I want to focus on solving the problem of how services like Twitter earn trust. And I also want to discuss how we ensure more choice in the market if we do not. During my testimony, I want to share our approach to earn trust with people who use Twitter. We believe these principles can be applied broadly to our industry and build upon the foundational framework of Section 230 for how to moderate content online. We seek to earn trust in four critical ways: (1) transparency, (2) fair processes, (3) empowering algorithmic choice, and (4) protecting the privacy of the people who use our service. My testimony today will explain our approach to these principles.

## I.    ENSURING GREATER TRANSPARENCY

We believe increased transparency is the foundation to promote healthy public conversation on Twitter and to earn trust. It is critical that people understand our processes and that we are transparent about what happens as a result. Content moderation rules and their potential effects, as well as the process used to enforce those rules, should be simply explained and understandable by anyone. We believe that companies like Twitter should publish their moderation process. We should be transparent about how cases are reported and reviewed, how decisions are made, and what tools are used to enforce. Publishing answers to questions like these will make our process more robust and accountable to the people we serve.

At Twitter, we use a combination of machine learning and humans to review reports and determine whether they violate the Twitter Rules. We take a behavior-first approach, meaning we look at how accounts behave before we review the content they are posting. Twitter's open nature means our enforcement actions are plainly visible to the public, even when we cannot reveal the private details of individual accounts that have violated our Rules. We have worked to build better in-app notices where we have removed Tweets for breaking our Rules. We also communicate with both the account that reports a Tweet and the account that posted it with additional detail on our actions. That said, we know we can continue to improve to further earn the trust of the people using Twitter.

In addition, regular reporting of outcomes in aggregate would help us all to increase accountability. We do this currently through the Twitter Transparency Center. This site provides aggregate content moderation data and other information for the individuals who use Twitter, academics, researchers, civil society groups, and others who study what we do to understand bigger societal issues. We believe it is now more important than ever to be transparent about our practices.

## II.    ADVANCING PROCEDURAL FAIRNESS

As a company, Twitter is focused on advancing the principle of procedural fairness in our decision-making. We strive to give people an easy way to appeal decisions we make that they think are not right. Mistakes in enforcement, made either by a human or algorithm, are inevitable, and why we strive to make appeals easier. We believe that all companies should be required to provide a straightforward process to appeal decisions made by humans or algorithms. This makes certain people can let us know when we do not get it right, so that we can fix any mistakes and make our processes better in the future.

Procedural fairness at Twitter also means we ensure that all decisions are made without using political viewpoints, party affiliation, or political ideology, whether related to automatically ranking content on our service or how we develop or enforce the Twitter Rules. Our Twitter Rules are not based on ideology or a particular set of beliefs. We believe strongly in being impartial, and we strive to enforce our Twitter Rules fairly.

2

III.     **EMPOWERING ALGORITHMIC CHOICE**

We believe that people should have choices about the key algorithms that affect their experience online. At Twitter, we want to provide a useful, relevant experience to all people using our service. With hundreds of millions of Tweets every day on Twitter, we have invested heavily in building systems that organize content to show individuals the most relevant information for that individual first. With 186 million people last quarter using Twitter each day in dozens of languages and countless cultural contexts, we rely upon machine learning algorithms to help us organize content by relevance.

In December 2018, Twitter introduced an icon located at the top of everyone's timelines that allows individuals using Twitter to easily switch to a reverse chronological order ranking of the Tweets from accounts or topics they follow. This improvement gives people more control over the content they see, and it also provides greater transparency into how our algorithms affect what they see. It is a good start. We believe this points to an exciting, market-driven approach where people can choose what algorithms filter their content so they can have the experience they want. We are inspired by the approach suggested by Dr. Stephen Wolfram, Founder and Chief Executive Officer of Wolfram Research, in his testimony before the Subcommittee on Communications, Technology, Innovation, and the Internet in June 2019. Enabling people to choose algorithms created by third parties to rank and filter their content is an incredibly energizing idea that is in reach.

We also recognize that we can do even more to improve our efforts to provide greater algorithmic transparency and fair machine learning. The machine learning teams at Twitter are studying these techniques and developing a roadmap to ensure our present and future machine learning models uphold a high standard when it comes to algorithmic transparency and fairness. We believe this is an important step in ensuring fairness in how we operate and we also know that it is critical that we be more transparent about our efforts in this space.

IV.     **PROTECTING THE PRIVACY OF PEOPLE ON TWITTER**

In addition to the principles I have outlined to address content moderation issues in order to better serve consumers, it is also critical to protect the privacy of the people who use online services. At Twitter, we believe privacy is a fundamental human right, not a privilege. We offer a range of ways for people to control their privacy experience on Twitter, from offering pseudonymous accounts to letting people control who sees their Tweets to providing a wide array of granular privacy controls. Our privacy efforts have enabled people around the world using Twitter to protect their own data.

That same philosophy guides how we work to protect the data people share with Twitter. Twitter empowers the people who use our service to make informed decisions about the data they share with us. We believe individuals should know, and have meaningful control over, what data is being collected about them, how it is used, and when it is shared.

3

Twitter is always working to improve transparency into what data is collected and how it is used. We believe that individuals should control the personal data that is shared with companies and provide them with the tools to help them control their data. Through the account settings on Twitter, we give people the ability to make a variety of choices about their data privacy, including limiting the data we collect, determining whether they see interest-based advertising, and controlling how we personalize their experience. In addition, we provide them the ability to access information about advertisers that have included them in tailored audiences to serve them ads, demographic and interest data about their account from ad partners, and information Twitter has inferred about them.

* * *

As you consider next steps, we urge your thoughtfulness and restraint when it comes to broad regulatory solutions to address content moderation issues. We must optimize for new startups and independent developers. In some circumstances, sweeping regulations can further entrench companies that have large market shares and can easily afford to scale up additional resources to comply. We are sensitive to these types of competition concerns because Twitter does not have the same breadth of interwoven products or market size as compared to our industry peers. We want to ensure that new and small companies, like we were in 2006, can still succeed today. Doing so ensures a level playing field that increases the probability of competing ideas to help solve problems going forward. We must not entrench the largest companies further.

I believe the best way to address our mutually-held concerns is to require the publication of moderation processes and practices, a straightforward process to appeal decisions, and best efforts around algorithmic choice. These are achievable in short order. We also encourage Congress to enact a robust federal privacy framework that protects consumers while fostering competition and innovation.

We seek to earn trust from the people who use our service every day, and I hope the principles I describe and my responses to your questions can better inform your efforts. Thank you for the opportunity to appear. We look forward to continuing this dialogue with the Committee.

4

*Twitter Inc. v. Ken Paxton, et. al.*
USDC-ND, San Francisco Division, Case No. 3:21-cv-1644-MMC

# EXHIBIT 3

**(Copy of the November 17, 2020 written Testimony of Jack Dorsey, Chief Executive Officer, Twitter, Inc., to the United States Senate Committee on the Judiciary for the hearing titled "Breaking the News: Censorship, Suppression, and the 2020 Election")**

**United States Senate Judiciary Committee**

**Testimony of Jack Dorsey**
**Chief Executive Officer**
**Twitter, Inc.**

**November 17, 2020**

Chairman Graham, Ranking Member Feinstein, and Members of the Committee:

Thank you for the opportunity today to speak to the Committee and to the American people.

Twitter's purpose is to serve the public conversation. People from around the world come together on Twitter in an open and free exchange of ideas. We want to make sure conversations on Twitter are healthy and that people feel safe in expressing their points of view. We do our work with the recognition that free speech and safety are interconnected.

Today's hearing, *Breaking the News: Censorship, Suppression, and the 2020 Election*, was called, in part, as a response to enforcement decisions relating to Tweets by @NYPost on October 14, 2020, and concerns of this Committee regarding "Big Tech," censorship, and competition. The @NYPost example demonstrates the complexity of content moderation and policy enforcement decisions. The world has changed since Section 230 of the Communications Decency Act of 1996 became law, but the fundamentals of online speech that led to its passage largely remain.

Knowing that overly burdensome government regulatory schemes are not always nimble nor quick and can have unintended consequences, I encourage Congress to work with industry and civil society to build upon Section 230's foundation, whether it be through additions to Section 230, industry-wide self-regulation best practices, or a new legislative framework. By doing so, we can build an adaptable future Internet that people trust by empowering technology companies to continually make necessary changes to policies, services, and products, as well as experiment and learn, to improve their platforms and services.

Working together we can also avoid potential pitfalls. For example, completely eliminating Section 230 or prescribing reactionary government speech mandates will neither address concerns nor align with the First Amendment. Indeed, such actions could have the opposite effect, likely resulting in increased removal of speech, the proliferation of frivolous lawsuits, and severe limitations on our collective ability to address harmful content and protect people online.

Likewise, amending the law solely through carve-outs will inevitably favor large incumbents with vast resources who may willingly embrace such changes as it would leave only a small number of giant and well-funded technology companies. For innovation to thrive, we must not entrench the largest companies further.

1

The challenges that technology companies face on the Internet continue to change, requiring us to be agile in updating our policies and also make unprecedented investments to safeguard the public conversation. I would like to share what Twitter is doing to address your concerns and earn trust from those who use our services, which may help create a blueprint of solutions for the broader technology community. We also have taken steps to respond to an increasing demand from our consumers to provide context around misinformation – including our efforts around civic integrity and combating efforts to undermine the US 2020 election, which I will discuss today.

## Building & Earning Trust

Three weeks ago, I told the Senate Committee on Commerce, Science and Transportation that I believe the best way to address our mutually-held concerns is to require the publication of moderation processes and practices, a straightforward process to appeal decisions, and best efforts around algorithmic choice, while protecting the privacy of the people who use our service. These are achievable in short order.

### Transparency

We believe increased transparency is the foundation to promote healthy public conversation on Twitter and to earn trust. It is critical that people understand our processes and that we are transparent about what happens as a result. Content moderation rules and their potential effects, as well as the process used to enforce those rules, should be simply explained and understandable by everyone. We believe that companies like Twitter should publish their moderation process. We should be transparent about how cases are reported and reviewed, how decisions are made, and what tools are used to enforce. Publishing answers to questions like these will make our process more robust and accountable to the people we serve.

At Twitter, we use a combination of machine learning and humans to review reports and determine whether they violate the Twitter Rules. We take a behavior-first approach, meaning we look at how accounts behave before we review the content they are posting. Twitter's open nature means our enforcement actions are plainly visible to the public, even when we cannot reveal the private details of individual accounts that have violated our Rules. We have worked to build better in-app notices where we have removed Tweets for breaking our Rules. We also communicate with both the account that reports a Tweet and the account that posted it with additional detail on our actions. That said, we know we can continue to improve to further earn the trust of the people using Twitter.

We also know that an important part of transparency is acknowledging when our policies require updating because of new or unanticipated circumstances and acting quickly to make the necessary changes. The @NYPost situation is a prime example of this. In 2018, we created a policy to prevent Twitter from being used to spread hacked materials. This policy was informed by conversations with the US government about foreign state misinformation and disinformation and the use of hacked materials or materials of dubious origin being used to manipulate the electorate and influence the outcome of an election. These warnings from government partners were also repeated in advance of the 2018 US Midterm Election and 2020 US Election.

It was against this backdrop that we enforced our Hacked Materials Policy against very specific content shared by the @NYPost. Under this policy, people on Twitter were blocked from sharing certain links from the @NYPost, publicly or privately, as those specific articles contained the source materials themselves. References to the contents of the materials or discussion about the materials were not restricted under the policy. After hearing from journalists and others, we quickly updated our policy to limit its scope to only cover the removal of materials shared by hackers directly. This action, however, did not allow us to reinstate the @NYPost Tweets as we do not retroactively review enforcement actions when we update our policies. In order to address the unique facts in the @NYPost case, we determined that we should change our practices to allow for circumstances when actions on a specific account have led to a policy change. Accordingly, we updated the relevant policy, informed @NYPost, and the newspaper's account was restored. While we may have taken longer than some would have wanted to take these actions, we believe that this process and associated review have helped us create strong and more transparent policies.

### Advancing Procedural Fairness

As a company, Twitter is focused on advancing the principle of procedural fairness in our decision-making across the board. We strive to give people an easy, clear way to appeal decisions we make that they think are not right. Mistakes in enforcement — made either by a human or algorithm — are inevitable, and why we strive to make appeals easier. We believe that all companies should be required to provide a straightforward process to appeal decisions. This makes certain people can let us know when we do not get it right, so that we can fix any mistakes and make our processes better in the future.

Procedural fairness at Twitter also means we ensure that all decisions are made without using political viewpoints, party affiliation, or political ideology, whether related to automatically ranking content on our service or how we develop or enforce the Twitter Rules. Our Twitter Rules are not based on ideology or a particular set of beliefs. We believe strongly in being impartial, and we strive to enforce our Twitter Rules fairly.

### Algorithmic Choice

We believe that people should have choices about the key algorithms that affect their experience online. At Twitter, we want to provide a useful, relevant experience to all people using our service. With hundreds of millions of Tweets every day on Twitter, we have invested heavily in building systems that organize content to show individuals the most relevant information for that individual first. With 187 million people last quarter using Twitter each day in dozens of languages and countless cultural contexts, we rely upon machine learning algorithms to help us organize content by relevance.

In December 2018, Twitter introduced an icon located at the top of everyone's timelines that allows individuals using Twitter to easily switch to a reverse chronological order ranking of the Tweets from accounts or topics they follow. This improvement gives people more control over the content they see, and it also provides greater transparency into how our algorithms affect

what they see. It is a good start. We believe this points to an exciting, market-driven approach where people can choose what algorithms filter their content so they can have the experience they want. We are inspired by the approach suggested by Dr. Stephen Wolfram, Founder and Chief Executive Officer of Wolfram Research, in his testimony before the Senate Committee on Commerce, Science and Transportation Subcommittee on Communications, Technology, Innovation, and the Internet in June 2019. Enabling people to choose algorithms created by third parties to rank and filter their content is an incredibly energizing idea that is within reach.

We also recognize that we can do even more to improve to provide greater algorithmic transparency and fair machine learning. The machine learning teams at Twitter are studying these techniques and developing a roadmap to ensure our present and algorithmic models uphold a high standard when it comes to transparency and fairness. We believe this is an important step in ensuring fairness in how we operate and we also know that it is critical that we be more transparent about our efforts in this space.

### Protecting Privacy

In addition to the principles I have outlined to address content moderation issues in order to better serve consumers, it is also critical to protect the privacy of the people who use online services. We believe privacy is a fundamental human right, not a privilege. We offer a range of ways for people to control their privacy experience on Twitter, from offering pseudonymous accounts to letting people control who sees their Tweets to providing a wide array of granular privacy controls. Our privacy efforts have enabled people around the world using Twitter to protect their own data.

That same philosophy guides how we work to protect the data people share with Twitter. We empower the people who use our service to make informed decisions about the data they share with us. We believe individuals should know, and have meaningful control over, what data is being collected about them, how it is used, and when it is shared.

We believe that individuals should control the personal data that is shared with companies and provide them with the tools to help them control their data. Through the account settings on Twitter, we give people the ability to make a variety of choices about their data privacy, including limiting the data we collect, determining whether they see interest-based advertising, and controlling how we personalize their experience. In addition, we provide them with the ability to access information about advertisers that have included them in tailored audiences to serve them ads, demographic and interest data about their account from ad partners, and information Twitter has inferred about them.

## Twitter's Civic Integrity Work Around the 2020 Elections

Throughout the 2020 election, we've seen record-levels of election-related conversations on Twitter. Our teams have and will continue to actively work to protect the integrity of this public conversation. We have taken a three-pronged approach to our work around the election, focusing our efforts on protecting our services through our policies, products, and partnerships. We will

4

produce a longer-form retrospective of all of our work around the 2020 US Election in early 2021, but here is an initial post-election assessment.

## Policy Updates

In the lead up to the 2020 elections, we made significant enhancements to our policies to protect the integrity of the election. Most notably, this year, we updated our civic integrity policy to more comprehensively enforce labeling or removing of false and misleading information. The updated policy, which we not only announced publicly but also briefed the Presidential campaigns, civil society, and other stakeholders on, covers the following activities:

- False or misleading information about how to participate in an election or civic process;
- Content intended to intimidate or dissuade people from participating;
- Misrepresentation about affiliation (for ex., a candidate or political party);
- Content that causes confusion about laws and regulations of a civic process, or officials and institutions executing those civic processes;
- Disputes of claims that could undermine public confidence in the election (e.g. unverified information about election rigging, ballot tampering, vote tallying, or certification of election results); and
- Content that misleads about outcomes (e.g., claiming victory before results are in, inciting unlawful conduct to prevent the procedural or practical implementation of election results).

The civic integrity policy augmented and enhanced other important rules aimed at preventing interference with the election. Twitter banned all political advertising in 2019, only allowing some cause-based advertising for non-partisan civic engagement, in line with our belief that the reach of political speech should be earned, not bought. Additionally, we adopted rules prohibiting deceptively shared synthetic or manipulated media, sometimes referred to as "deep fakes," that may lead to serious offline harm; and labeling deceptive or synthetic media to provide additional context. Moreover, we have rules prohibiting platform manipulation, impersonation, hateful conduct, ban evasion, and attributed activity, among other harmful activities. We have also labeled specific government and state-media accounts from UN P-5 nation states, and plan to expand this effort in the near future.

## Providing Context to Limit the Risk of Harmful Misinformation

As we noted in a blog published last week, we applied labels to add context and limit the risk of harmful election misinformation spreading without important context because the public told us they wanted us to take these steps. An initial assessment of our efforts from October 27th to November 11th has found the following:

- **Approximately 300,000 Tweets** have been labeled under our Civic Integrity Policy for content that was disputed and potentially misleading. These represent **0.2% of all US election-related Tweets** sent during this time period.
- **456** of those Tweets were also covered by a warning message and had engagement features limited (Tweets could be Quote Tweeted but not Retweeted, replied to, or liked).

5

- **Approximately 74%** of the people who viewed those Tweets saw them after we applied a label or warning message.
- We saw an estimated **29% decrease in Quote Tweets** of these labeled Tweets due in part to a prompt that warned people prior to sharing.

We also got ahead of potentially misleading information by showing everyone on Twitter in the US a series of pre-bunk prompts. These prompts, which were seen 389 million times, appeared in people's home timelines and in Search, and reminded people that the announcement of election results were likely to be delayed, and that voting by mail is safe and legitimate. Our efforts to safeguard the conversation on Twitter about the 2020 US elections continue unabated.

### **Product Changes**

In the weeks leading up to and during election week, we implemented significant product changes intended to increase context and encourage more thoughtful consideration before Tweets are amplified. We are continuing to assess the impact of these product changes to fully understand the effect on the public conversation, which will help guide our work going forward, but I wanted to mention some of our findings today.

We encouraged people to add their own commentary when amplifying content by prompting Quote Tweets instead of Retweets. This change introduced some friction, and gave people an extra moment to consider why and what they were adding to the conversation. The change slowed the spread of misleading information by virtue of an overall reduction in the amount of sharing on the service. We observed a 23% decrease in Retweets and a 26% increase in Quote Tweets, but on a net basis the overall number of Retweets and Quote Tweets combined decreased by 20%.

In addition, we stopped providing "liked by" and "followed by" Tweet recommendations from accounts you don't follow in the Home Timeline and through notifications. While we had initially hoped that this would reduce the potential for misleading information to spread on our service, we did not observe a statistically significant difference in misinformation prevalence as a result of this change (nor any meaningful reduction in abuse reports). Instead, we found that pausing these recommendations prevented many people from discovering new conversations and accounts to follow, and we have since reverted the change.

### **Partnerships**

A core part of our civic integrity efforts included partnerships that allowed us to share information, gather input from experts, and better gain context on how misinformation was being spread and impacting the public conversation. These partnerships included leaders in civic tech, our peers, federal, state, and local governments organizations (e.g., National Association of Secretaries of State, National Association of State Election Directors, Department of Homeland Security, Federal Bureau of Investigation, Department of Justice, Office of the Director of National Intelligence, and elections officials across the country), news organizations, and civil society, among others.

6

****

We want to be very clear that we do not see our job in this space as done. Our work here continues and our teams are learning and improving how we address these challenges and earn the trust of the people who use Twitter. I look forward to continuing to work with you on solutions and building the guideposts for the future Internet. Thank you for the opportunity to appear today.

*Twitter Inc. v. Ken Paxton, et. al.*
USDC-ND, San Francisco Division, Case No. 3:21-cv-1644-MMC

# EXHIBIT 4

(**Copy of the Dorsey Response Questions For The Record of Jack Dorsey, Chief Executive Officer, Twitter, Inc., to the United States Senate Committee on the Judiciary for the hearing titled "Breaking the News: Censorship, Suppression, and the 2020 Election"** )

**Questions from Senator Tillis**

**1. My subcommittee has spent this year holding a series of hearings on the Digital Millennium Copyright Act (DMCA) and the safe harbors that internet service providers enjoy when it comes to copyright infringement by their users. Technology company witnesses said they can't identify infringements by their users – but Twitter is very good at identifying and censoring or taking down or flagging content from conservative voices. Don't you think that if Twitter can track and take down political content that it also has the ability to take down content that infringes the IP of hard-working American creators?**

Twitter responds to copyright complaints submitted under the DMCA pursuant to our copyright policy. Section 512 of the DMCA outlines the statutory requirements necessary for formally reporting copyright infringement, as well as providing instructions on how an affected party can appeal a removal by submitting a compliant counter-notice. Twitter will respond to reports of alleged copyright infringement, such as allegations concerning the unauthorized use of a copyrighted image as a profile or header photo, allegations concerning the unauthorized use of a copyrighted video or image uploaded through our media hosting services, or Tweets containing links to allegedly infringing materials.

Twitter is unique among our industry peers and remains a text-first service for the creation of content. When media is shared on Twitter, it is often in service of commentary or criticism to drive real-time, public conversations and debate. For example, when our customers post snippets of third-party content (videos, photos and GIFs), they are frequently doing so in an exercise of political and newsworthy speech, and for the purpose of commentary and criticism (not to share and watch pirated content). As you can see in our transparency reports, the number of takedown notices Twitter receives annually is a fraction of what other platforms receive and reflects the fact that allegedly infringing material is a small fraction of the total Tweets uploaded to Twitter.

**2. Can you tell me about the number of human moderators you have at Twitter, and how many are working on copyright infringement?**

Twitter uses a combination of machine learning and human review to adjudicate reports of violations of the Twitter Rules and make determinations on whether the activity violates our rules. With hundreds of millions of Tweets sent every day, we recognize that engaging in content moderation at scale requires increased use of machine learning and algorithms to surface and take action against violations of our rules.  Thus, we continue to invest in efforts to automate content moderation.  As a result of these investments, more than 50 percent of Tweets we take action on for abuse are now proactively surfaced using technology, rather than relying on reports to Twitter.

**3. How does Twitter determine that it is appropriate to take a proactive step to counter, address, block, or remove content? Are the considerations different for political content and copyright-infringing content?**

Whether Twitter takes enforcement action is dependent on whether an individual is in violation of the Twitter Rules. The Twitter Rules include a range of policies, including policies that prohibit abuse, harassment, hateful conduct, and child sexual exploitation, among many others. The Twitter Rules also include a copyright policy. Under this policy, Twitter will respond to reports of alleged

copyright infringement, such as allegations concerning the unauthorized use of a copyrighted image as a profile or header photo, allegations concerning the unauthorized use of a copyrighted video or image uploaded through our media hosting services, or Tweets containing links to allegedly infringing materials.

**4. I know that Twitter has developed significant technological tools to guard against foreign interference in elections or to identify and label content that you deem politically misleading, inaccurate, or dispute. What types of technological tools do you use to identify and address content that infringes copyright?**

Twitter relies on rightsholders, who are in the best position to know whether use of their content is infringing or not, to notify us of infringing material on Twitter. Twitter's response to copyright complaints may include the removal or restriction of access to allegedly infringing material. If we remove or restrict access to content in response to a copyright complaint, Twitter will make a good-faith effort to contact the affected account holder with information concerning the removal or restriction of access, including a full copy of the complaint, along with instructions for filing a counter-notice.

In an effort to be as transparent as possible regarding the removal or restriction of access to Tweeted content, we clearly mark withheld Tweets and media to indicate to viewers when content has been withheld in response to a complaint from a rightsholder. We also send a redacted copy of each copyright complaint that we process to Lumen, where they are posted to a public-facing website, with all personal information removed.

One important consideration as we contemplate voluntary agreements and technological measures to address this problem is that in certain circumstances heightened specificity can hurt small businesses that are launching new apps and platforms. Small companies will not necessarily have the resources to afford expensive third-party technical solutions. Additionally, we are always concerned that voluntary agreements will further entrench the market dominant players.

**5. Can you give me an update on Twitter's ongoing issues with RIAA and the steps you are taken to be more proactive in taking down the content of musicians and other artists that is being pirated on your site?**

Twitter responds to all legitimate copyright complaints as laid out in Section 512 of the DMCA. Furthermore, Twitter does not allow for full-length music streaming as some of our competitors do. A full accounting of actions taken to protect copyrighted material on our platform can be found in our Transparency Report. For 2019, the total copyright takedown notices we received worldwide from all rightsholders was less than 285,000; those notices resulted in 1.1 million pieces of media removed in 2019 worldwide.

We are actively engaged with the RIAA and many other rightsholder bodies regarding copyright concerns they have. We dedicate significant resources to quickly respond to takedown notices, and we work with rightsholders and representative bodies to address specific concerns if and when they arise.

**6. We're now continuing the DMCA reform process with draft legislation that I want stakeholders from all perspectives to help me refine so we can build consensus. Do I have your commitment that Twitter will participate constructively and in good faith?**

Yes, we look forward to engaging with you on constructive dialogue on this issue.

**7. It is not uncommon for legitimate media outlets to make corrections or update stories that they publish and post on Twitter. Does your platform place a notification on posts for stories that have been corrected? If not, why not?**

We have heard from the people who use Twitter that we should not determine the truthfulness of Tweets and we should provide context to help people make up their own minds in cases where the substance of a Tweet is disputed. Consistent with this feedback from our customers, we have expanded our enforcement options to allow us to label misinformation. When we label Tweets, we link to Twitter conversation that shows three things for context: (1) factual statements; (2) counterpoint opinions and perspectives; and (3) ongoing public conversation around the issue.

For now, we have focused these labeling efforts on areas where we believe there is the greatest risk of harm, including COVID-19, civic integrity, and manipulated media. However, we continue to explore additional ways in which we can provide additional context to people who use Twitter, in order to address potential harms associated with misinformation.

**8. You claim you are not a publisher. At the same time you substitute your judgment for what can be published on your website for the editorial decision of traditional news outlets. The main example of this is the recent censoring of the New York Post story on Hunter Biden. How are you not engaging in editorial decision making by prohibiting a traditional news outlet from publishing a story on your site?**

We issued the Distribution of Hacked Materials Policy in advance of the U.S. 2018 midterm elections to discourage and mitigate harms associated with hacks and unauthorized exposure of private information. Pursuant to these policies, on October 14, 2020, we took action on Tweets related to two articles published by the *New York Post* that, based on preliminary information, linked to content we determined to be in violation of our policies, including the Distribution of Hacked Materials Policy. Following our enforcement actions, we received significant feedback — both positive and negative — on the action.

After reviewing the feedback, we made changes within 24 hours to the policy to address concerns that there could be unintended consequences to journalists, whistleblowers, and others in ways that are contrary to Twitter's purpose of serving the public conversation. We also noted publicly that the only enforcement action available under the Distribution of Hacked Materials Policy was removal, which was no longer in alignment with new product capabilities, such as a label, that provide people with additional context.

Under Section 230 of the Communications Decency Act, services like Twitter are not considered publishers or speakers for hosting content by third parties.  This protection allows us to act responsibly to promote healthy conversations by taking action against misinformation, abuse, harm and illegal activity that makes its way onto Twitter, and has been critical to promoting free

expression online. Eliminating Section 230 or prescribing reactionary government speech mandates will neither address concerns nor align with the First Amendment. Indeed, such actions could have the opposite effect, likely resulting in increased removal of speech, the proliferation of frivolous lawsuits, and severe limitations on our collective ability to address harmful content and protect people online.  In addition, complex regulatory schemes or carveouts that favor already dominant market participants could stifle innovation and competition, ultimately giving consumers less choice online.

**9. Has your company or any subsidiary entered into an agreement, either written or not, with a government to either limit access to certain information, or to not limit government officials posts or place warnings on those posts?**

No, we have not entered into separate agreements with governments that would exempt them from complying with the Twitter Rules or enforce these rules differently with regards to specific government accounts.

Notwithstanding this, many countries, including the United States, have laws that may apply to Tweets and Twitter account content. In our continuing effort to make our services available to people everywhere, if we receive a valid and properly scoped request from an authorized entity, it may be necessary to withhold access to certain content in a particular country from time to time. Such withholdings will be limited to the specific jurisdiction that has issued the valid legal demand or where the content has been found to violate local laws.Upon receipt of requests to withhold content, we will promptly notify affected users unless we are prohibited from doing so (e.g., if we receive a court order under seal). We also clearly indicate within the product when content has been withheld and publish requests to withhold content on Lumen—unless, similar to our practice of notifying users, we are prohibited from doing so. The Transparency Report discloses information on government requests to remove content under local laws pursuant to our "Country Withheld Content" policy.

**10. I asked if Twitter used a platform similar to the Tasks platform identified by Facebook. It was hard to hear your response but you did say that Twitter uses a similar platform.**
>    **- What is the name of this platform?**
>    **- How does it work?**
>    **- What is it primarily used for?**
>    **- Does Twitter collect metadata from this platform?**
>    **- Does any**

Twitter uses a variety of methods and software to assist with businesses functions, including project management.  For example, Twitter uses the software Jira to help with project management and issue tracking. Among numerous tasks, the software can help track issues logged in a range of contexts, including questions from employees to human resources or computer issues flagged to the IT Department.

**11. Do you coordinate with any other company or outside group when you make decisions about content moderation?**

Twitter does not coordinate with other entities when making content moderation decisions. However, we have partnerships with government agencies, nonprofits, and industry peers to facilitate information sharing to inform our policy and enforcement decisions.

For example, the National Center for Missing & Exploited Children, whose mission is to help find missing children, reduce child sexual exploitation, and prevent child victimization, is an important partner for Twitter and our industry peers. When we are made aware of content depicting or promoting child sexual exploitation, including links to images or content or third party sites where this content can be accessed, the material is removed without further notice and reported to NCMEC. While our general practice is to notify Twitter users when their content is reported to third-parties or law enforcement, we do not notify users when the reported content includes child sexual exploitation material. Furthermore, we participate in NCMEC's hash sharing database for industry and non-governmental organizations which consists of image and video hashes of known child sexual abuse material.

We also partner with nonprofits dedicated to child protection across the globe. In addition to our important relationship with NCMEC, Twitter is an active member of the Technology Coalition. This industry-led non-profit organization strives to eradicate child sexual exploitation by mentoring emerging or established companies, sharing trends and best-practices across industry, and facilitating technological solutions across the ecosystem. The Technology Coalition serves as an effective model because it gives companies the flexibility to create, test, and iterate across our diverse products and models.

**12. Does Twitter receive any information from any other company or entity other than Twitter about posts and content moderation decisions?**

Twitter has numerous partnerships that we rely on to better inform policy and decision making. In addition to the partnerships described above, Twitter is part of the Global Internet Forum to Counter Terrorism, which brings together industry, government, civil society, and academia to share information and collaborate to counter terrorist or extremist content online. Through the GIFCT, we have assembled a shared industry database of "hashes" or digital "fingerprints" for violent terrorist propaganda that spans more than 100,000 hashes. The database allows a company that discovers terrorist content on one of its sites to create a digital fingerprint and share it with the other companies in the forum, who can then use those hashes to identify such content on their services or platforms, review against their respective policies and individual rules, and remove matching content as appropriate or block extremist content before it is posted.

We also began to work with a small group of companies to test a new collaborative system to share URLs. Because Twitter does not allow files other than photos or short videos to be uploaded, one of the behaviors we saw from those seeking to promote terrorism was to post links to other services where people could access files, longer videos, PDFs, and other materials. Our pilot system allows us to alert other companies when we removed an account or Tweet that linked to material that promoted terrorism hosted on their service. This information sharing ensures the hosting companies can monitor and track similar behavior, taking enforcement action pursuant with their individual policies. This is not a high-tech approach, but it is simple and effective, recognizing the resource constraints of smaller companies.

In order to safeguard the conversation regarding the 2020 U.S. election, we also have partnerships with leaders in civic tech, industry, and governments organizations, such as the National Association of Secretaries of State, National Association of State Election Directors, Department of Homeland Security, Federal Bureau of Investigation, Department of Justice, Office of the Director of National Intelligence, and elections officials across the country. We have also developed partnerships with news organizations, civil society, and others, which have been instrumental in informing policies and helping to identify potential threats regarding the integrity of the election conversation occurring on Twitter.

**13. What procedure or policies does Twitter have in place to ensure content moderation is done in a objective manner?**

Twitter does not use political viewpoints, perspectives, or party affiliation to make decisions, and we have taken several steps to ensure objective content moderation. For example, the Twitter Rules themselves are objective and not rooted in a particular ideology; the rules are focused on preventing harm and safeguarding the public conversation. In addition, we take a behavior-first approach to content moderation enforcement, meaning we look at how accounts behave before we look at the content they are posting.  Moreover, we have invested in advancing procedural fairness, to facilitate impartial decision-making and provide avenues for individuals to appeal decisions if there has been a mistake.

**14. In response to Senator Ernst you mentioned a tool for tracking all content moderation decisions.**
- **What is the name of this tool?**
- **What information does it track?**
- **Who has access to this tool?**
- **Does it track who makes a content moderation decision?**
- **Do you collect metadata on this platform? Are you willing to share trends based on this metadata with Congress?**
- **Are Republicans subject to content moderation more than Democrats based on the information you have from this platform?**
- **You indicated there are safeguards in this system. Please outline and describe each step in the content moderation process, including the process for appeals.**

Twitter does not use political viewpoints, perspectives, or party affiliation to make content moderation decisions. We apply the Twitter Rules impartially.  Twitter uses a variety of methods and software to assist with businesses functions, including project management.  For example, Twitter uses the software Jira to help with project management and issue tracking, including in some cases where there may be potential violations of Twitter Rules. We work to be transparent about our enforcement, and have provided information about enforcement trends in the Twitter Transparency Center.

With regards to appeals, if an account was suspended or locked in error, an individual can appeal. First, the individual must log in to the account that is suspended and file an appeal. The individual must describe the nature of the appeal and provide an explanation of why the account is not in violation of the Twitter Rules. Twitter employees will typically engage with the account holder via email to resolve the appeal. Mistakes in enforcement — made either by a human or algorithm —

are inevitable, and why we strive to make appeals easier. We recognize that enhancing procedural fairness, including through a straightforward appeals process is a critical part of building consumer trust and we look forward to working with the Committee on this issue.

**15. Why do you only place warnings on some stories published by traditional news sources and not go one step farther and provide more context on all posts from traditional news sources when the text in the post or the title of the post may not fully tell an accurate story?**

Our policies focus on labeling misinformation in the contexts where there is the greatest risk of harm, including COVID-19, civic integrity, and manipulated media. However, we continue to explore additional ways in which we can provide additional context to people who use Twitter, in order to address potential harms associated with misinformation.

**Questions from Senator Blackburn**

**1. During the November 3, 2020 election (before and after this date), did Twitter maintain any informal or formal lists of U.S. public officials who were specifically targeted for special monitoring of their Twitter posts?**

During the election period, we used a combination of human and automated mechanisms to enforce our policies. For example, we reviewed Tweets reported as potential violations by the public, civil society partners, or government agencies. We also used automated systems to detect suspicious behaviors or identify potential violations of our rules. Twitter's enforcement teams prioritized the review of Tweets from the accounts of each of the presidential candidates and their campaigns and reviewed each to ensure compliance with our terms of service, beginning two weeks prior to election day.

**2. During the November 3, 2020 election (before and after this date), did Twitter's enforcement teams prioritize the review of Tweets from the official and campaign accounts of any U.S. Senators for compliance with Twitter's terms of service?**

As noted in the response to Question 1, we used a variety of mechanisms to enforce our policies during the election period. All people who use Twitter are governed by The Twitter Rules and all incorporated policies, Privacy Policy, and Terms of Service, which collectively make up the "Twitter User Agreement." Our enforcement teams receive reports of Tweets and other media to review against our Terms of Service through a variety of channels, including through in-app reporting from the people who use our service to reports from government partners, political stakeholders, the press, and civil society.

**3. In advance of the January 5, 2021 Georgia Senate run-off elections, are Twitter's enforcement teams prioritizing the review of Tweets from the official and campaign accounts of any U.S. Senators for compliance with Twitter's terms of service?**

Twitter's work to safeguard the conversation regarding the 2020 U.S. election is ongoing; we continue to work to safeguard the conversation around the 2021 Georgia Senate run-off elections.

**4. In advance of the January 5, 2021 Georgia Senate run-off elections, are Twitter's enforcement teams prioritizing the review of Tweets from the official and campaign accounts of any candidates for U.S. Senate for compliance with Twitter's terms of service?**

Twitter's work to safeguard the conversation regarding the 2020 U.S. election is ongoing; we continue to work to safeguard the conversation around the 2021 Georgia Senate run-off elections.

**5. Does Twitter's enforcement team prioritize the review of Tweets from any reporters from One America News for compliance with Twitter's terms of service?**

All people who use Twitter are governed by The Twitter Rules and all incorporated policies, Privacy Policy, and Terms of Service, which collectively make up the "Twitter User Agreement." Our enforcement teams receive reports of Tweets and other media to review against our Terms of

Service through a variety of channels, including through in-app reporting from the people who use our service to reports from government partners, political stakeholders, the press, and civil society.

**6. Does Twitter's enforcement team prioritize the review of Tweets from any reporters from Fox News for compliance with Twitter's terms of service?**

As noted in the response to Question 1, we used a variety of mechanisms to enforce our policies during the election period. All people who use Twitter are governed by The Twitter Rules and all incorporated policies, Privacy Policy, and Terms of Service, which collectively make up the "Twitter User Agreement." Our enforcement teams receive reports of Tweets and other media to review against our Terms of Service through a variety of channels, including through in-app reporting from the people who use our service to reports from government partners, political stakeholders, the press, and civil society.

**7. Twitter placed a blue elections flag label on a November 5, 2020 clip from Fox News' Hannity Show quoting Rep. Jim Jordan. The flag stated, "This claim about election fraud is disputed." Upon clicking the notice, the user is directed to a page which reads, "Voter fraud of any kind is exceedingly rare in the US, election experts confirm." In the flagged clip, Congressman Jim Jordan discusses Justice Samuel Alito's decision ordering Pennsylvania counties to comply with a state directive to separate late ballots received after Election Day. Please explain why Twitter's election fraud label was imposed on a Tweet that discussed a Supreme Court decision ordering Pennsylvania officials to follow election laws.**

We have heard from the people who use Twitter that we should not determine the truthfulness of Tweets and we should provide context to help people make up their own minds in cases where the substance of a Tweet is disputed. Consistent with this feedback from our customers, we have expanded our enforcement options to allow us to label misinformation. When we label Tweets, we link to Twitter conversation that shows three things for context: (1) factual statements; (2) counterpoint opinions and perspectives; and (3) ongoing public conversation around the issue. In the case referenced, we labeled the Tweet to provide individuals with additional context regarding the claims being made.

**8. Does Twitter maintain a list of users that have a history of posting "misleading" or "false" speech as determined by Twitter's criteria?**

When determining whether to take enforcement action, we may consider a number of factors, including whether the account holder has a history of violating our policies. If an account holder repeatedly violates our Rules then the penalty for violating our policies will increase. This includes requiring violators to remove the Tweet(s) and taking additional actions like verifying account ownership and/or temporarily limiting their ability to Tweet for a set period of time.

**9. Does Twitter maintain a list of users with links to Chinese state-sponsored actors that have a history of posting "misleading" or "false" speech as determined by Twitter's criteria?**

In August 2019, Twitter disclosed 936 accounts originating from within the People's Republic of China (PRC). These accounts were deliberately and specifically attempting to sow political discord in Hong Kong, including undermining the legitimacy and political positions of the protest

movement on the ground. Based on our intensive investigations, we have reliable evidence to support that this is a coordinated state-backed operation. Specifically, we identified large clusters of accounts behaving in a coordinated manner to amplify messages related to the Hong Kong protests.

As Twitter is blocked in PRC, many of these accounts accessed Twitter using VPNs. However, some accounts accessed Twitter from specific unblocked IP addresses originating in mainland China. The accounts represent the most active portions of this campaign; a larger, spammy network of approximately 200,000 accounts — many created following our initial suspensions — were proactively suspended before they were substantially active on the service. These accounts were disclosed in Twitter's comprehensive public archive of Tweets and media associated with suspected state-backed information operations on Twitter.

**10. Based on previous cybersecurity breaches, has Twitter suspected in the past that Chinese state-sponsored actors have targeted Twitter accounts affiliated with Chinese dissidents for hacking or other internet attacks?**

We have well-established relationships with law enforcement agencies active in this arena, including the Federal Bureau of Investigation Foreign Influence Task Force and the Department of State's Global Engagement Center. We look forward to continued cooperation with federal partners on the threats posed by state-backed information operations, because in certain circumstances only they have access to information critical to our joint efforts to stop bad faith actors.

**11. Does Twitter's enforcement team prioritize the review of Tweets from any accounts affiliated with China's state propaganda outlets, which include the People's Daily, China Daily, China News Service, the Global Times, and CCTV, for compliance with Twitter's terms of service?**

An important part of our work is providing people with context so that they can make informed decisions about the content they see on Twitter. Accordingly, in August 2020, we made the decision to add labels to the Twitter accounts of key government officials, with a focus on senior officials who are the voices of the state abroad, and accounts belonging to state-affiliated media entities, their editors-in-chief, and senior staff. We believe providing these labels are an important step, so that when people see an account discussing geopolitical issues from another country, they have context about its affiliation and who it represents. We are applying labels to the accounts that represent the five permanent members of the UN Security Council: China, France, Russian Federation, the United Kingdom, and the United States before expanding to a wider range of countries. Additionally, we do not permit news media entities controlled by state authorities to purchase advertisements. This policy extends to individuals reporting on behalf of or who are directly affiliated with such entities.

**12. Of the $3.59 billion in revenue Twitter generated in 2019, how much ad revenue did Twitter generate from relationships with Chinese businesses or government agencies?**

The Twitter annual report contains additional information about the company's revenue streams.

**13. How much ad revenue did Twitter generate from Huawei for marketing the launch of its tablet, the Huawei Ascend Mate 7? For reference, this marketing campaign is found on**

Twitter's "Success Stories" page:
[https://marketing.twitter.com/en_apac/success-stories/huaweis-new-tablet-goes-global-with-promoted-tweets](https://marketing.twitter.com/en_apac/success-stories/huaweis-new-tablet-goes-global-with-promoted-tweets).

The Twitter annual report contains additional information about the company's revenue streams. As a global platform, Twitter provides advertising services to companies around the world.  All ads must comply with Twitter policies, which among other things, prohibit ads from state media or that promote unacceptable business practices.

**14. How much ad revenue did Twitter generate from Huawei for marketing the launch of its phone, the Huawei Mate 30 Pro 5G? For reference, this marketing campaign is found on Twitter's "Success Stories" page:**
[https://marketing.twitter.com/en_gb/success-stories/huawei-mate-30-launch](https://marketing.twitter.com/en_gb/success-stories/huawei-mate-30-launch).

The Twitter annual report contains additional information about the company's revenue streams. All ads must comply with Twitter policies, which among other things, prohibit ads from state media  As a global platform, Twitter provides advertising services to companies around the world. All ads must comply with Twitter policies, which among other things, prohibit ads from state media or that promote unacceptable business practices.

**15. How much ad revenue did Twitter generate from Huawei for marketing the @HuaweiMobile brand in advance of the GSMA Mobile World Congress, a global tech conference? For reference, this marketing campaign is found on Twitter's "Success Stories" page:**
[https://marketing.twitter.com/en_apac/success-stories/how-huawei-became-the-most-talked-about-brand-at-a-global-event](https://marketing.twitter.com/en_apac/success-stories/how-huawei-became-the-most-talked-about-brand-at-a-global-event).

The Twitter annual report contains additional information about the company's revenue streams. As a global platform, Twitter provides advertising services to companies around the world.  All ads must comply with Twitter policies, which among other things, prohibit ads from state media or that promote unacceptable business practices.

**<u>Questions from Senator Cruz</u>**

**1. The following questions examine how Twitter views its activities in moderating and directing its platform:**

> **a. When Twitter hosts, unaltered, the material of a third party – as in the form of a basic Tweet – is Twitter acting as publisher?**

Under subsection (c)(1), Section 230 of the Communications Decency Act provides that neither providers nor the people who use our service are to "be treated as the publisher or speaker of any information provided by another information content provider." Whether a plaintiff's claim treats an entity as a publisher for purposes of Section 230 is a determination that a court would make based on the specific details of a case.

 Section 230's protection has been critical to preserving free expression online, as well as promoting innovation. Looking forward, we encourage Congress to work with industry and civil society to build upon Section 230's foundation, whether it be through additions to Section 230, industry-wide self-regulation best practices, or a new legislative framework.  We believe that the best way to address concerns with content moderation is to require the publication of moderation processes and practices, a straightforward process to appeal decisions, and best efforts around algorithmic choice, while protecting the privacy of individuals.  We look forward to working with the committee to achieve these goals.

> **b. When Twitter blocks a Tweet, is it acting as a publisher?**

Under subsection (c)(1), Section 230 of the Communications Decency Act provides that neither providers nor the people who use our service are to "be treated as the publisher or speaker of any information provided by another information content provider." Whether a plaintiff's claim treats an entity as a publisher for purposes of Section 230 is a determination that a court would make based on the specific details of a case. Twitter does not block Tweets. In cases where an account violates the Twitter Rules, it may be subject to a range of enforcement actions, which can include account suspension or removal of a Tweet.

> **c. When Twitter intentionally limits the reach of a Tweet, is it acting as a publisher?**

Under subsection (c)(1), Section 230 of the Communications Decency Act provides that neither providers nor the people who use our service are to "be treated as the publisher or speaker of any information provided by another information content provider." Whether a plaintiff's claim treats an entity as a publisher for purposes of Section 230 is a determination that a court would make based on the specific details of a case.  In cases where an individual violates the Twitter Rules, they may be subject to various enforcement actions, including actions designed to provide additional context to individuals about the Tweet.  For example, in some  circumstances where we do not remove content which violates the civic integrity policy, we may take other actions, including applying a label and/or warning message to the content where it appears in the Twitter product; showing a warning to people before they share or like the content; reducing the visibility of the

content on Twitter and/or prevent it from being recommended; and/or providing a link to additional explanations or clarifications, such as in a Twitter Moment or relevant Twitter policies.

    **d.  When Twitter covers the face of a Tweet with a warning or other label written by Twitter, requiring the user to click through in order to access the content of that Tweet, is Twitter acting a publisher?**

Under subsection (c)(1), Section 230 of the Communications Decency Act provides that neither providers nor the people who use our service are to "be treated as the publisher or speaker of any information provided by another information content provider." Whether a plaintiff's claim treats an entity as a publisher for purposes of Section 230 is a determination that a court would make based on the specific details of a case.

In cases where an individual violates the Twitter Rules, they may be subject to various enforcement actions. In certain cases involving a violation of the Twitter Rules by a world leader, we will err on the side of leaving the content up if there is a clear public interest in doing so. In such cases, we may place the violative content behind a warning notice that provides context about the violation and allows people to click through should they wish to see the content.

    **e.  When Twitter labels a Tweet, instructing the user that the information in the Tweet is subject to controversy or is in dispute, is Twitter acting as a publisher**?

Under subsection (c)(1), Section 230 of the Communications Decency Act provides that neither providers nor the people who use our service are to "be treated as the publisher or speaker of any information provided by another information content provider." Whether a plaintiff's claim treats an entity as a publisher for purposes of Section 230 is a determination that a court would make based on the specific details of a case.

In cases where an individual violates the Twitter Rules, they may be subject to various enforcement actions. We have heard from the people who use Twitter that we should not determine the truthfulness of Tweets and we should provide context to help people make up their own minds in cases where the substance of a Tweet is disputed. When we label Tweets, we link to Twitter conversation that shows three things for context: (1) factual statements; (2) counterpoint opinions and perspectives; and (3) ongoing public conversation around the issue. We will only add descriptive text that is reflective of the existing public conversation to let people determine their own viewpoints.

    **f.  When Twitter labels a Tweet, informing the user that Twitter has determined that the information in the Tweet is untrue, is Twitter acting as a publisher?**

Under subsection (c)(1), Section 230 of the Communications Decency Act provides that neither providers nor the people who use our service are to "be treated as the publisher or speaker of any information provided by another information content provider." Whether a plaintiff's claim treats an entity as a publisher for purposes of Section 230 is a determination that a court would make based on the specific details of a case.

We have heard from the people who use Twitter that we should not determine the truthfulness of Tweets and we should provide context to help people make up their own minds in cases where the substance of a Tweet is disputed. When we label Tweets, we link to Twitter conversation that shows three things for context: (1) factual statements; (2) counterpoint opinions and perspectives; and (3) ongoing public conversation around the issue. We will only add descriptive text that is reflective of the existing public conversation to let people determine their own viewpoints.

**g.  When Twitter makes a judgment regarding the content of a tweet, and accordingly reduces or limits its dissemination, is Twitter acting as a publisher?**

Under subsection (c)(1), Section 230 of the Communications Decency Act provides that neither providers nor the people who use our service are to "be treated as the publisher or speaker of any information provided by another information content provider." Whether a plaintiff's claim treats an entity as a publisher for purposes of Section 230 is a determination that a court would make based on the specific details of a case. In cases where an individual violates the Twitter Rules, they may be subject to various enforcement actions.

**h.  When Twitter conditions usage of its platform upon not sharing information, is Twitter acting as publisher?**

Under subsection (c)(1), Section 230 of the Communications Decency Act provides that neither providers nor the people who use our service are to "be treated as the publisher or speaker of any information provided by another information content provider." Whether a plaintiff's claim treats an entity as a publisher for purposes of Section 230 is a determination that a court would make based on the specific details of a case. When individuals use Twitter, they agree to comply with the Twitter Rules, which are designed to prevent harm. For example, the Twitter Rules prohibit the promotion of terrorism or violent extremism.

**i.  When Twitter categorizes and organizes Tweets, deciding on their order or presence in a "Trending" list, or employs similar tools to suggest content, is Twitter acting as a publisher?**

Under subsection (c)(1), Section 230 of the Communications Decency Act provides that neither providers nor the people who use our service are to "be treated as the publisher or speaker of any information provided by another information content provider." Whether a plaintiff's claim treats an entity as a publisher for purposes of Section 230 is a determination that a court would make based on the specific details of a case.

The goal of Trends is to provide individuals who use Twitter topics that are popular now, so they can discover emerging topics of discussion.  Trends are, by default, tailored to an individual based on who they follow, their interest, and other factors.  However, individuals can choose to see Trends that are not tailored for them by selecting a specific location, which identify popular topics among people in a specific geographic location.

**2. Twitter recently limited the distribution and dissemination of reporting from the *New York Post* regarding Joe Biden, his family's business dealings, and his campaign.**

### a. Has Twitter ever acted to limit the distribution of:

#### i. News stories regarding President Trump's personal financial information, including but not limited to confidential tax records?

The Twitter Rules prohibit posting other people's private information (such as home phone number and address) without their express authorization and permission. They also prohibit threatening to expose private information or incentivizing others to do so. News stories referencing the fact that a disclosure has been made, which does not directly share private information, would not fall under this prohibition. In addition, our Distribution of Hacked Materials policy prohibits distribution of hacked materials, but does not prohibit reporting on such materials.

#### ii. The disclosures of Edward Snowden, including but not limited to the illegally obtained material for which he is currently under federal investigation?

Our Distribution of Hacked Materials was not in place at the time of the Snowden disclosures. On October 23, 2020, we revised the Distribution of Hacked Materials to state that we will no longer remove hacked content unless it is directly shared by hackers or groups directly associated with a hack.

#### iii. Stories regarding First Lady Trump, and personal conversations recorded without her knowledge or consent?

The Twitter Rules prohibit posting other people's private information (such as home phone number and address) without their express authorization and permission. They also prohibit threatening to expose private information or incentivizing others to do so. News stories referencing the fact that a disclosure has been made, which does not directly share private information, would not fall under this prohibition.

#### b. If the answer to the previous questions is "no," please explain, with specificity, the disparate treatment between these news items. If the answer is "yes," please state with specificity what actions were taken to limit distribution.

Twitter is constantly refining its rules and enforcement practices to better safeguard the public conversation and respond to the feedback from the public. For example, following the application of our Distribution of Hacked Materials Policy against specific content shared by @NYPost, we received significant feedback — both positive and negative — on the action.. After reviewing the feedback, we made changes within 24 hours to the policy to address concerns that there could be unintended consequences to journalists, whistleblowers and others in ways that are contrary to Twitter's purpose of serving the public conversation. We also noted publicly that the only enforcement action available under the Distribution of Hacked Materials Policy was removal, which was no longer in alignment with new product capabilities, such as the application of a label, that provides people with additional context.

**3. Despite the unprecedented steps Twitter has taken to define for the average user which information is "false," and which information is to be relied upon, you were unable to answer**

**questions on the subject of voter fraud in your testimony before the Committee. Please answer the following questions regarding the public discussion of voter fraud:**

      **a.  Does voter fraud exist?**

Twitter does not tell people what information is true or false as it relates to civic processes. Our intention is to connect the dots of conflicting statements and show the information in dispute so people can judge for themselves.

      **b.  Are any of the executives at Twitter, including but not limited to those who are making content moderation policy decisions, experts in voter fraud?**

We seek to employ individuals with a range of backgrounds, expertise, and skill sets.

      **c.  What sources of authority does Twitter rely upon in making determinations regarding the truthfulness of claims of voter fraud?**

Twitter's enforcement of its civic integrity policy does not tell people what information is true or false. Our intention is to connect the dots of conflicting statements and show the information in dispute so people can judge for themselves. We have heard from the people who use Twitter that we should not determine the truthfulness of Tweets and we should provide context to help people make up their own minds in cases where the substance of a Tweet is disputed. When we label Tweets, we link to Twitter conversation that shows three things for context: (1) factual statements; (2) counterpoint opinions and perspectives; and (3) ongoing public conversation around the issue. We will only add descriptive text that is reflective of the existing public conversation to let people determine their own viewpoints.

      **d.  Would the following statement violate Twitter's election information policies: "Absentee ballots remain the largest source of potential voter fraud"?**

When making enforcement decisions, Twitter considers a range of behaviors, including the content of the Tweet itself, but also platform behavior. Thus, it is difficult to provide an answer to such hypothetical scenarios.

      **e.  Would the following statement violate Twitter's election information policies: "Voter fraud is particularly possible where third-party organizations, candidates, and political party activists are involved in handling absentee ballots"?**

When making enforcement decisions, Twitter considers a range of factors.  This can include the content of the Tweet itself, but also platform behavior.  Thus, it is difficult to provide an answer to such hypothetical scenarios.

      **f.  In making determinations regarding the truth or verifiability of voter fraud claims, does Twitter employ corporate values, beliefs, priorities, or opinions when deciding what content is removed, republished, moderated, labelled, or otherwise promoted or demoted? What are those values?**

The Twitter Rules are objectively enforced, without regards to political viewpoints, party affiliation, political ideology, or personal beliefs. As outlined in our testimony, in order to build trust, we fully support efforts to enhance transparency, procedural fairness, privacy, and algorithmic choice.

> **g.  Does Twitter make these determinations on a viewpoint-neutral basis?**

In developing and enforcing our rules for the service we seek to be impartial.  As part of this, Twitter supports and has invested in advancing procedural fairness to ensure decisions are made impartially and individuals have mechanisms to appeal in cases where they believe a mistake has been made.

**4. The day before you testified before the Committee, you and I spoke on the telephone and you told me that Twitter was committed to transparency with regard to its content moderation policies and enforcement. Accordingly, the following questions relate to Twitter's enforcement of its content moderation policies. For this question and its subparts, please construe "content moderation policies" broadly, including decisions regarding the position or order in which content is displayed, the position or order in which users or content appear in searches, whether users or content are promoted or demoted, and all other modifications of content, such as flagging, qualifying, labelling, and denoting.**

> **a.   In your enforcement of content moderation policies:**

> > **i.   How many times has Twitter blocked, flagged, censored, limited the reach of, or otherwise affected the tweets, posts, or content of Republican candidates for office between January 1, 2016 and November 24, 2020? Please include enforcements that were later reversed or recognized to be in error.**

Twitter does not track the political affiliation of the people who use our service. Our biannual Twitter Transparency Center highlights trends in enforcement of our Rules, legal requests, intellectual property-related requests, and email privacy best practices.

> > **ii.   How many times has Twitter blocked, flagged, censored, limited the reach of, or otherwise affected the tweets, posts, or content of Democratic candidates for office between January 1, 2016 and November 24, 2020? Please include enforcements that were later reversed or recognized to be in error.**

Twitter does not track the political affiliation of the people who use our service. Our biannual Twitter Transparency Center highlights trends in enforcement of our Rules, legal requests, intellectual property-related requests, and email privacy best practices.

> > **iii.   How many times has Twitter blocked, flagged, censored, limited the reach of, or otherwise affected the tweets, posts, or content of Republican elected officials between January 1, 2016 and November 24,**

**2020? Please include enforcements that were later reversed or recognized to be in error.**

Twitter does not track the political affiliation of the people who use our service. Our biannual Twitter Transparency Center highlights trends in enforcement of our Rules, legal requests, intellectual property-related requests, and email privacy best practices.

>    iv.  **How many times has Twitter blocked, flagged, censored, limited the reach of, or otherwise affected the tweets, posts, or content of Democratic elected officials between January 1, 2016 and November 24, 2020? Please include enforcements that were later reversed or recognized to be in error.**

Twitter does not track the political affiliation of the people who use our service. Our biannual Twitter Transparency Center highlights trends in enforcement of our Rules, legal requests, intellectual property-related requests, and email privacy best practices.

>   **b. For each instance marked and counted in the previous question, please provide the name of the account affected, the content of the material affected, and the specific reason for the enforcement action.**

Our biannual Twitter Transparency Center highlights trends in enforcement of our Rules, legal requests, intellectual property-related requests, and email privacy best practices.

>   **c. In your enforcement of election information content moderation policies, are decisions made and executed by humans, or by algorithm with preset code?**

Twitter uses a combination of automation and human review to adjudicate reports of violations and make determinations on whether activity violates our rules.

>    i.  **Has anyone been tasked with keeping track of which content or users are affected by these policies?**

We have made efforts to be as transparent as possible about our enforcement decisions. Because Twitter is a public platform, enforcement decisions are often apparent to the public. In some contexts, we have also taken steps to provide additional datasets to researchers. For example, in October 2018, we published the first comprehensive archive of Tweets and media associated with known state-backed information operations on Twitter. This one of a kind resource, used by researchers, journalists and experts around the world, now spans operations across 15 countries, including more than nine terabytes of media and 200 million Tweets.

>    ii.  **If not, has anyone been tasked with keeping track of other information of this type, in other contexts?**

We have made efforts to be as transparent as possible about our enforcement decisions, providing information about enforcement through the Twitter Transparency Center. Apart from this, we fully support efforts to increase transparency around content moderation. We believe that companies like

Twitter should publish their moderation process, and should be transparent about how cases are reported and reviewed, how decisions are made, and what tools are used to enforce.

> ### iii.   If so, please explain the difference in the maintenance of records.

> **d. In drafting Twitter's election information content moderation policies and enforcing those same policies with regard to the 2020 elections, did Twitter collaborate with, confer with, or defer to any outside individuals or organizations? If so, please list the individuals and organizations and state the nature of their relationship with Twitter.**

As part of our civic integrity efforts, we have developed partnerships that allowed us to share information, gather input from experts, and better gain context on how misinformation was being spread and impacting the public conversation. These partnerships included leaders in civic tech, our peers, federal, state, and local governments organizations (e.g., National Association of Secretaries of State, National Association of State Election Directors, Department of Homeland Security, Federal Bureau of Investigation, Department of Justice, Office of the Director of National Intelligence, and elections officials across the country), news organizations, and civil society, among others.

> ### i.   Does Twitter take account of the political, philosophical, or ideological orientation or reputation of those sources with which it cooperates in executing its election information content moderation policies?

Twitter does not use political viewpoints, perspectives, or party affiliation to make any decisions.

> **e. The following questions relate to the individuals with supervisory authority who are responsible for the formulation and implementation of content moderation policies.**

> ### i.   Among those individuals with supervisory authority who make substantive decisions regarding content moderation policy, how many:

> > #### 1.   Self-identify or are registered as Democrats?

Twitter does not ask employees to disclose their political affiliation.

> > #### 2.   Self-identify or are registered as Republicans?

Twitter does not ask employees to disclose their political affiliation.

> > #### 3.   Would identify themselves as "liberal?"

Twitter does not ask employees to disclose their political affiliation.

> > #### 4.   Would identify themselves as "conservative?"

Twitter does not ask employees to disclose their political affiliation.

### 5. Have donated to:

#### a. The Democratic Party?

Twitter does not ask employees to publicly disclose political contributions, apart from disclosures required under existing laws.

#### b. A candidate running for office as a Democrat?

Twitter does not ask employees to publicly disclose political contributions, apart from disclosures required under existing laws.

#### c. A cause primarily affiliated with or supported by the Democratic Party?

Twitter does not ask employees to publicly disclose political contributions, apart from disclosures required under existing laws.

#### d. A cause primarily affiliated with or supported by liberal interest groups?

Twitter does not ask employees to publicly disclose political contributions, apart from disclosures required under existing laws.

#### e. A political action committee primarily advocating for the Democratic Party, Democratic candidates or office-holders, or causes primarily supported by the Democratic Party?

Twitter does not ask employees to publicly disclose political contributions, apart from disclosures required under existing laws.

#### f. The Republican Party?

Twitter does not ask employees to publicly disclose political contributions, apart from disclosures required under existing laws.

#### g. A candidate running for office as a Republican?

Twitter does not ask employees to publicly disclose political contributions, apart from disclosures required under existing laws.

#### h. A cause primarily affiliated with or supported by the Republican Party?

Twitter does not ask employees to publicly disclose political contributions, apart from disclosures required under existing laws.

### i.   A cause primarily affiliated with or supported by conservative interest groups?

Twitter does not ask employees to publicly disclose political contributions, apart from disclosures required under existing laws.

### j.   A political action committee primarily advocating for the Republican Party, Republican candidates or office-holders, or causes primarily supported by the Republican Party?

Twitter does not ask employees to publicly disclose political contributions, apart from disclosures required under existing laws.

### 6.   Worked on or volunteered for a Democratic campaign?

Decisions at Twitter are made without regard to political viewpoints, party affiliation, or political ideology.

### 7.   Worked on or volunteered for a Republican campaign?

Decisions at Twitter are made without regard to political viewpoints, party affiliation, or political ideology.

### 8.   Worked on, interned for, or volunteered for a Democratic legislator, State or federal?

Decisions at Twitter are made without regard to political viewpoints, party affiliation, or political ideology.

### 9.   Worked on, interned for, or volunteered for a Republican legislator, State or federal?

Decisions at Twitter are made without regard to political viewpoints, party affiliation, or political ideology.

### 10. Worked on or interned for a Democratic administration or candidate?

Decisions at Twitter are made without regard to political viewpoints, party affiliation, or political ideology.

**11. Worked on or interned for a Republican administration or candidate?**

Decisions at Twitter are made without regard to political viewpoints, party affiliation, or political ideology.

**ii. Following a Constitution Subcommittee in April 2019 in which a Twitter executive testified, I submitted questions similar to those in 4.d.1 above. Twitter responded by refusing to answer the questions asked and instead stating that it "does not use political ideology as a factor in its hiring decisions."**

**1. Does Twitter believe that it can adopt and enforce viewpoint neutral content moderation rules if the individuals developing and enforcing those rules overwhelmingly identify as Democrats and progressives?**

Yes. Decisions at Twitter are made without regard to political viewpoints, party affiliation, or political ideology.  To help ensure that decisions are made objectively, we have invested in developing fair processes.

**2. When hiring individuals to make substantive decisions regarding content moderation policies or to enforce those policies, does Twitter consider any personal characteristics or demographic information, including but not limited to race, ethnicity, sex, gender, or sexual orientation, to ensure that Twitter's content moderation policies and enforcement actions reflect diverse views?**

We believe that being a diverse and inclusive company is key to serving the public conversation. By 2025 we have set a goal to have at least 25% of our overall U.S. workforce be underrepresented minorities. We consistently share our progress with the public every quarter. Our most recent report reflects U.S. ethnicity for all roles and levels at 41.4% White, 28.4% Asian, 6.3% Black, 5.2% Latinx, 3.7 Multiracial,  and less than 1% Indigenous.

**a. If the answer is "yes", please identify the characteristics or demographic information Twitter considers and explain how that characteristic promotes view-point neutrality but ensuring diverse political ideologies does not.**

As a company, Twitter is focused on advancing the principle of procedural fairness in our decision-making across the board. Procedural fairness at Twitter means we ensure that all decisions are made without using political viewpoints, party affiliation, or political ideology, whether related to automatically ranking content on our service or how we develop or enforce the Twitter Rules. Our Twitter Rules are not based on ideology or a particular set of beliefs. We believe strongly in being impartial, and we strive to enforce our Twitter Rules fairly.

In addition, we strive to give people an easy, clear way to appeal decisions we make that they think are not right. Mistakes in enforcement — made either by a human or algorithm — are inevitable, and why we strive to make appeals easier. We believe that all companies should be required to provide a straightforward process to appeal decisions. This makes certain people can let us know when we do not get it right, so that we can fix any mistakes and make our processes better in the future.

> **f. A top Twitter executive—Vijaya Gadde—has been praised as the leader of the "resistance" and the "lead architect of the policy approach that led Twitter to clamp down on . . . President Donald Trump."[1]**

>> **i. Does this description of the top policy executive at Twitter reflect the orientation and priorities of the election information content moderation team as a whole?**

Decisions at Twitter are made without regard to political viewpoints, party affiliation, or political ideology. We focus our content moderation efforts to reduce harm and facilitate the public conversation.

>> **ii. Is Ms. Gadde ultimately responsible for what is determined to be "true" and "untrue" regarding claims made by users on Twitter?**

Twitter does not tell people what information is true or false as it relates to information concerning COVID-19, civic integrity, or manipulated media. Our intention is to connect the dots of conflicting statements and show the information in dispute so people can judge for themselves.  We have heard from the people who use Twitter that we should not determine the truthfulness of Tweets and we should provide context to help people make up their own minds in cases where the substance of a Tweet is disputed. When we label Tweets, we link to Twitter conversation that shows three things for context: (1) factual statements; (2) counterpoint opinions and perspectives; and (3) ongoing public conversation around the issue. We will only add descriptive text that is reflective of the existing public conversation to let people determine their own viewpoints.

>> **iii. If she is not ultimately responsible, who is?**

No one individual makes content decisions at Twitter. As Twitter's Chief Executive Officer Jack Dorsey Tweeted in May 2020: "Fact check: there is someone ultimately accountable for our actions as a company, and that's me."  We fully support efforts to enhance transparency and procedural fairness, so that individuals have trust in our company and the platforms they use. We also support efforts to increase competition and innovation, so that individuals have choices if a platform fails to earn their trust.

---

[1]https://www.politico.com/news/magazine/2020/10/28/twitter-vijaya-gadde-free-speech-policies-technology-social-media-429221

**Questions from Senator Grassley**

**1. How do your users hold you and your companies accountable for your content moderation practices?  Congress has the benefit of bringing you before this Committee to answer questions.  But when one of my constituents thinks his or her speech was wrongfully moderated or fact-checked, why should they have any faith that their objection will even be heard?**

As a company, Twitter is focused on advancing the principle of procedural fairness in our decision-making across the board. We strive to give people an easy, clear way to appeal decisions we make that they think are not right. Mistakes in enforcement — made either by a human or algorithm — are inevitable, and why we strive to make appeals easier. We believe that all companies should be required to provide a straightforward process to appeal decisions. This makes certain people can let us know when we do not get it right, so that we can fix any mistakes and make our processes better in the future. We fully support efforts to increase procedural fairness and look forward to working with your office on this issue.

**2. Do you agree that users should be entitled to due process when content they post is taken down or moderated?  And do you agree that there could be more transparency by your companies in explaining why certain speech or content is moderated?**

We agree that increased transparency and procedural fairness are key to address concerns with content moderation. We believe that all companies should be required to provide a straightforward process to appeal decisions. In addition, we believe that all companies should publish their content moderation process, and be transparent about how cases are reported and reviewed, how decisions are made, and what tools are used to enforce rules.

<u>**Questions from Senator Hawley**</u>

**1. Does Twitter have a policy prohibiting its employees from coordinating content moderation decisions with outside companies such as Facebook or Google, where such moderation is not strictly required by law?**

Twitter does not coordinate its content moderation decisions with outside entities.  However, Twitter has numerous partnerships that we rely on to better inform decision making and facilitate information sharing. For example, we share information in three critical areas: combatting child sexual exploitation, prohibiting terrorism and violent extremism, and safeguarding the conversation about the U.S. election.

The National Center for Missing & Exploited Children is a nonprofit whose mission is to help find missing children, reduce child sexual exploitation, and prevent child victimization. NCMEC is an important partner for Twitter and our industry peers. When we are made aware of content depicting or promoting child sexual exploitation, including links to images or content or third party sites where this content can be accessed, the material is removed without further notice and reported to NCMEC. We also partner with nonprofits dedicated to child protection across the globe. In addition to our important relationship with NCMEC, Twitter is an active member of the Technology Coalition. This industry-led non-profit organization strives to eradicate child sexual exploitation by mentoring emerging or established companies, sharing trends and best-practices across industry, and facilitating technological solutions across the ecosystem.

In addition, Twitter is part of the Global Internet Forum to Counter Terrorism, which brings together industry, government, civil society, and academia to share information and collaborate to counter terrorist or extremist content online. Through the GIFCT, we have assembled a shared industry database of "hashes" or digital "fingerprints" for violent terrorist propaganda that spans more than 100,000 hashes. The database allows a company that discovers terrorist content on one of its sites to create a digital fingerprint and share it with the other companies in the forum, who can then use those hashes to identify such content on their services or platforms, review against their respective policies and individual rules, and remove matching content as appropriate or block extremist content before it is posted.

We have also begun to work with a small group of companies to test a new collaborative system to share URLs. Because Twitter does not allow files other than photos or short videos to be uploaded, one of the behaviors we saw from those seeking to promote terrorism was to post links to other services where people could access files, longer videos, PDFs, and other materials. Our pilot system allows us to alert other companies when we removed an account or Tweet that linked to material that promoted terrorism hosted on their service. This information sharing ensures the hosting companies can monitor and track similar behavior, taking enforcement action pursuant with their individual policies. This is not a high-tech approach, but it is simple and effective, recognizing the resource constraints of smaller companies.

Furthermore, in order to safeguard the conversation regarding the 2020 U.S. election, we have critical partnerships with leaders in civic tech, industry, and government organizations, such as the National Association of Secretaries of State, National Association of State Election Directors, Department of Homeland Security, Federal Bureau of Investigation, Department of Justice, Office of the Director of National Intelligence, and elections officials across the country. We also have

partnerships with news organizations, civil society, and others, which have been instrumental in informing policies and helping to identify potential threats regarding the integrity of the election conversation occurring on Twitter.

**2. Please provide a list of all hashtags, URLs, and real-world individuals that Twitter has banned across its platform.**

Our biannual Twitter Transparency Center highlights trends in enforcement of our Rules, legal requests, intellectual property-related requests, and email privacy best practices.  In addition, in 2018, we published the first comprehensive archive of Tweets and media associated with known state-backed information operations on Twitter. This one of a kind resource, used by researchers, journalists and experts around the world, now spans operations across 15 countries, including more than nine terabytes of media and 200 million Tweets.

**<u>Questions from Senator Blumenthal</u>**

1. **During your testimony, you stated that Twitter will take steps to combat rampant disinformation on social media in Spanish-speaking sites.**

   a. **Who is in charge of setting Spanish-language content policy and making high-level decisions about enforcement, including about posts that come from high-ranking U.S. officials and the president?**
   b. **How many U.S.-based Spanish language content moderators does Twitter have and what is the proportion of U.S.-based Spanish-language moderators to U.S.-based Spanish-language Twitter users? How does that compare to U.S.-based English-language moderators vs. U.S.-based English-language users?**

Twitter has taken numerous steps to combat election misinformation and provide voting information to Spanish-speaking communities. In advance of the election, when searching for key terms related to voter registration, individuals who used Twitter received prompts in English and Spanish pointing them to official resources. In addition, we trained voter education nonprofits and government partners on how to use Twitter tools and create content targeted at Spanish-language audiences. As part of this, we have worked with @USAGovEspanol, @NALEO, @HispanicFed, @MALDEF, @LULAC, and @WeAreUnidos to promote voter education and misinformation pre-bunking targeted at Spanish-speaking communities. In addition to this, during the election period, our content moderators routinely took enforcement action on Tweets that violated our rules.

In the lead up to the Georgia run-off, we will continue to monitor the platform for election misinformation targeted at Spanish-speaking communities and proactively debunk misinformation through Twitter Moments which provide additional context to the conversation. In addition, we have an Elections Hub available for all people in the US with Twitter Moments, available in English and Spanish, that provides information about voter registration and early voting for the Georgia runoff.

2. **We all have an interest in setting a baseline standard for privacy protections. Some in the tech industry want preemption, but there are significant concerns over whether the standard we set will be enforced. Would you be open to a national consumer privacy law that includes some form of private enforcement?**

Twitter supports passage of a strong national federal privacy law, which includes robust enforcement. Our team is happy to provide feedback on specific enforcement proposals.

3. **Section 230 shuts the courthouse door on victims seeking justice. Even when tech companies are aware of abuse and crime – even when they amplify and promote that conduct – they are immune.**

   a. **Should an online platform that actively facilitates discriminatory advertising be fully accountable under our civil right laws?**

      **b. Should Section 230 serve as a shield for online platforms against protections for children, civil rights, and consumer protection where platforms enable the promotion of illegal content or conduct?**

      **c. How should Section 230 be reformed to ensure that it encourages platforms to be good Samaritans—not bad actors?**

The Communications Decency Act already exempts federal criminal activity from liability protections, including illegal conduct that violates civil rights, consumer protection, or childhood sexual exploitation laws. As explained in more detail in our written testimony, we do not believe that the solution to concerns raised about content moderation is to eliminate or create carveouts to existing Section 230 liability protections. Such changes can counterproductively harm speech and safety. Instead, we believe the solution to addressing content moderation challenges should be focused on enhancing transparency, procedural fairness, privacy, and algorithmic choice.

**4. In December, Twitter announced "Bluesky," a project to develop an open standard for social networks. The long-term goal of Bluesky is to foster interoperability between social networks. In the Microsoft antitrust case, as well as AOL's merger with Time Warner, enforcers required firms to adopt open standards to enable competition.**

      **a. Do you agree that antitrust enforcers should consider requiring that dominant tech platforms offer interoperability and open standards to smaller competitors?**

Twitter supports interoperability, and making sure the people understand and have transparency into how their data is used and can control who it is shared with and when, including between tech companies.

      **b. Recently, Senators Warner, Hawley, and I introduced the ACCESS Act, which would require dominant platforms to offer interoperability with competitors. What recommendations would you provide to build on the ACCESS Act?**

Our teams are happy to work with you in more depth on the ACCESS Act. Twitter appreciates efforts to enable data transfer projects to increase interoperability. Frameworks like Bluesky will help us meet that objective too by creating common standards for the industry.

**5. During your testimony, you stated that Twitter was on heightened alert for misinformation and disinformation in the lead-up to and immediately following the 2020 election, and took additional steps to label misinformation and disinformation to protect the integrity of the 2020 election.**

      **a. How, if at all, will Twitter's content moderation policies and practices differ from the period surrounding the 2020 election in the lead-up to the Georgia runoff?**

      **b. How, if at all, will Twitter's content moderation policies and practices differ after the Georgia runoff?**

In the lead up to the 2020 U.S. election, we made significant enhancements to our policies to protect the integrity of the conversation occurring on Twitter regarding the election. The civic integrity policy and others aimed at safeguarding the public conversation remain in effect and will continue to be enforced in the lead up to and after the Georgia runoff.

For example, this year, we updated our civic integrity policy to more comprehensively enforce labeling or removing of false and misleading information. The updated policy covers the following activities:

- False or misleading information about how to participate in an election or civic process;
- Content intended to intimidate or dissuade people from participating;
- Misrepresentation about affiliation (for ex., a candidate or political party);
- Content that causes confusion about laws and regulations of a civic process, or officials and institutions executing those civic processes;
- Disputes of claims that could undermine public confidence in the election (e.g. unverified information about election rigging, ballot tampering, vote tallying, or certification of election results); and
- Content that misleads about outcomes (e.g., claiming victory before results are in, inciting unlawful conduct to prevent the procedural or practical implementation of election results).

The civic integrity policy augmented and enhanced other important rules aimed at preventing interference with the election. Twitter banned all political advertising in 2019, only allowing some cause-based advertising for non-partisan civic engagement, in line with our belief that the reach of political speech should be earned, not bought. Additionally, we adopted rules prohibiting deceptively shared synthetic or manipulated media, sometimes referred to as "deep fakes," that may lead to serious offline harm; and labeling deceptive or synthetic media to provide additional context. Moreover, we have rules prohibiting platform manipulation, impersonation, hateful conduct, ban evasion, and attributed activity, among other harmful activities. We have also labeled specific government and state-media accounts from UN P-5 nation states, and plan to expand this effort in the near future.

6. **Since Joe Biden was declared the President-elect, Twitter has scaled its content moderation. However, President Trump routinely flouts Twitter's policies, hourly seeking to delegitimize the election. There is a real threat of violence, and these unfounded allegations are corrosive to our democracy.**

   a. **Under what conditions would you return to preventing a viewer from seeing the President's misinformation about the election results unless the user affirmatively clicks "view" on a warning label?**
   b. **Under what conditions would you return to preventing a user from commenting on or retweeting the President's misinformation about the election results?**

In October 2020, we clarified our civic integrity policy to provide more information about our efforts to safeguard the public conversation against false claims of victory in the 2020 U.S. election. Applying warnings to premature claims of victory or victory claims that differed from official sources was always intended to be a temporary measure designed to guard against claims of

victory when the election outcome was still being determined and the risk of harm was most acute. Once the race was called by official sources and the outcome was widely disseminated, we determined that the risk associated with false claims of victory in the Presidential race significantly decreased and that warnings were no longer necessary to safeguard the public conversation.

7. **This year, Russia and Iran engaged in aggressive campaigns to suppress the vote and undermine candidates throughout the election.**

    a. **Is it correct that Twitter received warnings from law enforcement about the threat of hack-and-leak operations during the election?**
    b. **Would you have taken the same steps as you did with the *New York Post*, if it were *The Guardian* and about one of the Trump children?**

In 2018, we created a policy to prevent Twitter from being used to spread hacked materials. This policy was informed from the activity we saw on the service during the 2016 elections by Russian-state actors. Additionally, we were warned by government partners generally about the threats that hack and leak operations could pose to the integrity of the conversation regarding the 2020 U.S. election.

It was against this backdrop that we enforced our Hacked Materials Policy against very specific content shared by the @NYPost. Under this policy, people on Twitter were blocked from sharing certain links from the @NYPost, publicly or privately, as those specific articles contained the source materials themselves. References to the contents of the materials or discussion about the materials were not restricted under the policy. After hearing feedback from journalists and others, we quickly updated our policy to limit its scope to only cover the removal of materials shared by hackers directly. Our initial decision was not impacted by political ideology or the party affiliation of the individuals who had information disclosed by the materials. It was informed by our Hacked Materials Policy at the time, and the warnings we had received about potential hack-and-leak operations.

8. **Your counterpart, Facebook, has updated its policies to prohibit dehumanization based on race, ethnicity, and immigration status; whereas Twitter's does not clearly cover dehumanizing content targeting people based on race. How does Twitter account for differences in its policies on hate speech?**

Twitter recently expanded its hateful conduct policy to prohibit language that dehumanizes people on the basis of race, ethnicity, or national origin. More information about the expansion can be found here.

<u>Questions from Senator Booker</u>

1. **Social media platforms, including Twitter, have a responsibility to stem the flow of election misinformation on their platforms. I believe it is possible for platforms like Twitter to ensure Americans' freedom to speak out while protecting the legitimacy of our democratic process and the public's safety.**

   a. **Has Twitter considered implementing viral circuit breakers as proposed by Professor Ellen Goodman and the Center for American Progress,[1] where social media platforms would design a pause in the algorithmic amplification of fast-growing content about the election until content moderators can conduct an effective review for accuracy? Do you think this would be an effective tool in combatting the flow of misinformation on social media?**

   b. **Has Twitter considered instituting a short delay on content from specific high-reach accounts to allow for human review, just as live network TV institutes a short delay to prevent unacceptable content from airing? Do you think this would be an effective tool in combatting the flow of misinformation on social media?**

   c. **Will Twitter commit to hiding false and misleading content that baselessly delegitimizes our democratic process—content designed to sow doubt and division— behind a click-through warning label? Will Twitter commit to ensuring that its algorithm does not amplify such content?**

Twitter has taken numerous steps to combat the spread of misinformation. We have heard from the people who use Twitter that we should not determine the truthfulness of Tweets and we should provide context to help people make up their own minds in cases where the substance of a Tweet is disputed. When we label Tweets, we link to Twitter conversation that shows three things for context: (1) factual statements; (2) counterpoint opinions and perspectives; and (3) ongoing public conversation around the issue. We will only add descriptive text that is reflective of the existing public conversation to let people determine their own viewpoints. In addition, we will reduce the visibility of labeled Tweets, meaning we will not amplify the Tweets on a number of surfaces across Twitter.  We also alert people with a warning in cases where they seek to share a Tweet that has been labeled for misinformation, and in some cases disable engagement altogether. This has helped us to combat the potential spread of misinformation on the platform.

While we do not currently institute a short delay on content from high-reach accounts and have not instituted viral circuit breakers, we continue to study and refine our approach to addressing harms associated with misinformation. We look forward to continuing the conversation with your office about additional steps we can take to address harmful misinformation.

2. **Do you agree that social media platforms like yours have a responsibility to continue enforcing their enhanced election-related rules for user-generated content during the period between Election Day and the presidential inauguration on January 20?**

In the lead up to the 2020 U.S. election, we made significant enhancements to our policies to protect the integrity of the conversation occurring on Twitter regarding the election. The civic

integrity policy and others aimed at safeguarding the public conversation remain in effect and will continue to be enforced in the lead up and after the Georgia runoff.

Specifically, this year, we updated our civic integrity policy to more comprehensively enforce labeling or removing of false and misleading information. The updated policy covers the following activities:

- False or misleading information about how to participate in an election or civic process;
- Content intended to intimidate or dissuade people from participating;
- Misrepresentation about affiliation (for ex., a candidate or political party);
- Content that causes confusion about laws and regulations of a civic process, or officials and institutions executing those civic processes;
- Disputes of claims that could undermine public confidence in the election (e.g. unverified information about election rigging, ballot tampering, vote tallying, or certification of election results); and
- Content that misleads about outcomes (e.g., claiming victory before results are in, inciting unlawful conduct to prevent the procedural or practical implementation of election results).

The civic integrity policy augmented and enhanced other important rules aimed at preventing interference with the election. Twitter banned all political advertising in 2019, only allowing some cause-based advertising for non-partisan civic engagement, in line with our belief that the reach of political speech should be earned, not bought. Additionally, we adopted rules prohibiting deceptively shared synthetic or manipulated media, sometimes referred to as "deep fakes," that may lead to serious offline harm; and labeling deceptive or synthetic media to provide additional context. Moreover, we have rules prohibiting platform manipulation, impersonation, hateful conduct, ban evasion, and attributed activity, among other harmful activities. We have also labeled specific government and state-media accounts from UN P-5 nation states, and plan to expand this effort in the near future.

**3. What steps have you taken to modify Twitter's algorithms to ensure that blatantly false election disinformation posted by election officials that receives high levels of interaction isn't amplified?**

In cases where a label or interstitial is applied, we take steps to reduce the visibility of Tweets, meaning we will not amplify the Tweets on a number of surfaces across Twitter. We may also remove the ability for people to retweet or like the Tweet.

---

[1] Adam Conner & Erin Simpson, *Results Not Found: Addressing Social Media's Threat to Democratic Legitimacy and Public Safety After Election Day*, CTR. FOR AM. PROGRESS (Oct. 23, 2020), https://www.americanprogress.org /issues/technology-policy/reports/2020/10/23/492232/results-not-found-addressing-social-medias-threat-democratic-legitimacy-public-safety-election-day.; [2] Donald J. Trump (@realDonaldTrump), TWITTER (Nov. 12, 2020, 11:34 A.M.), https://twitter.com/realdonaldtrump/status/1326926226888544256.; [3] *Joint Statement from Elections Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committees*, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY (Nov. 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election.

4. **If an elected official repeatedly and flagrantly violates Twitter's policies, at what point would Twitter impose a more severe enforcement penalty beyond labeling or hiding individual tweets?**

We assess reported Tweets from world leaders against the Twitter Rules, which are designed to ensure people can participate in the public conversation freely and safely. We take enforcement action for any account on our service that involves the promotion of terrorism; clear and direct threats of violence against an individual; posting of private information; posting or sharing intimate photos or videos of someone produced or distributed without their content; engaging in behaviors related to child sexual exploitation; engaging in violations of the copyright policy, and encouraging or promoting self-harm. Direct interactions with fellow public figures, comments on political issues of the day, or foreign policy saber-rattling on economic or military issues are generally not in violation of these Twitter Rules.

In other cases involving a violation of the Twitter Rules, we will err on the side of leaving the content up if there is a clear public interest in doing so. In such cases, we may place the violative content behind a warning notice that provides context about the violation and allows people to click through should they wish to see the content.

5. **What is the most significant enforcement action Twitter has taken against an American elected official's account for violating your policies?**

Twitter has taken a range of enforcement actions against the accounts of American elected officials, including removing, labeling, limiting the visibility of Tweets, or placing warning labels on content.

6. **What is the most significant enforcement action Twitter has taken against a foreign leader's account for violating your policies?**

Twitter has taken a range of enforcement actions against the accounts of foreign leaders, including removing, labeling, or placing warning labels on content.

7. **Has Twitter undertaken any studies about how hiding a tweet behind a warning label—as opposed to just adding a label beneath a tweet—limits the spread of disinformation? Has Twitter studied what content fills the void when these steps are taken? And if so, what has Twitter found? If not, do you plan to initiate such studies, or will you make a commitment to do so**?

We are continuously analyzing our enforcement policies – including the impact of specific types of enforcement actions – so that we can learn and improve. We are currently analyzing the effectiveness of actions we took during the 2020 U.S. election and look forward to sharing our findings with the Committee.  An initial analysis of the impact of some of our efforts around the U.S. 2020 election is here.

8. **President Trump is spreading dangerous misinformation about our electoral process on your platforms right now. What specific lessons have you learned since Election Day? And what concrete steps has Twitter taken to enhance its enforcement policies**

**regarding election disinformation since Election Day?**

Our efforts to safeguard the conversation on Twitter regarding the 2020 U.S. election are ongoing and we continue to apply labels, warnings, and additional restrictions to Tweets that included potentially misleading information about the election. We continue to assess the impact of our enforcement actions, but an initial examination of our efforts from October 27th to November 11th has found:

- Approximately 300,000 Tweets have been labeled under our Civic Integrity Policy for content that was disputed and potentially misleading. These represent 0.2% of all US election-related Tweets sent during this time period;
- 456 of those Tweets were also covered by a warning message and had engagement features limited (Tweets could be Quote Tweeted but not Retweeted, replied to, or liked);
- Approximately 74% of the people who viewed those Tweets saw them after we applied a label or warning message; and
- There was an estimated 29% decrease in Quote Tweets of these labeled Tweets due in part to a prompt that warned people prior to sharing.

9. **At noon on January 20, Donald Trump will no longer be President of the United States. If he continues to spread election misinformation in the future, will Twitter treat Donald Trump's tweets differently—as an ex-President—from how the platform does now?**

We assess reported Tweets from world leaders against the Twitter Rules, which are designed to ensure people can participate in the public conversation freely and safely. We take enforcement action for any account on our service that involves the promotion of terrorism; clear and direct threats of violence against an individual; posting of private information; posting or sharing intimate photos or videos of someone produced or distributed without their content; engaging in behaviors related to child sexual exploitation; engaging in violations of the copyright policy, and encouraging or promoting self-harm. Direct interactions with fellow public figures, comments on political issues of the day, or foreign policy saber-rattling on economic or military issues are generally not in violation of these Twitter Rules.

In cases involving a world leader, we will err on the side of leaving the content up if there is a clear public interest in doing so. In such cases, we may place the violative content behind a warning notice that provides context about the violation and allows people to click through should they wish to see the content. Twitter's world leader policy no longer applies when the account in question is no longer a world leader.

10. **On November 10, President Trump issued a baseless tweet falsely claiming that an election technology company had "DELETED" millions of his votes and had "SWITCHED" hundreds of thousands more.[2] In fact, a group of federal and state officials responsible for election cybersecurity issued a statement debunking President Trump's claims. "There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised," they wrote, adding that "[t]he November 3rd election was the most secure in American history."[3]**

     **a.** **Is Twitter aware of any evidence to suggest that any election security company deleted millions of Trump votes nationwide?**

     **b.** **Do you think baseless claims about election fraud are harmful to our democracy?**

     **c.** **When President Trump posted similarly outrageous tweets during the week of the election, Twitter had hidden those tweets behind a warning label, which had the effect of reducing how many users were exposed to this false and misleading information. Why was this more recent tweet by President Trump—spreading outrageous falsehoods about the 2020 election—treated differently?**

Twitter does not have additional information related to the election security company referenced, beyond what has been publicly reported and shared by government sources. As the response to Question 2 details, in 2020, we updated our civic integrity policy to better safeguard the public conversation around critical civic processes, like the election and census. This policy permits us to take action in cases where individuals make claims that could undermine public confidence in the election, including unverified information about election rigging, ballot tampering, vote tallying, or certification of election results.

With regards to the specific Tweet referenced in (c), it was posted on November 12, 2020 and labeled pursuant to Twitter's civic integrity policy.

**11. On November 15, President Trump tweeted, "I WON THE ELECTION!"[4] This blatant election misinformation was liked and retweeted hundreds of thousands of times. This and other similar tweets by President Trump were false declarations of victory aimed at undermining the integrity of our electoral process. Why did Twitter decide not to hide this disinformation behind a warning label, as it did for some earlier tweets?**

In October 2020, we clarified our civic integrity policy to provide more information about our efforts to safeguard the public conversation against false claims of victory in the 2020 U.S. election. Applying labels and warnings to premature claims of victory or victory claims that differed from official sources was always intended to be a temporary measure designed to guard against claims of victory when the election outcome was still being determined and the risk of harm was most acute. Once the race was called by official sources and the outcome was widely disseminated, we determined that the risk associated with false claims of victory in the Presidential race significantly decreased and that warnings were no longer necessary to safeguard the public conversation.

### Questions from Senator Coons

1. **Some have criticized social media platforms for evaluating new products and business unit performance based on engagement-oriented metrics that in their view, reward misinformation and harmful content.**
   a. **What metrics does Twitter use when evaluating a new product or the performance of its business units?**
   b. **How does Twitter ensure that its metrics and incentive structures do not reward the development of products that contribute to misinformation or other harmful content?**

At Twitter, we prioritize healthy public conversation through our product, policies, and enforcement. The health principles that guide our work include decreasing potential for likely harm; harmful bias and incentives; and reliance on content removal. Our principles also push us to increase diverse perspectives and public accountability. These principles connect to everything for us — from our decision to ban all political ads, to our policy around public-interest notices, and even a product test that allows people to choose who can reply to their Tweets.

2. **Does Twitter calculate, as Facebook now does, the prevalence of hate speech on its platform?**
   a. **If not, please explain why not and how Twitter believes it can effectively address hate speech without this information.**
   b. **If so, please explain and state whether that information will be made public.**

Twitter is a uniquely open service, which is used by academics across the world as a data source to study important issues, including hate online. Published papers have recognised that "Twitter provides a unique big data source for public health researchers"while Carl Miller highlighted that "Twitter is the only major service to make public conversation data available via an API, for the purposes of study." The accessibility of Twitter's APIs allows researchers to pursue their own areas of focus, measuring whatever is relevant to their field of study. Enabling independent research is a different way to inform the public debate and something we believe strongly in.

In addition to this, we have numerous policies aimed at combating hateful conduct on our platform. Our Hateful Conduct Policy prohibits references to violent events or types of violence where protected categories were the primary victims, or attempts to deny or diminish such events. We recently expanded this policy to prohibit language that dehumanizes people on the basis of race, ethnicity, or national origin. In addition, our Glorification of Violence Policy prohibits content that glorifies or praises historical acts of violence and genocide, including the Holocaust. And, our Violent Organizations Policy prohibits violent organizations, including extremist groups, from using Twitter to promote violence. Under this policy, we have removed 204 groups, half of which had links to white supremacy, and permanently suspended 1.7 million unique accounts for the promotion of terrorism.

3. **You indicated in your testimony that you would not conduct an independent civil rights audit, as Facebook has done, in light of your consultation with civil rights groups and the transparency reports you issue.  Please provide more detail about the specific groups that you consult with, the nature of the consultations, and why you**

**believe that consultation is an adequate substitute for an independent audit of the company that would permit direct access and analysis of Twitter's internal policies, products, and actions.**

We agree that third-party feedback and metrics can be valuable resources to inform our work. Our focus is not only assessment but building a framework both internally and externally to make substantive change over time. To that end, we have established a global, cross-functional group with C-suite representation to inform and evaluate our work related to civil rights. In addition, several national organizations that represent the interests and defense of civil rights, serve in advisory roles on our Trust and Safety Council. These partnerships inform how we shape and enforce our policies. Prospectively, we will continue to engage groups in the U.S. that are focused on civil rights as we advance our work.

4. **You testified, "We wanted to scope our approach to start to focus on the highest severity of harm. We focused on three areas: manipulated media... civic integrity... and public health, specifically around COVID."  The Fourth National Climate Assessment concluded that climate change "affects human health by altering exposures to heat waves, floods, droughts, and other extreme events; vector-, food- and waterborne infectious diseases; changes in the quality and safety of air, food, and water; and stresses to mental health and well-being."[1]  Given the immediate public health risks posed by climate change, does Twitter intend to develop a climate change misinformation policy?  If not, please explain why not.  If so, please provide details including timing.**

At this time, Twitter does not take enforcement action against climate change misinformation. However, we continue to evaluate our policies and if additional safeguards are necessary to better serve the needs of the people who use Twitter.

5. **The *Guardian* reported in February 2020 that a draft study by Brown University researchers suggests "a substantial impact of mechanized bots in amplifying denialist messages about climate change."[2]  What steps has Twitter taken to address the amplification of climate denialism by bots?**

Twitter has various policies to address potential harms associated with automated activity. For example, our Platform Manipulation and Spam Policy prohibits engaging in bulk, aggressive, or deceptive activity that misleads and/or disrupts individuals' experience on Twitter. This policy is intended to address a range of behavior, including commercially motivated spam, inauthentic engagements, coordinated harmful activity, and coordinated activity that attempts to artificially influence conversations through the use of multiple accounts, fake accounts, automation and/or scripting.

6. **In the coming months, it is likely that extensive new information about COVID-19**

---

[1] Kristi L. Ebi et al. "Human Health," in *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II*, U.S. Global Change Research Program (2018), *available at* https://nca2018.globalchange.gov/chapter/14/.
[2] *See* Oliver Milman, "Revealed: Quarter of all Tweets About Climate Crisis Produced by Bots," *The Guardian* (Feb. 21, 2020), *available at* https://www.theguardian.com/technology/2020/feb/21/climate-tweets-twitter-bots-analysis (Feb. 21, 2020).

**vaccine candidates will become available.  Unfortunately, misinformation about vaccines abounds, and the World Health Organization named resulting vaccine hesitancy one of the top ten threats to global health in 2019.[3]  In addition, a recent study found that social media users exposed to content on certain vaccines were more likely to grow misinformed over time than were consumers of traditional media.[4]**

   a.  **Is Twitter proactively engaged in planning efforts to address misinformation about emerging COVID-19 vaccines on its platforms?**
   b.  **If so, how does Twitter plan to assess the accuracy of information about these vaccines?**
   c.  **Has Twitter partnered with (or will Twitter partner with) fact checkers with relevant training and expertise to address misinformation about COVID-19 vaccines?**
   d.  **How will Twitter handle vaccine-related content deemed valid when posted but which more recent guidance or consensus suggests is misleading or inaccurate?**
   e.  **How will Twitter engage public health, immunology, and other related experts to identify and contextualize content that is incomplete or misleading?**

The public conversation occurring on Twitter is critically important during this unprecedented public health emergency. With a critical mass of expert organizations, official government accounts, health professionals, and epidemiologists on our service, our goal is to elevate and amplify authoritative health information as far as possible. To address this global pandemic, on March 16, 2020, we announced new enforcement guidance, broadening our definition of harm to address, specifically, content related to COVID-19 that goes directly against guidance from authoritative sources of global and local public health information. We require individuals to remove violative Tweets in a variety of contexts with the goal of preventing offline harm. Additionally, we are currently engaged in an effort launched by the Office of the U.S. Chief Technology Officer under President Trump in which we are coordinating with our industry peers to provide timely, credible information about COVID-19 via our respective platforms. This working group also seeks to address misinformation by sharing emerging trends and best practices.

In addition, in December 2020, we updated our policy approach to misleading information about COVID-19. Beginning December 21, we may require people to remove Tweets which advance harmful false or misleading narratives about COVID-19 vaccinations, including:

- False claims that suggest immunizations and vaccines are used to intentionally cause harm to or control populations, including statements about vaccines that invoke a deliberate conspiracy;
- False claims which have been widely debunked about the adverse impacts or effects of receiving vaccinations; or
- False claims that COVID-19 is not real or not serious, and therefore that vaccinations are unnecessary.

---

[3] *See* Sarah Geoghegan et al., "Vaccine Safety: Myths and Misinformation," *Frontiers in Microbiology* (Mar. 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7090020/.
[4] Dominik Andrezej Stecula et al., "How Trust in Experts and Media Use Affect Acceptance of Common Anti-Vaccination Claims," *Misinformation Review* (Jan. 2020).

Starting in early 2021, we may label or place a warning on Tweets that advance unsubstantiated rumors, disputed claims, as well as incomplete or out-of-context information about vaccines. Tweets that are labeled under this expanded guidance may link to authoritative public health information or the Twitter Rules to provide people with additional context and authoritative information about COVID-19. We will enforce this policy in close consultation with local, national and global public health authorities around the world, and will strive to be iterative and transparent in our approach.

7. **In the lead-up to the election, reporting and company representatives have referenced efforts by Twitter to alter content distribution algorithms in order to restrict the reach of harmful content. The scope and extent of such efforts, and to what degree they are temporary or permanent, is unclear. Please elaborate on the following:**

   a. **Any systems put in place, whether automated or manual, to alter content distribution or recommendation algorithms;**
   b. **Any associated changes in content moderation practices;**
   c. **Specific definitions of content areas to which changes were applied;**
   d. **An evaluation of the results of such changes, including any metrics you can provide for each week during October and November (or a statement that such evaluation will be included in a subsequent post-mortem analysis).**

Twitter made several policy and product changes in an effort to safeguard the public conversation occurring on Twitter regarding the 2020 U.S. election. On the policy side, notably, we expanded and enforced our Civic Integrity Policy, which prohibits manipulating or interfering in elections or other civic processes. This includes posting or sharing content that may suppress participation or mislead people about when, where, or how to participate in a civic process. Under this policy, Twitter labeled and reduced the visibility of Tweets containing false or misleading information about civic processes in order to provide additional context.

During the period from October 27 to November 11, 2020, we labeled approximately 300,000 Tweets under our Civic Integrity Policy for content that was disputed and potentially misleading. These represent 0.2% of all U.S. election-related Tweets sent during this time period. Approximately 450 of those Tweets were also covered by a warning message and had engagement features limited, including Tweets could be Quote Tweeted but not Retweeted, replied to or liked. Approximately 74% of the people who viewed those Tweets saw them after we applied a label or warning message. We saw an estimated 29% decrease in Quote Tweets of these labeled Tweets due in part to a prompt that warned people prior to sharing.

In addition to policy changes, we implemented significant product changes intended to increase context and encourage more thoughtful consideration before Tweets are amplified. For example, we encouraged people to add their own commentary when amplifying content by prompting Quote Tweets instead of Retweets. This change introduced some friction, and gave people an extra moment to consider why and what they were adding to the conversation. The change slowed the spread of misleading information by virtue of an overall reduction in the amount of sharing on the service. We observed a 23% decrease in Retweets and a 26% increase in Quote Tweets, but on a net basis the overall number of Retweets and Quote Tweets combined decreased by 20%.

In addition, we stopped providing "liked by" and "followed by" Tweet recommendations from accounts you do not follow in the Home Timeline and through notifications. While we had initially hoped that this would reduce the potential for misleading information to spread on our service, we did not observe a statistically significant difference in misinformation prevalence as a result of this change (nor any meaningful reduction in abuse reports). Instead, we found that pausing these recommendations prevented many people from discovering new conversations and accounts to follow, and we have since reverted the change. We are continuing to assess the impact of these product and policy changes and look forward to sharing further information with the Committee.

8. **Twitter has affirmed its interest in working with outside researchers to improve conversations on the platform, but academics and activists have expressed frustration over the roadblocks they have encountered in getting research projects off the ground. Twitter has acknowledged that "[a] number of factors, including internal employee changes and unforeseen complexity in establishing partnerships, have contributed to delays and uncertainty."[5] What progress, if any, has Twitter made on removing obstacles for outside researchers seeking to study the health of discourse on Twitter, and what research projects, if any, are currently under way?**

Twitter is a uniquely open service, which is used by academics across the world as a data source to study important issues, including hate online. Published papers have recognised that "Twitter provides a unique big data source for public health researchers"while Carl Miller highlighted that "Twitter is the only major service to make public conversation data available via an API, for the purposes of study." Enabling independent research is a different way to inform the public debate and something we believe strongly in. For example, earlier this year we made available at no cost to researchers a dedicated API-endpoint of Covid-19 Tweets, enabling a wide range of research into the pandemic.

Moreover, to further support the work of academics, we have been testing an Academic Research product track, which will launch next year.  The Academic Research product track will offer qualified academic researchers a significantly higher monthly Tweet volume cap for free, as well as endpoints and enhanced features to get more precise and complete data for analyzing the public conversation.

In addition to accessing public Tweets, we have also taken the decision to make the data relating to state-linked information operations that we have removed available to researchers and the public. Beginning in 2018, we now make available  a comprehensive archive of Tweets and media associated with known state-backed information operations that we have removed. This unique archive, the only source of its kind made available by any company, is used by researchers, journalists and experts around the world and now spans operations across 15 countries, including more than nine terabytes of media and 200 million Tweets.

9. **While important questions about the potential addictive properties of social media remain open for further research, the association between social media use and mental**

---

[5] *See* Deepa Seetharaman, "Jack Dorsey's Push to Clean Up Twitter Stalls, Researchers Say," *Wall Street Journal* (Mar. 15, 2020), *available at* https://www.wsj.com/articles/jack-dorseys-push-to-clean-up-twitter-stalls-researchers-say-11584264600.

health disorders, especially among youth, raises urgent questions.[6]

   a. **What research has Twitter conducted internally on the mental health impacts of social media use?**
   b. **What resources has Twitter made available for independent, external study of the potential implications of its platform for users' mental health?**
   c. **Has Twitter integrated the findings of any such studies into its product design?**

We continue to follow this issue, including academic research, closely.  Studies have produced a range of insights and findings that do not suggest that these questions are as clear cut as some discussion may suggest, with some finding that the impact of digital technology on mental health and wellbeing is positive.

Our Trust & Safety Council has a dedicated advisory group on Suicide Prevention and Mental Health, while we partner with organisations around the world to better understand these issues, in addition to supporting our partners in their work providing support and raising understanding.  In addition to this, earlier this summer, we worked with various mental health partners across the globe to raise awareness and encourage honest conversation around the emotional challenges we are experiencing together, amid the unprecedented COVID-19 crisis. Since then, we've expanded our work with NGOs to identify, connect, and engage vulnerable people across the world. In particular, we've continued to engage suicide prevention organizations and counseling services to ensure that people on Twitter feel safe and have access to support when they need it most.

   10. **The 1998 Digital Millennium Copyright Act (DMCA) established a "notice and takedown" system for policing copyright infringement on the internet, but a recent Copyright Office report concluded that "Congress' original intended balance has been tilted askew" and that takedown notices have not remedied the widespread problem of digital piracy.[7]  I am concerned about the impact of this ongoing piracy on our nation's creative community.**

   a. **What responsibility should platforms like Twitter shoulder in proactively identifying, removing, and blocking infringing content?**
   b. **What steps has Twitter taken to protect copyright owners beyond processing DMCA takedown notices?**
   c. **Does Twitter ever monetize copyrighted content that is posted without the permission of the copyright owner?**
   d. **I am concerned by reports that Twitter charges copyright owners for access to the tools necessary to search for infringing content on the platform and limits the number of infringing posts that can be identified for removal.  How do you respond?**

---

[6] *See, e.g.*, Cleveland Clinic, "Is It Possible to Become Addicted to Social Media?" (Mar. 1, 2019), *available at https://health.clevelandclinic.org/is-it-possible-to-become-addicted-to-social-media/*; Elroy Boers et al., "Association of Screen Time and Depression in Adolescence," *JAMA Pediatrics* (2019), *available at* https://jamanetwork.com/journals/jamapediatrics/article-abstract/2737909?guestAccessKey=f3fe2ed6-1fb3-44cc-a9a8-a38bd0463942&utm_content=weekly_highlights&utm_term=081019&utm_source=silverchair&utm_campaign=jama_network&cmp=1&utm_medium=email.

[7] United States Copyright Office, *Section 512 of Title 17: A Report of the Register of Copyrights* (May 21, 2020), *available at* https://www.copyright.gov/policy/section512/section-512-full-report.pdf.

      **e.  As further noted in the recent Copyright Office report, "Congress' vision of broad, open, cross-industry standards-setting for the creation of standard technical measures has not come to pass."  Why do you think that is, and do you have any hope that future voluntary standardization of technical measures will combat digital piracy effectively?**

Twitter responds to all legitimate copyright complaints as laid out in Section 512 of the DMCA. Furthermore, Twitter does not allow for full-length music streaming as some of our competitors do. Twitter is unique among our industry peers and remains a text-first service for the creation of content. When media is shared on Twitter, it is often in service of commentary or criticism to drive real-time, public conversations and debate. For example, when our customers post snippets of third-party content (videos, photos and GIFs), they are frequently doing so in an exercise of political and newsworthy speech, and for the purpose of commentary and criticism (not to share and watch pirated content). As you can see in our transparency reports, the number of takedown notices Twitter receives annually is a fraction of what other platforms receive and reflects the fact that allegedly infringing material is a small fraction of the total Tweets uploaded to Twitter.

Twitter relies on rightsholders, who are in the best position to know whether use of their content is infringing or not, to notify us of infringing material on Twitter. Twitter's response to copyright complaints may include the removal or restriction of access to allegedly infringing material. If we remove or restrict access to content in response to a copyright complaint, Twitter will make a good-faith effort to contact the affected account holder with information concerning the removal or restriction of access, including a full copy of the complaint, along with instructions for filing a counter-notice.

We are actively engaged with the RIAA and many other rightsholder bodies regarding copyright concerns they have. We dedicate significant resources to quickly respond to takedown notices, and we work with rightsholders and representative bodies to address specific concerns if and when they arise.

One important consideration as we contemplate voluntary agreements and technological measures is that in certain circumstances, heightened specificity can hurt small businesses that are launching new apps and platforms. Small companies will not necessarily have the resources to afford expensive third-party technical solutions. Additionally, we are always concerned that voluntary agreements will further entrench the market dominant players.

<u>Questions from Senator Durbin</u>

1. **On October 28, *The New York Times* published an article entitled "Evidence of anti-conservative bias by platforms remains anecdotal."  The article says: "Conservatives have said for years that online social media platforms censor their views. But their evidence is largely anecdotal, and conservative accounts frequently perform extremely well online."**

    a. **Do you agree that evidence of online social media platforms censoring conservative views is "largely anecdotal"?**

Yes.  Twitter enforces our policies impartially, without regards to political viewpoints or affiliation. Political bias in the enforcement of our policies or other related decision-making has not been credibly confirmed by any studies of which we are aware.

    b. **Do you agree that "conservative accounts frequently perform extremely well online"?**

Conservative voices have a strong presence on Twitter. For example, President Trump was the most mentioned person in the U.S. last year with more than 300 million mentions. Additionally, the hashtag #MAGA was the third most popular hashtag with more than 60 million Tweets.

2. **In their sobering book "How Democracies Die," authors Steven Levitsky and Daniel Ziblatt make the following observation:**

    **"Under President Trump, America has been defining political deviancy down. The president's routine use of personal insult, bullying, lying, and cheating has, inevitably, helped to normalize such practices.  Trump's tweets may trigger outrage from the media, Democrats, and some Republicans, but the effectiveness of their responses is limited by the sheer quantity of violations.  As [Senator Daniel Patrick Moynihan] observed [in 1993], in the face of widespread deviance, we become overwhelmed and then desensitized.  We grow accustomed to what we previously thought to be scandalous.  Furthermore, Trump's deviance has been tolerated by the Republican Party, which has helped make it acceptable to much of the Republican electorate."**

    **Mr. Dorsey, I know that Twitter was not conceived as a medium for desensitizing Americans to political deviancy.  But President Trump's tweets have had that effect, with serious consequences to our democratic institutions.  What is your reaction to the authors' discussion of the normalization of personal insults, bullying, lying, and cheating that has been accelerated through President Trump's tweets?**

We assess reported Tweets from world leaders, including President Trump, against the Twitter Rules. In response to violations of the Twitter Rules, we have taken action on a variety of Tweets posted by President Trump, including labeling Tweets or placing them behind an interstitial and limiting amplification. Importantly, we believe there is a value in keeping the content available on

our service. There is a public interest in enabling the people to be informed and engage directly with their elected leaders.

While Twitter has a responsibility to safeguard the integrity of the public conversation, we recognize that we are only one part of the broader ecosystem that impacts the broader public discourse. The internet has lowered traditional media barriers to entry for all voices, allowing for unprecedented discourse and community building across the political and socio-economic spectrum.. We are happy to work with Congress on efforts to increase civic resilience to better safeguard against harmful misinformation and other concerning behavior.

3. **Has President Trump ever posted or retweeted tweets that contain objectively false information during his presidency?  If so, has Twitter ever identified such tweets as containing objectively false information?**

Twitter does not make determinations about whether information on the platform is true or false. We have heard from the people who use Twitter that we should not determine the truthfulness of Tweets and we should provide context to help people make up their own minds in cases where the substance of a Tweet is disputed. Consistent with this feedback from our customers, we have expanded our enforcement options to allow us to label misinformation related to manipulated media, COVID-19, and civic integrity. When we label Tweets, we link to Twitter conversation that shows three things for context: (1) factual statements; (2) counterpoint opinions and perspectives; and (3) ongoing public conversation around the issue.

4. **Twitter has been trying to address election disinformation, sometimes by adding small disclaimers at the bottom of false or misleading tweets, sometimes by putting disclaimer screens so users have to click past the disclaimer in order to view the tweet.  For example, recently President Trump tweeted, "Most fraudulent Election in history!" At the bottom of this tweet, Twitter posted a small disclaimer, saying, "This claim about election fraud is disputed."  When President Trump makes an objectively false claim like this, shouldn't Twitter say that it's false, not disputed?**

We have heard from the people who use Twitter that we should not determine the truthfulness of Tweets and we should provide context to help people make up their own minds in cases where the substance of a Tweet is disputed. In addition, we recognize that Twitter is only one part of the broader ecosystem that is necessary to build civic resilience and combat harmful misinformation. We encourage Congress to engage in efforts to promote civic resilience more broadly and are happy to work with you on such efforts.

5. **It is not widely known that Twitter allows users to post graphic pornographic content. While Twitter does not allow children under the age of 13 to sign up an account, a child does not need an account to access content posted on Twitter, including pornographic content.**

   a. **What measures is Twitter taking to ensure that children are protected from exposure to graphic pornographic content on your service, especially at a time when millions of American children are spending many hours online every day due to remote learning?**

Our Twitter Rules and Twitter Media Policy limit the types of content that may be shared on Twitter and describe requirements for users who choose to share potentially sensitive content on Twitter. In addition, we also provide people, irrespective of their age, a variety of settings to control their experience, including their safety and content experience on the platform.

Every account holder has the choice of whether they will see a warning for sensitive content or not. When an individual on Twitter has this setting enabled, people who visit a specific profile may see a message that the account may include potentially sensitive content and inquire if the individual wants to view it. This setting enables individuals on Twitter to control their own experience and protects them from seeing sensitive content without first having made a choice to click through the warning, or to never see warnings.

**b. Will Twitter consider reaching out to local school systems to encourage them to block access to Twitter on school-issued devices and other online learning platforms, especially for elementary school students?**

We believe strongly in protecting children on Twitter. As part of our work, we comply with the Children's Online Privacy Protection Act, or COPPA and provide a range of tools for individuals to control whether or not they see sensitive content on Twitter. We encourage schools to use these tools in cases where they are concerned about children accessing sensitive content and will continue to work with your office on addressing this concern.

<u>**Questions from Senator Hirono**</u>

1. **In your opening statement, you expressed your belief that "companies like Twitter should publish their moderation process."**

   a. **What is preventing Twitter from publishing its content moderation process right now?**
   b. **Does Twitter commit to publishing its content moderation process?  If so, when?  If not, why not?**

We have made significant efforts to be transparent about our content moderation rules and enforcement.  Our Twitter Rules are publicly available, and we strive to ensure that these rules are easily understood. In addition, an important component of our transparency efforts is the Twitter Transparency Center. This year, we expanded our biannual transparency report site to become a comprehensive Twitter Transparency Center. Our goal with this evolution is make our transparency reporting more easily understood and accessible to the general public. This site includes data visualizations making it easier to compare trends over time and more information for the individuals who use Twitter, academics, researchers, civil society groups and others who study what we do to understand bigger societal issues.

The Transparency Center includes data on enforcement actions under the Twitter Rules that requires the removal of specific Tweets or to suspend accounts. The Center also includes sections covering information requests, removal requests, copyright notices, trademark notices, email security, platform manipulation, and state-backed information operations. We continue working on additional ways we can be transparent about our enforcement practices, and support efforts by this committee to enhance platform transparency.

2. **Section 230(c)(1) of the Communications Decency Act currently grants platforms like yours broad immunity for content posted by third parties, even if platforms have knowledge of the content, promote the content, or profit off the content.  This immunity applies regardless of platform's size, resources, or efforts to moderate content.**

   a. **Do you believe that all internet platforms should receive the same degree of immunity under Section 230(c)(1) regardless of their size and resources?**
   b. **Do you believe that all internet platforms should receive the same degree of immunity under Section 230(c)(1) regardless of whether, and to what extent, they moderate content?**
   c. **Would you support legislation that required platforms to earn their immunity under Section 230(c)(1) by conditioning immunity on meeting a minimum standard of care?**

Section 230 is the Internet's most important law for free speech and safety. Weakening Section 230 protections will remove critical speech from the Internet. We must ensure that all voices can be heard, and we continue to make improvements to our service so that everyone feels safe participating in the public conversation—whether they are speaking or simply listening. The protections offered by Section 230 help us achieve this important objective. Eroding the foundation of Section 230 could collapse how we communicate on the Internet, leaving only a small number of giant and well-funded technology companies. We should also be mindful that undermining Section 230 will result in far more removal of online speech and impose severe limitations on our collective ability to address harmful content and protect people online.

As explained in more detail in our written testimony, we do not believe that the solution to concerns raised about content moderation is to eliminate Section 230 liability protections. Instead, we believe the solution should be focused on enhancing transparency, procedural fairness, privacy, and algorithmic choice, which can be achieved through additions to Section 230, industry-wide self-regulation best practices, or additional legislative frameworks.

3. **I have heard from copyright holders that Twitter has imposed hurdles to the efficient removal of infringing content on its platform, including by limiting the number of legitimate Digital Millennium Copyright Act notices that can be sent through its webform and by withholding from copyright holders free search capabilities that would help them enforce their rights.**

   **Do you commit to working with copyright holders to remove these hurdles as other platforms already have?**

Twitter relies on rightsholders, who are in the best position to know whether use of their content is infringing or not, to notify us of infringing material on Twitter. Twitter's response to copyright complaints may include the removal or restriction of access to allegedly infringing material. If we remove or restrict access to content in response to a copyright complaint, Twitter will make a good-faith effort to contact the affected account holder with information concerning the removal or restriction of access, including a full copy of the complaint, along with instructions for filing a counter-notice.

Twitter responds to all legitimate copyright complaints as laid out in Section 512 of the DMCA. Furthermore, Twitter does not allow for full-length music streaming as some of our competitors do. Twitter is unique among our industry peers and remains a text-first service for the creation of content. When media is shared on Twitter, it is often in service of commentary or criticism to drive real-time, public conversations and debate. For example, when our customers post snippets of third-party content (videos, photos and GIFs), they are frequently doing so in an exercise of political and newsworthy speech, and for the purpose of commentary and criticism. As you can see in our transparency reports, the number of takedown notices Twitter receives annually is a fraction of what other platforms receive and reflects the fact that allegedly infringing material is a small fraction of the total Tweets uploaded to Twitter.

We are actively engaged with the RIAA and many other rightsholder bodies regarding copyright concerns they have. We dedicate significant resources to quickly respond to takedown notices, and we work with rightsholders and representative bodies to address specific concerns if and when they arise.

## Questions from Senator Leahy

1. **You committed to me during your testimony that Twitter will conduct a post-mortem analysis of election misinformation and disinformation spread on your platform and make it available for the public to review.**

   a. **What is the scope of this review, including what timeframe will it cover?**
   b. **When do you anticipate the review will be complete?**
   c. **You testified your review would be made available to the public so academics and researchers can review it.  Do you intend to place any limitations on the availability of any data made public compared to your internal review?**

Our work to safeguard the conversation on Twitter regarding the 2020 U.S. election is ongoing, and we continue to assess the measures we have taken for effectiveness. We have already engaged in an unprecedented level of transparency around our election work, including routinely publicly releasing datasets of information that can reliably be linked to state backed actors.  The archive of these datasets, which includes information released in October 2020, is the only type of its kind in industry.

Apart from these measures, we have already released initial analysis regarding our efforts to safeguard the conversation occurring on Twitter about the 2020 U.S. election. We are in the process of conducting additional analysis on actions taken throughout the entire election period and plan to release additional information to the public early next year.

2. **The label used by Twitter to describe the President's election-related tweets states that his claims are disputed, or that other sources called the election differently.  In fact, many of these tweets are demonstrably, factually false.  To this day, the President is absurdly claiming he won the election.  When we know a tweet on your platform will be seen by millions and is objectively false, why not simply label it as "false?"**

We have heard from the people who use Twitter that we should not determine the truthfulness of Tweets and we should provide context to help people make up their own minds in cases where the substance of a Tweet is disputed. Consistent with this feedback from our customers, we have expanded our enforcement options to allow us to label misinformation related to manipulated media,COVID-19, and civic integrity. When we label Tweets, we link to Twitter conversation that shows three things for context: (1) factual statements; (2) counterpoint opinions and perspectives; and (3) ongoing public conversation around the issue.

3. **Will Twitter maintain and continue building on its Civic Integrity Policy to ensure that its platform does not amplify misinformation in political elections and other civic matters?**

We will continue to assess and build on our efforts to safeguard the public conversation around elections and other civic processes.

4. **What is Twitter doing to ensure that Live Videos are not utilized as a loophole to evade the platform's Civic Integrity Policy?**

Our policies apply to all content posted on Twitter, including live videos.  When there is a violation of these policies, we can apply a range of enforcement options, including removal, limiting visibility, and providing additional context.  For example, Twitter removed live video of a speech from President Trump on November 5, 2020, due to violations of our Civic Integrity Policy.

5. **Misinformation campaigns targeting communities of color are a very dangerous tool that contribute to voter suppression. A report by the Senate Intelligence Committee noted that Russian interference in the 2016 election targeted African Americans in our country with disinformation campaigns. In October, the *Washington Post* reported that Twitter had deleted fake accounts posing as Black Americans. One of the fake accounts that was suspended had garnered 24,000 followers and its most popular tweet was like 75,000 times.  What steps is Twitter taking to improve the speed at which fake accounts are found and to prevent the spread of misinformation campaigns targeting communities of color on the platform?**

As platform manipulation tactics evolve, we are continuously updating and expanding our rules to better reflect what types of inauthentic activity violate our guidelines. We continue to develop and acquire sophisticated detection tools and systems to combat malicious automation on our service.

Individuals are not permitted to use Twitter in a manner intended to artificially amplify, suppress information, or engage in behavior that manipulates or disrupts other people's experience on the service. We do not allow spam or platform manipulation, such as bulk, aggressive, or deceptive activity that misleads others and disrupts their experience on Twitter. We also prohibit the creation or use of fake accounts.

We also know that certain groups and individuals engage in persistent, organized efforts to manipulate and interfere with the conversation on Twitter. Therefore, when we are able to reliably attribute an account on Twitter to an entity known to violate the Twitter Rules, we will remove additional accounts associated with that entity. For instance, if we are able to identify activity associated with the Russian Internet Research Agency, all accounts tied to that entity will be removed, regardless of the content they share. We likewise will remove accounts that deliberately mimic or are intended to replace accounts we have previously suspended for violating our rules. These steps allow us to take more aggressive action against known malicious actors.

6. **Misinformation spreads in many languages on social media platforms. In October 2020, *The New York Times* reported that misinformation in America thrives in both English and Spanish. In October 2020, a study published in The American Journal of Tropical Medicine and Hygiene, detailed how COVID-19 misinformation has circulated in 25 different languages across at least 87 countries. What are you doing to prevent misinformation from spreading in languages other than English and alerting users about this on the platforms?  How prepared is Twitter to handle misinformation in Spanish specifically?**

Twitter has taken numerous steps to address misinformation in Spanish that violates our policies. We have content moderators with Spanish language capability who can enforce our policies.  In addition, we partner with a range of government and civil society organizations on how to use Twitter tools to facilitate the flow of credible information to Spanish speaking communities.  For example, as part of our efforts to safeguard the public conversation around the election when searching for key terms related to voter registration, individuals who used Twitter received prompts in English and Spanish pointing them to official resources. In addition, we trained voter education nonprofits and government partners on how to use Twitter tools and create content targeted at Spanish-language audiences. As part of this, we have worked with @USAGovEspanol, @NALEO, @HispanicFed, @MALDEF, @LULAC, and @WeAreUnidos to promote voter education and misinformation pre-bunking targeted at Spanish-speaking communities. In addition to this, during the election period, our content moderators routinely took enforcement action on Tweets that violated our rules.

7.  **Will you commit to take additional steps based on lessons learned during the 2020 presidential election to prevent the spread of misinformation during the upcoming U.S. Senate elections in Georgia? What steps are you planning, if any, at this stage?**

Our work to safeguard the conversation occurring on Twitter regarding the 2020 U.S. election is ongoing.  In the lead up to the 2020 elections, we made significant enhancements to our policies to protect the integrity of the election. The civic integrity policy and others aimed at safeguarding the public conversation remain in effect and will continue to be enforced around the Georgia runoff.

*Twitter Inc. v. Ken Paxton, et. al.*
USDC-ND, San Francisco Division, Case No. 3:21-cv-1644-MMC

# EXHIBIT 5

**(Copy of the March 25, 2021 Written Testimony of Twitter CEO Jack Dorsey (@jack) to the Subcommittee on Communications and Technology and the Subcommittee on Consumer Protection and Commerce of the United States House of Representatives Committee on Energy and Commerce for the joint hearing titled "Disinformation Nation: Social media's Role in Promoting Extremism and Misinformation" )**

# WRITTEN TESTIMONY OF TWITTER CEO JACK DORSEY (@JACK)
## U.S. HOUSE COMMITTEE ON ENERGY & COMMERCE
### MARCH 25, 2021

Twitter's purpose is to serve the public conversation. While much has changed in the world since we started fifteen years ago, we believe our mission is more important than ever.

Every day Twitter grapples with complex considerations on how to address extremism and misinformation. How do we prevent harm, while also safeguarding free expression and the right of diverse individuals to express a range of views? How do we develop policies that can be built at scale and adapt rapidly, especially given diverse regulatory models around the world? What role should our company play in determining these pivotal questions? What information should we rely on when making decisions? How do we earn the trust of those who use our service?

These are even harder questions in an increasingly polarized world, which has consequently heightened concerns about information sources. Quite simply, a trust deficit has been building over the last several years, and it has created uncertainty — here in the United States and globally. That deficit does not just impact the companies sitting at the table today but exists across the information ecosystem and, indeed, across many of our institutions.

This Committee has expressed interest in what we are doing to combat "falsehoods about the COVID-19 vaccine" and "debunked claims of election fraud." We have COVID-19 and vaccine misinformation policies, as well as a COVID information hub. Our civic integrity and platform manipulation policies are available on our Help Center, along with information on our bans on state-controlled media advertising and political advertising. As a follow-up to our preliminary post-election update, we are conducting a review of the 2020 U.S. election, the findings of which we intend to share.

Our efforts to combat misinformation, however, must be linked to earning trust. Without trust, we know the public will continue to question our enforcement actions. I believe we can earn trust by focusing on the following: enhancing transparency, ensuring procedural fairness, enabling algorithmic choice, and strengthening privacy.

## **Building & Earning Trust**

Every day, millions of people around the world Tweet hundreds of millions of Tweets, with one set of rules that applies to everyone and every Tweet. We strive to implement policies impartially and at scale. We built our policies primarily around the promotion and protection of three fundamental human rights — freedom of expression, safety, and privacy.

At times, these rights can conflict with one another. As we develop, implement, and enforce our policies, we must balance these rights. Additionally, our policies must be adaptable to changes in behavior and evolving circumstances. This is why we must be transparent, embrace procedural fairness and choice, and protect privacy.

*Transparency*

While Twitter has made significant progress with respect to transparency, we know that we can do more to strengthen our efforts. People who use our service should understand our processes — how potential violations of our rules are reported and reviewed, how content-related decisions are made, and what tools are used to enforce these decisions. Publishing answers to questions

like these will continue to make our internal processes both more robust and more accountable to the people we serve.

Twitter's open nature means our enforcement actions are plainly visible to the public, even when we cannot reveal the private details behind individual accounts that have violated our rules. We use a combination of machine learning and human review to assess potential violations of the Twitter Rules. We take a behavior-first approach, meaning we look at how accounts behave before we review the content they are posting. If an account owner breaks our Rules and may be required to delete a Tweet, we have worked to build better in-app notices to communicate with both the account that reports a Tweet and the account that posted it with additional information about our actions. In January, we published our biannual update to the Twitter Transparency Center, with additional data about actions we have taken to disrupt state-backed information operations, to enforce our COVID-19 policy, and take action on Tweets that violate our Rules.

In addition to ensuring transparency around our decisions, we are seeking ways to enhance transparency around how we develop our content moderation policies. In recent months, for example, there have been increased questions about how we should address policy violations from world leaders. As a result, we are currently re-examining our approach to world leaders and are soliciting feedback from the public. Our feedback period is currently open and our survey will be available in more than a dozen languages to ensure a global perspective is reflected.

*Procedural Fairness (Accountability & Reliability)*

Twitter is focused on advancing procedural fairness in our decision-making. We strive to give people an easy, clear way to appeal decisions we make that they think are not right. Mistakes in enforcement — made either by a human or an automated system — are inevitable and why we strive to make appeals easier. We believe that all companies should be required to provide those who use their service with straightforward processes to appeal decisions that impact them.

*Algorithmic Choice*

We believe that people should have transparency or meaningful control over the algorithms that affect them. We recognize that we can do more to provide algorithmic transparency, fair machine learning, and controls that empower people. The machine learning teams at Twitter are studying techniques and developing a roadmap to ensure our present and future algorithmic models uphold a high standard when it comes to transparency and fairness.

We also provide people control over algorithms that affect their core experience on Twitter. We have invested heavily in building systems that organize content to show individuals relevant information that improves their experience. With 192 million people last quarter using Twitter daily in dozens of languages and countless cultural contexts, we rely upon machine learning algorithms to help us organize content by relevance to provide a better experience for the people who use our service.

*Privacy*

We have always believed that privacy is a fundamental human right. We believe that individuals should understand the personal data that is shared with companies and have the tools to help

them control their information. To help people better understand their options, we have created the Twitter Privacy Center, which acts as a hub for information about our privacy and data protection work.

We are constantly working to improve the controls people have to manage their personal data and experience on Twitter. In addition, we continue to support efforts to pass strong federal privacy legislation to safeguard important privacy rights.

### Innovations to Address Misinformation

We also recognize that addressing harms associated with misinformation requires innovative solutions. Content moderation in isolation is not scalable, and simply removing content fails to meet the challenges of the modern Internet. This is why we are investing in two experiments — Birdwatch and Bluesky. Both are aimed at improving our efforts to counter harmful misinformation.

*Birdwatch*

In January, we launched the "Birdwatch" pilot, a community-based approach to misinformation. Birdwatch is expected to broaden the range of voices involved in tackling misinformation, and streamline the real-time feedback people already add to Tweets. We hope that engaging diverse communities here will help address current deficits in trust for all. More information on Birdwatch can be found here. We expect data related to Birdwatch will be publicly available at Birdwatch Guide, including the algorithm codes that power it.

*Bluesky*

Twitter is also funding Bluesky, an independent team of open source architects, engineers, and designers, to develop open and decentralized standards for social media. This team has already created an initial review of the ecosystem around protocols for social media to aid this effort. Bluesky will eventually allow Twitter and other companies to contribute to and access open recommendation algorithms that promote healthy conversation and ultimately provide individuals greater choice. These standards will support innovation, making it easier for startups to address issues like abuse and hate speech at a lower cost. Since these standards will be open and transparent, our hope is that they will contribute to greater trust on the part of the individuals who use our service. This effort is emergent, complex, and unprecedented, and therefore it will take time. However, we are excited by its potential and will continue to provide the necessary exploratory resources to push this project forward.

### Conclusion

As we look to the future, I agree with this Committee that technology companies have work to do to earn trust from those who use our services. For Twitter, that means tackling transparency, procedural fairness, algorithmic choice, and privacy. I think that this approach will be a growing trend across all companies and organizations, both big and small. I look forward to your questions.

*Twitter Inc. v. Ken Paxton, et. al.*
USDC-ND, San Francisco Division, Case No. 3:21-cv-1644-MMC

# EXHIBIT 6

**(Copy of the January 13, 2021, Press Release of Ken Paxton, Attorney General of Texas, titled "AG Paxton Issues Civil Investigative Demands to Five Leading Tech Companies Regarding Discriminatory and Biased Policies and Practices")**





**Menu**

Español (/es/news/releases/procurador-general-paxton-emite-demandas-de-investigacion-civil-cinco-empresas-tecnologicas-lideres)

About (/about-office)   News (/news)

Opinions (/attorney-general-opinions)

Jobs (/careers/job-listings)   Contact Us (/contact-us)

HOME (/)   >   NEWS (/NEWS)   >   NEWS RELEASES (/NEWS/RELEASES)   >
AG PAXTON ISSUES CIVIL INVESTIGATIVE DEMANDS TO FIVE LEADING TECH COMPANIES REGARDING
DISCRIMINATORY AND BIASED POLICIES AND PRACTICES

**January 13, 2021 | Press Release**

# AG Paxton Issues Civil Investigative Demands to Five Leading Tech Companies Regarding Discriminatory and Biased Policies and Practices

**SHARE THIS:**                    **400**

Attorney General Ken Paxton today issued civil investigative demands (CIDs) to Google, Facebook, Twitter, Amazon Web Services, and Apple, asking the companies for their policies and practices regarding content moderation and, more specifically, for information related to Parler, a social media application recently terminated or blocked by Google, Amazon, and Apple.

For years, these Big Tech companies have silenced voices in the social media sphere and shut down competing companies and platforms. It has only grown worse in recent months. And just last week, this discriminatory action

included the unprecedented step of removing and blocking President Donald Trump from online media platforms.

"First Amendment rights and transparency must be maintained for a free online community to operate and thrive. However, the seemingly coordinated de-platforming of the President of the United States and several leading voices not only chills free speech, it wholly silences those whose speech and political beliefs do not align with leaders of Big Tech companies. Every American should be concerned about this large-scale silencing and the effects it will have on the future of free speech," said Attorney General Paxton. "The public deserves the truth about how these companies moderate and possibly eliminate speech they disagree with. I am hopeful that these companies will set aside partisan politics and cooperate with these CIDs in order to get to the bottom of this contention and ensure a truly free online community consistent with the highest American ideals."

Read a copy of the CIDs below:

Amazon (https://www.texasattorneygeneral.gov/sites/default/files/images/admin/2021/Press/Amazon-Parler%20CID%20011321.pdf)

Apple (https://www.texasattorneygeneral.gov/sites/default/files/images/admin/2021/Press/Apple-Parler%20CID%20011321.pdf)

Facebook (https://www.texasattorneygeneral.gov/sites/default/files/images/admin/2021/Press/Facebook-Parler%20CID%20011321.pdf)

Google (https://www.texasattorneygeneral.gov/sites/default/files/images/admin/2021/Press/Google-Parler%20CID%20011321.pdf)

Twitter (https://www.texasattorneygeneral.gov/sites/default/files/images/admin/2021/Press/Twitter-Parler%20CID%20011321.pdf)

*Receive email updates from the OAG Press Office:*

Your Emai    **Submit**

## Related News

### Immigration | Episode 6 (/news/releases/immigration-episode-6)

**March 24, 2021 | Podcast**

### AG Paxton Announces $188.6 Million Multistate Settlement with Medical Device Manufacturer Boston Scientific Corporation (/news/releases/ag-paxton-announces-1886-million-multistate-settlement-medical-device-manufacturer-boston-scientific)

**March 23, 2021 | Press Release**

### AG Paxton's Law Enforcement Round Up (/news/releases/ag-paxtons-law-enforcement-round-3)

**March 22, 2021 | Noteworthy**

### AG Paxton Sues La Quinta BCB for Price Gouging During 2021 Winter Storm (/news/releases/ag-paxton-sues-la-quinta-bcb-price-gouging-during-2021-winter-storm)

**March 18, 2021 | Press Release**

See all News (/news)

Back to Top

| | | | |
|---|---|---|---|
| **Child Support** (/child-support) | **All Divisions** (/divisions) | **Where the Money Goes** (https://comptroller.texas.gov/transparen | office/compact-texans) |
| | | | **Cost Efficiency** |
| **Crime Victims** (/crime-victims) | **Opinions** (/attorney-general-opinions) | **ADA Compliance** (/ada-compliance) | **Saving Ideas** (/about-office/cost-efficiency-saving-ideas) |
| **Consumer Protection** | **Initiatives** (/initiatives) | **Compact With Texans** (/about- | |

(https://twitter.com/TXAG)

(/)

(https://www.facebook.com/TexasAttorneyGeneral)

PO Box 12548
Austin, TX 78711-2548

Consumer
Protection
(/consumer-
protection/)

Open
Government
(/open-
government)

State Agency
Contracts
(https://oagtx.force.com/contacts/s/)

TRAILS Search
(https://www.tsl.state.tx.us/trail/index.html)

Texas
Homeland

Human
Resources
(/careers)

Reporting
Fraud (/about-
office/reporting-
fraud-state-
government)

Texas.gov
(http://www.texas.gov)

Security
(https://gov.texas.gov/)

Texas Veterans
Portal
(https://veterans.portal)

Texas.gov
(http://www.texas.gov)

Accessibility &
Site Policies
(/site-policies)

*Twitter Inc. v. Ken Paxton, et. al.*
USDC-ND, San Francisco Division, Case No. 3:21-cv-1644-MMC

# EXHIBIT 7

(Copy of the January 5, 2018 statement by Twitter titled "World Leaders on Twitter" )

 Blog

Back

## Company

# World Leaders on Twitter

By [@twitter](#)

Friday, 5 January 2018

There's been a lot of discussion about political figures and world leaders on Twitter, and we want to share our stance.

Twitter is here to serve and help advance the global, public conversation. Elected world leaders play a critical role in that conversation because of their outsized impact on our society.

Blocking a world leader from Twitter or removing their controversial Tweets would hide important information people should be able to see and debate. It would also not silence that leader, but it would certainly hamper necessary discussion around their words and actions.

We review Tweets by leaders within the political context that defines them, and enforce our rules accordingly. No one person's account drives Twitter's growth, or influences these decisions. We work hard to remain unbiased with the public interest in mind.

We are working to make Twitter the best place to see and freely discuss everything that matters. We believe that's the best way to help our society make progress.



(https://www.twitter.com/twitter)

***Twitter Inc. v. Ken Paxton, et. al.***
USDC-ND, San Francisco Division, Case No. 3:21-cv-1644-MMC

# EXHIBIT 8
**(Copy of The Santa Clara Principles on Transparency and Accountability in Content Moderation, proposed on May 7, 2018)**

Case 3:21-cv-01644-MMC Document 38-3 Filed 03/29/21 Page 89 of 119



*These principles are meant to serve as a starting point, outlining minimum levels of transparency and accountability that we hope can serve as the basis for a more in-depth dialogue in the future.*

On the occasion of the first Content Moderation at Scale conference in Santa Clara, CA on February 2nd, 2018, a small private workshop of organizations, advocates, and academic experts who support the right to free expression online was convened to consider how best to obtain meaningful transparency and accountability around internet platforms' increasingly aggressive moderation of user-generated content.

Now, on the occasion of the second Content Moderation at Scale conference in Washington, DC on May 7th, 2018, we propose these three principles as initial steps that companies engaged in content moderation should take to provide meaningful due process to impacted speakers and better ensure that the enforcement of their content guidelines is fair, unbiased, proportional, and respectful of users' rights.

### ACLU Foundation of Northern California

### Center for Democracy & Technology

### Electronic Frontier Foundation

### New America's Open Technology Institute

### Irina Raicu
Markkula Center for Applied Ethics, Santa Clara University

### Nicolas Suzor
Queensland University of Technology

**Sarah Myers West**

USC Annenberg School for Communication and Journalism

**Sarah T. Roberts**

Department of Information Studies, School of Education & Information Studies, UCLA

# 1  Numbers

**Companies should publish the numbers of posts removed and accounts permanently or temporarily suspended due to violations of their content guidelines.**

At a minimum, this information should be broken down along each of these dimensions:

- Total number of discrete posts and accounts flagged.

- Total number of discrete posts removed and accounts suspended.

- Number of discrete posts and accounts flagged, and number of discrete posts removed and accounts suspended, by category of rule violated.

- Number of discrete posts and accounts flagged, and number of discrete posts removed and accounts suspended, by format of content at issue (e.g., text, audio, image, video, live stream).

- Number of discrete posts and accounts flagged, and number of discrete posts removed and accounts suspended, by source of flag (e.g., governments, trusted flaggers, users, different types of automated detection).

- Number of discrete posts and accounts flagged, and number of discrete posts removed and accounts suspended, by locations of flaggers and impacted users (where apparent).

This data should be provided in a regular report, ideally quarterly, in an openly licensed, machine-readable format.

# 2  Notice

**Companies should provide notice to each user whose content is taken down or account is suspended about the reason for the removal or suspension.**

In general, companies should provide detailed guidance to the community about what content is prohibited, including examples of permissible and impermissible content and the guidelines used by reviewers. Companies should also provide an explanation of how automated detection is used across each category of content. When providing a user with notice about why her post has been removed or an account has been suspended, a minimum level of detail for an adequate notice includes:

- URL, content excerpt, and/or other information sufficient to allow identification of the content removed.

- The specific clause of the guidelines that the content was found to violate.

- ■ How the content was detected and removed (flagged by other users, governments, trusted flaggers, automated detection, or external legal or other complaint). The identity of individual flaggers should generally not be revealed, however, content flagged by government should be identified as such, unless prohibited by law.

- ■ Explanation of the process through which the user can appeal the decision.

Notices should be available in a durable form that is accessible even if a user's account is suspended or terminated. Users who flag content should also be presented with a log of content they have reported and the outcomes of moderation processes.

## 3 Appeal

**Companies should provide a meaningful opportunity for timely appeal of any content removal or account suspension.**

Minimum standards for a meaningful appeal include:

- ■ Human review by a person or panel of persons that was not involved in the initial decision.

- ■ An opportunity to present additional information that will be considered in the review.

- ■ Notification of the results of the review, and a statement of the reasoning sufficient to allow the user to understand the decision.

In the long term, independent external review processes may also be an important component for users to be able to seek redress.

### Acknowledgements

We thank Santa Clara University's High Tech Law Institute for organizing the Content Moderation & Removal at Scale conference, as well as Eric Goldman for supporting the convening of the workshop that resulted in this document. That workshop was also made possible thanks to support from the Internet Policy Observatory at the University of Pennsylvania. Suzor is the recipient of an Australian Research Council DECRA Fellowship (project number DE160101542).

  

# THE SANTA CLARA PRINCIPLES
On Transparency and Accountability in Content Moderation

Privacy                                                                                          CC License

*Twitter Inc. v. Ken Paxton, et. al.*
USDC-ND, San Francisco Division, Case No. 3:21-cv-1644-MMC

# EXHIBIT 9

(Twitter CEO Jack Dorsey talked to NYU's Jay Rosen for an hour, on the record. Read and
listen to the full interview here," containing the imbedded audio file of the interview)

Twitter CEO Jack Dorsey talked to NYU professor Jay Rosen podcast transcript Vox

# Twitter CEO Jack Dorsey talked to NYU's Jay Rosen for an hour, on the record. Read and listen to the full interview here.

Dorsey says "we have definitely been gamed" by bad-faith actors and doesn't expect that Twitter will ever build a "perfect antidote."

By Peter Kafka | Updated Sep 14, 2018, 10:05am EDT



Twitter CEO Jack Dorsey | Fairfax Media / Getty

Jack Dorsey runs one of the most valuable, maddening, delightful and frustrating technology companies in the world.

Now Dorsey is trying to make Twitter better, and he wants your help.

And if you're very lucky, he'll spend an hour talking to you, asking you what you like about the service, what you'd like to change about it, and telling you what he thinks.

That's what happened this week when Dorsey sat down for an hour with Jay Rosen, a Twitter power user who is also a professor of journalism at New York University. Rosen

recorded the conversation on his iPhone (5!), and you can listen to it now, on a special episode of **Recode Media with Peter Kafka.** We've also included a transcript of their conversation below.

Dorsey has done a lot of talking over the past few weeks, and if you are a Dorsey completist you may recognize components of this discussion from other interviews. But this is more of a conversation than a conventional Q&A, and if you have deep interest in the way Dorsey thinks about his powerful/fraught platform/messaging service (don't call it a microblog!) you'll get a lot out of this.

For instance, he's clearly interested in the idea of letting users tell the world that they're actively on the service, in real time, a notion he has noticed bubbling up from Black Twitter. And while he's very interested in presenting different slices of Twitter to different users, he's also adamantly opposed to closing off subsets of the service to specific groups, like Facebook is encouraging its users to do.

Pro tip: If you'd like to spend an hour talking to Jack Dorsey about Twitter, one way to go about it is to tweet about Dorsey's conversations about Twitter, after spending years building a following as a thoughtful observer of journalism, media and technology.

That's what Rosen did last month, which led to this response from Dorsey:

> Happy to talk with you more about this Jay
>
> — jack (@jack) August 21, 2018

Which led to the conversation below.

You can find more of Jay Rosen's work at his blog PressThink and on Twitter; you can also listen to him on two other episodes of **Recode Media**. Special thinks to Ben Brandstein at NYU for his audio production help with this recording.



Recode Media
Twitter CEO Jack Dorsey

00:51:25

SHARE    SUBSCRIBE    COOKIE POLICY

You can listen to **Recode Media** wherever you get your podcasts — including Apple Podcasts, Spotify, Google Podcasts, Pocket Casts and Overcast.

Below, we've shared a full transcript of Jay's conversation with Jack.

---

**Jack Dorsey:** You're sticking with the [iPhone] 5?

**Jay Rosen: Yeah. I don't like to change much, and that's not so great for technology.**

Yeah.

**I'm one of those users who always screams when you change something, and then half the time I hate it, and half the time I get to like it.**

What did you think of the 280?

**Exactly that. At first, I said, "I'm not gonna do this. I'm gonna voluntarily stick to 140," because I thought that was a great constraint and I thought it was unwise to change it. But now, it became a little ridiculous to hold out because everybody else was using 280 when they needed to. So now I'm comfortable with it. It didn't actually create any huge problems.**

Yeah. Well, we found that when people are just tweeting more as a broadcast, it on average tends to stay below 140.

**Yeah, that's very interesting.**

Case 3:21-cv-01644-MMC   Document 38-3   Filed 03/29/21   Page 96 of 119

Which has been great, but where it's really been helpful is when people have a conversation. So, replies do go above 140 and allows a little bit more nuance and a little bit more space to have a discussion and discourse.

**Yeah. It's actually been very successful for me in that sense because I often have views that need qualification, and knowing Twitter the way I do and the kinds of reactions that you sometimes get, if what you're saying *sounds* like something people have heard before, they react to that. In order to say, "I'm not saying this. I *am* saying that," 280 actually makes a big difference.**

Yeah.



NYU professor Jay Rosen | Bosch Foundation

**What has been … I have several questions I wanted to ask you. What has been your experience in your listening tour, especially with conservatives? What have you learned?**

Well, first and foremost, at least I personally have not tended to have conversations with many people in a more conservative end of the spectrum or right end of the spectrum, so goal number one was to say that we're here, be present, and see the folks who I

personally haven't talked to, and as an organization, we tend not to naturally lean towards, and I don't know if there are any fundamentally different learnings that are different from the conversations that we have with folks who are more on the left end of the spectrum, more of the liberal end of the spectrum or libertarian end of the spectrum, wherever that lies.

So, there's a lot of questions as to how — well, why we make decisions the way we make them, how the algorithms work, a lot of questions around timeline ranking, and that changed three years ago. It was the first time we really applied machine learning to where people spent the majority of their time within the service, and some confusion about that. I think there was a question as to why there haven't been a lot of conversations with people on the more conservative end of the spectrum in the past. There was a desire to have more. There's a desire to be able to have an open feedback channel, and I don't know, always good conversations. We had some folks from the media in every one of these. We had some folks in politics, some folks in academia, some technology folks, and pretty good.

**Mm-hmm. You say they're similar to conversations, people on the left side of the spectrum, but people on the left side of the spectrum aren't accusing Twitter of shadow banning their voices, are they?**

The people we talked to didn't really accuse us of shadow banning their voices.

**They didn't? They didn't accuse you of bias against conservatives?**

They asked questions as to whether a bias within the company would translate into the service and into actions, but it was all questions rooted in, "I follow this person. Why am I not seeing their tweets in my timeline?" The majority of the questions I got about shadow banning and bias were either on Twitter or within the Congressional hearing.

**So, public performances, where there was some external audience to perform for. Yeah. Why did you go public with this generalization that people in Twitter are generally liberal or lean left, and that's our culture, which I have no trouble believing is true, but why did you start talking about that?**

I think it's more and more important to at least clarify what our own bias leans towards, and just express it. I'd rather know what someone biases to rather than try to interpret

through their actions. So, if we can say that, and also have the freedom to evolve and change, then at least people know it, and I think it allows us to remove that a little bit more from the work, but it has to be proven out in our actions as well, so … I mean, we have a lot of conservative-leaning folks in the company as well, and to be honest, they don't feel safe to express their opinions at the company.

They do feel silenced by just the general swirl of what they perceive to be the broader percentage of leanings within the company, and I don't think that's fair or right. We should make sure that everyone feels safe to express themselves within the company, no matter where they come from and what their background is. I mean, my dad was a Republican. When I was growing up, was on the radio all the time with Rush Limbaugh and Sean Hannity, so my mom was on the opposite end of the spectrum and …

**Right. I read about that in another interview you did. Yeah.**

Yeah, and I appreciate that, and I always felt safe to challenge both of them, especially my dad, and so it was definitely a privilege, but if we're creating a culture that doesn't enable people or empower people to speak up or not, we're gonna be able to do that for our service.

**I'm of two minds on that. On the one hand, it's absolutely true that if you don't feel safe in speaking out, then in effect, you don't have free speech. I think that's true, and that's a tremendously important thing for a company like Twitter, but it's also true that public life and participating in public debate involves risk. The most basic risk is that someone will criticize you, and do you ever feel like saying to your conservative employees, "Look. Speak up. You might get criticized, but you have to have the courage to do that. We're not gonna penalize you, but you are, to some degree, when you speak up in public or in a public culture of a company, you are, yes, vulnerable to criticism, vulnerable to reaction. That's part of public life. That's part of being a mature citizen?" Do you ever say that back to them?**

I mean, yeah. It's easier said than done. I know this for myself. I was a kid that was very shy. I grew up with a speech impediment. It taught me not to speak at all, and I eventually got over that, and speaking up in a collection of 3,000 people where you make an assumption that they potentially think differently than you or believe differently is

hard. It does require sacrificing a lot of your ego and your intellect in being vulnerable for a minute.

What are the best bridges to enable people to do that? I don't know if entering into a political debate is always the right first step, but maybe. But yeah, I definitely encourage speaking up and having the courage to do so, but one has to feel it maybe in a different context before they get more of that, and I think it just takes time. But we have people who will be courageous and speak up, but I don't know. It's hard to do as any individual.

**When I interviewed Adam Sharp, who at the time was the head of news for Twitter, he said something very interesting to me, which was that we may, from the outside, underestimate how passionate people on Twitter are about news, how much they love news and how obsessed they are with the news. Is that true? Is that part of the culture at the company? Where does that come from?**

Oh, what do you mean? In terms of us being obsessed with news?

**Yeah, the people who work there are lovers of news. They are obsessed with it. They follow it, obviously. They contribute to it through the company, the platform, and they are especially tuned to the problems in the news system. That's what he was saying.**

Yeah. I think so. I mean, when we started the company, we built something that we wanted to use, and more and more, people taught us what they wanted to use it for, and then what they wanted to use it for was to see what's happening, which was ...

**News.**

... news and newsworthy, and whether it be a conversation between two people as being newsworthy to someone, or actual breaking news that is more global of nature, it is certainly now in our DNA, but I do think it's a byproduct of what our real fundamental is, which is public conversation. Entertainment is a byproduct of that. If we lose sight of the fundamental that we're serving, which is enabling people to converse in public and discuss in public ...

**Why do you see that as more fundamental than news? Because I don't see it that way.**

Because we never know what is going to be newsworthy or not, and oftentimes we've seen simple conversations turn into something really meaningful. The most prominent that's top of mind immediately in this moment is there was an IT professional in Pakistan who was tweeting at 3:40 in the morning about helicopters over his apartment, and five hours later, we learned that that was the raid on Osama bin Laden.

**Bin Laden. I remember that. Yep.**

If we purely focus on news as just the fundamental atomic unit, I think we become dependent upon news sources rather than seeing potentially everything as newsworthy to someone, and I also think if we were to focus entirely just on news as the atomic unit, we wouldn't see as much discussion and debate and dialogue around what's happening as well. So, it's not that I don't think Twitter is about news and people don't use it to see what's happening and get their news, but there's gotta be something that feeds that, and to me it's that public conversation aspect.

**See, I see it almost as the reverse. When I say news, though, I don't mean the news industry or the major providers of news.**

Anything new or noteworthy.

**Yeah. I mean news in the more fundamental sense of "what's happening?" It could be what's happening in my life. It could be what's happening in my neighborhood. It could be what's happening in the world, what happened today in Congressional hearings. And the way I look at Twitter is that it's a part of the news system. It's a fundamental part of the news system. It's become part of the infrastructure of the news system, which is why anybody who pays attention to the news closely knows that news usually breaks on Twitter.**

**Very often, the first notice you have of it is on Twitter, and I first became aware of that with the plane crash in the Hudson, where I kind of knew it as an abstract thing, but seeing it happen, especially because I live in New York and I wasn't that far from the event itself, and so Twitter is fundamentally … It's part of the news system. You go there to find out what's happening, *and* what people naturally do, what they need to do to have a healthy democracy is, of course, discuss the news, and so I see them as complementary …**

Case 3:21-cv-01644-EMC Document 38-3 Filed 03/29/21 Page 101 of 119

Oh, absolutely.

**… and equally fundamental.**

And they cycle. Sometimes those discussions become what's happening and become news as well. And to your point around … Twitter was described in the past, I'm not sure who said it, as where the news gets its news.

**Yeah, that's true, too. Yeah.**

I think a lot of that has to do with the fact that people do feel free to discuss what's happening. What I appreciate about Twitter is, unlike in Instagram, it doesn't feel like a post. It feels like the start of a — it feels like a message.

**So, you want to increase that sense of flow rather than posting, right?**

Fluidity. Yeah. We don't want to post and then stop. One of the descriptions and labels that we had in the past, which I always despised, was microblogging, because you …

**Yeah. I remember that.**

It encourages behavior of post, comment, comment, comment, and it just feels such to be a dead end versus message, message, message, message, which is just as fluid reply, and it could go anywhere, and I think that speaks to the fact that we don't have a social graph. We have a graph around interest. We have people following you not because of the fact that you're in their address book, but because they're interested in what you have to say, and the spectrum of what you have to say changes over time, and that fluidity is really important and isn't really captured in, "I'm composing a post." It's like, "this is what I think right now, and this is what I think right now, and let me clarify, and let me clarify, and this is what I think right now."

**Yeah. I use it that way, and I try to benefit from that feature of Twitter and the thread mechanism, which …**

Has that been helpful?

**Yeah. I like the fact that it started as a user convention, and then …**

Everything on Twitter.

**Yeah, everything starts that way. Right.**

The @ symbol, the hashtag, the retweet.

**Totally. I enjoy that part of Twitter, and I like the thread because it's a form of writing that is very demanding. So, for me, it is what you say. It's intended to be part of conversation. It lends itself to conversation. I can always add to my thread if I want to, which is really interesting. I could actually come back three weeks later and add something to it if I want to, *but* because of the risks that anybody with a public platform on Twitter has whenever they post — meaning if I say something stupid, it could create a viral attack on me, if it's really out of bounds. I'm always aware of that. And so even though it's supposed to be a flow and supposed to be a natural conversation, that's an artifice for me because I have to think super carefully about everything I post.**

How do we fix that? How do we allow more space for verification?

**An edit button would be one. I know that's hard. I know there's all kinds of issues, but that's …**

It's not that it's hard. It's that if you asked a hundred different people what they intend by "edit," you'll get a hundred different answers.

**Well, I just mean fixing mistakes within a few minutes.**

Within a five-minute window?

**Yeah, within a few minutes of something that you post.**

What about longer? But that doesn't address the clarification issue. You may tweet something stupid and not realize it after an uproar or outrage for a day.

**Yeah. Well, there, I don't know how hard this is from an engineering point of view, but it would be interesting and I would use it if I could clarify something that I posted.**

Do you ever do that with your own tweets through quote-tweet?

**I do. Yeah. Mm-hmm. Yeah. I correct things that way.**

Does that work?

**It does, except that very often the follow-up doesn't spread the way that the original did. So I can use it that way, but somehow, to indicate that something that is spreading has a further explanation to it or qualification, I would probably use that, even though it's only a handful of times when I need it.**

You need it.

**But when I need it, I need it a lot.**

Yeah.

**But as I said, for me, I don't really mind having to think through what I say, because I'm a college professor. I'm supposed to be careful and precise, and actually, I consider it a good discipline, the fact that one wrong tweet could blow up your life, which is a fact. It's happened to many people. It does make it risky. It means never tweet drunk, all these basic things, but it's also a very good discipline for me as a writer. I like it.**

Yeah.

**Let me ask you about something else. When I read through your testimony, which was a** series of tweets**, and some of the interviews ...**

Which one?

**The one that you did recently.**

No, I did two hearings, and there are two different series of tweets. Those were just the openings, but they were different. One was focused on election interference and then the other was focused on bias.

**I think it was the second one.**

Twitter CEO Jack Dorsey on NYU professor Jay Rosen's podcast - Recode - Vox

Congress.

**I felt like there's a tension in what you're trying to do. The tension is, on the one hand you're saying, "We are impartial. We're an impartial platform. When we write our rules, when we enforce our rules, we're not trying to discriminate against this group or that group. Even though we, as individuals at Twitter and as a company with a culture, do lean this way." Right there, those are two different motions. One is impartial, we are neutral, we're objective.**

Not neutral.

**Okay. You didn't use the word neutral. You don't want the word neutral.**

No.

**All right. That's good. I wanted to figure that out. All right. I'll ask you about that in a second. So, "We're impartial, but we're not saying that we don't have any points of view, or that we don't have our own culture. We do."**

Correct.

**Okay. That's one system. Another system that seemed to be coming through in that tweet thread is, "We are a company that contributes to the public square and to conversation in the public sphere."**

That's how we're used.

**That's how we're used. Okay.**

We believe that many people see us as a public square and use us as a public square. I don't have expectations accordingly. They expect, because we're used as a public square, they expect to have the same sort of, well, they have the same sort of expectations they would have of a public square, like Bryant Park.

**Okay. So my question is, why aren't the values of Twitter what it takes to have a healthy public sphere?**

I guess it depends on what you mean by value. We value health in dialogue so that is our singular objective right now, is to increase the health of how people participate in our public square. I think it does benefit to get into neutrality versus impression.

**Yeah, let's do that.**

A lot of people have asked us, "Are you a public utility?" and, "Are you a neutral communications platform?"

**Like the electric company or something like that.**

Or AT&T. Neutral communications platform, presumably, you pick up the phone, you call your friend, you call your father, you call your mother.

**Right. It doesn't care who you're calling or what you're using.**

Presumably, they do not care about the content whatsoever because the other person picked up the phone — or multiple, you have a group conference call, they all decided to participate in that thing. And they should be completely neutral to whatever happens on that pipe and through that pipe. And a lot of people have taken that neutrality and then said, "Well, we should also be that because we are like the internet."

**Yeah, pipes.**

Pipes. But we, upon further reflection, we are being used more like what you would find in Washington Square Park. You walk into Washington Square Park and there's a bunch of people who, when I walk in, there's a bunch of people there who are not expecting me to walk in and aren't expecting me to do the things that I intend to do and might see it out of the corner of their eye and might come over and listen or interact or whatnot. In that public square, there's all these things that happen and some are amazing, and some are stupid, and some are silly, and some are really terrible. There's a guy in the corner with a megaphone broadcasting his thoughts and then he recognizes you and he says, "Jay, get the hell over here. You're a terrible person and I hate you," and all these other things. And it's completely directed at you.

And at that point, people recognize it and they tell him to stop, or the park stewards or police come over and say, "Here's a warning and if you keep attacking this one person

who doesn't want it and is not even paying attention to you, then you're out." So that action right there was not neutrality, it was being impartial to the conduct and with an eye towards more of the collective, with an eye towards like, "We need to make Washington Square Park something that people actually want to be at and recognize that there's going to be people who choose unhealthy behaviors and we're going to at least demonstrate what is not healthy and what could be healthier."

I do believe health is a value that we've chosen to make a singular objective, and we value health in public conversation, but in order to do it correctly, we need to do it with a principle of impartiality, which means that we're not going to do on the basis of bias or prejudice or favoring one account over another for improper reasons. Where we have failed in that is to be transparent around how we write our rules and how we enforce them.

And where we've also failed in the past is being open with our mistakes and then correcting them. Because we're not always going to see outcomes of impartiality even though that is our intent. We will see outcomes that are not impartial and that may favor one account over another or inject bias, whether it be through the training set that was used to train our algorithm or a human operator that had to make a judgment call and made it incorrectly.

So I think it's really important we clarify, we do value health in this thing that people see as a public square. We are going to make it our objective to increase the collective health. We realize not everyone is going to choose health in the short term, but we want to demonstrate by choosing healthy conduct. We can further amplify your reach, but if you don't, it's only your earned audience and if you're harassing people, then we're going to ask you to leave.

**What do you think this principle of health that you just articulated replaces in your old thinking, if this is the new thinking? What did you have in that place before?**

I think we were just addressing this in terms of what we're seeing on the surface.

**Just going from problem to problem without really having a coherent point of view?**

A coherent, cohesive framework to link them altogether?

Twitter CEO Jack Dorsey interviewed by NYU professor Jay Rosen - podcast transcript - Vox

**Yeah.**

We saw abuse, we went after abuse. We saw misinformation, we went a little bit after that.

**Right. It's fighting fires.**

But they're all tied together. This is what the Cortico folks and Deb Roy asked us about a year-and-a-half ago now, which is like, "What if you can measure health of conversation?" I said, "How would you do that?" He said, "Well, first you need to figure out what the indicators of health are." I said, "What do you mean?" He said, "Well, your body has an indicator of health and system imbalance which is your temperature, 98.6 means more or less your system's in balance. If it's above or below then something's out of whack and something's out of balance."

We recognize that's an indicator of health, but we also need to measure it so we needed to invent thermometers to measure it. Then we get a metric out and then we can see how that metric trends over time. And as we deploy solutions like hot water with lemon or when you take wine, what happens with that trend? Then based on those experiences, we can say that, "If you want to be healthy, then you drink more hot water with lemon and less wine during that time of imbalance."

So he came up with four, which are shared attention — and implicit in all these indicators is that more of them is healthier. Shared attention, like what percentage of the conversation is focused on the same things rather than disparate things. Shared reality, which is what percentage of conversation is sharing the same facts, not that they're true or not, but this percentage of the conversation or accounts or people believe the world is round and this percentage believe it's flat. The implied assumption there is that the more of us that are sharing the same facts, the healthier the conversation will be.

**Yeah, but the world is round.**

Yes, and the predominant percentage believes that that is factual. There are other people who share different facts. And that's just one crazy but illustrative example.

**That's a rabbit hole there.**

It's just an example, but there are … religion. And I believe this fact to be fact and I believe this to be factual and those aren't necessarily shared. And then the third one being receptivity. Participants, are they receptive or are they creating toxic action? And then fourth and finally is variety of perspective. Are we feeding a filter bubble or echo chamber or are we actually seeing divergent — it's not diverse, but divergent abuse.

**That's the beginning of the direction that I would like to see you go in. It's fundamentally compatible with what you're saying. But the way I would say it is, Twitter contributes to, is part of, wants to be a key part of a healthy public sphere.**

Which we've committed to.

**Okay, you committed to that already. And, in order to have a healthy public sphere, certain things have to be true, certain things have to be had.**

Or increased.

**Yes. And we are continually in the process of learning what the requirements of a healthy public sphere are. We know what some of them are and we are designing our systems and enforcing our rules accordingly. And we are continually learning what it really takes to have a healthy public sphere in a global connected society and a platform that reaches everywhere in the world. And therefore, we don't want to apologize for changing our policies or evolving them because nobody knows everything about this problem.**

**And furthermore, because we're always learning, we have to learn in a very public way and therefore we are committed to, yes, transparency as an abstraction, but in practice, it means we have to share a lot more data. We have to share our thinking. We have to share the kind of criticism we're getting and we may have to build systems to get better criticism. That's the way I would state it.**

**And that is — it's important because it means that you're not saying anything goes, you're not saying you're indifferent to what happens on the platform. You're saying, "We are standing up for these values and we're continually learning what they require of us and if you violate the requirements of a healthy public sphere, we will take action against you."**

Jack Dorsey talks with NYU professor Jay Rosen in podcast transcript - Vox

**And one of the things that obviously you have to recognize — and I'm sure you're recognizing it more and more — is that there are bad actors who don't actually want there to be a healthy public sphere. They want it to be distorted. They want it to break down. They even might want to destroy the institutions of a public sphere because, in the wreckage of those institutions, a lot of energy is released, a lot of fury, controversy. And you can power a political movement with them.**

I agree with all that. Did you read my health thread?

**I think I did.**

Because we said, we committed to all the things you said.

**I know you committed to it, right.**

But it is, like we do say a lot and we need to prove it through the work, but ultimately … and we'll have updates to that, obviously, as well. But we believe those health indicators shouldn't be owned by us. They should be designed and defined by a third party. We should publish to them and we should be held accountable to them.

**Third party meaning …**

Third party being like Cortico, MIT, social apps. For example, the researchers that we're working with through our feed process to define what these indicators are. I don't know, but we recognize we're not the only ones serving a public square, a public conversation, that there are multiple folks including journalists and publications like the New York Times and the National Review or whoever. And maybe they could also utilize these indicators to determine health of the discussion around their work, or even measure the efficacy of their work as a contribution, as an impact to the public conversation.

**What about having public editor or public editors, plural.**

Internally?

**No, like a Margaret Sullivan, somebody who's empowered to listen to complaints that users are having, get answers from the company. They are not beholden to the company, but they are like ombudsmen. And that's a way of showing that there's**

**somebody that you can talk to when you think something is amiss and they push for more transparency. They push for answers on behalf of the users.**

I like the idea of it.

**Yeah. Who is empowered to work on behalf of the users at Twitter? Everybody?**

Everyone, in terms of direct, the most direct contribution, it's engineers and product and design folks. We have a research team that is constantly having conversations with people all around the world that use our service and people who don't use it, asking them why. We're about to hire a social scientist as well to help us understand more of our impact, not within the service alone, but also off platform.

This is another dimension that we're adding is, the ramifications of what people do on Twitter and how they translate off, and vice versa. So it really depends on what you mean, but we are most frontline, to actual people that we serve, is our research team, our customer support team and our sales team. They offer conversations on the databases, live.

**I guess what I meant is, I see people sometimes explode in frustration, and I'm sure you've seen this too. They say, "Hey, @Jack, would you fix ..." and they're trying to talk to the top of the company, which isn't really a very practical way of getting their concerns registered and acted upon. So you need a system for that, that's immediate flare-ups.**

**Then it seems to me you have another listening project, which would be medium-term, things like, "How's the 280 going?" that's a medium-term concern. And then you have these longer-term issues like the ones you're talking about, of how do people follow conversation, how do we make the platform more topic-focused, things like that. But I don't know who, if I have something I think is wrong with Twitter, I don't know where to go and I'm a pretty experienced user.**

Yeah, tweeting it, usually. The amount of tweets we send internally as, "Look at what people are saying about this," or this feature, or, "This is really topical," or, "This is a fair critique," is pretty immense. Our leadership team alone, we've have a private DM that we coordinate almost everything that we do around, and we're constantly sending tweets that we find that are critiques of us or ... like there was a really good critique sent

Twitter CEO Jack Dorsey on NYU professor Jay Rosen's podcast - Recode - Vox

yesterday around the rank timeline and how Sarah ... I forget how to pronounce her last name ...

**Kendzior, from St. Louis?**

Same as I'm from.

**Yeah, you're from there, right.**

She sent a tweet about, she turns the switch off, the ranked timeline ...

**I saw that.**

... and she saw a bunch of things from people that she hadn't heard from in weeks. So we passed that around and we need to look into why that was happening because that's not the intention of the ranking. It should be focused on like, "If this person is extremely relevant within the moment and relevant to the viewer, it should be at the top of the timeline." So these are all signals that we use.

**So who's responsible for explaining that?**

Our engineering team ultimately designing the home timeline experience and the algorithms behind it.

**But who's in charge of explaining it to users?**

It really depends. I would like more of our employees to be more conversational on our service on a regular basis. I want to be a really open company where we're just having conversations nonstop about our work. We tried another set with this when we were ... we'd been playing with the idea of what presence means on Twitter and also playing with threading on Twitter as well, both with the desire to incentivize more conversation and, ultimately, healthier conversation.

So if, you know, people get a lot ... like Zeynep is someone who says like, "Twitter's all about conversation," and like, "The amount of work I have to do to follow replies and understand who's replying to what and this tweet goes here and this tweet goes here is ridiculous. You're taking a bunch of time away from me." So it's really under that

initiative of like, "Let's better organize how people are utilizing this so that we make Twitter feel more conversational."

**What does presence have to do with it? Why do you use the term "presence?"**

Presence is like, it's, you know, it's basically, "I'm online, I'm here." There's been a really amazing, kind of organic thing that's come out of Black Twitter, which is #onhere, to describe just experiences that are happening right now or contextualize the experiences happening on Twitter itself. We've been playing internally, and we shared some screenshots of what if — of course if you give permission — what if you see a green dot next to my name? Seeing that, like …

**That means that I'm on …**

I'm active on Twitter right now and you could reach out and talk with me right now or tweet at me right now. Or if *you* tweet, I might be more likely to see it, but just that sense of like —

**I might use that. Yeah, I might use that sometimes.**

Like, it's who's up.

**Yeah. Who's up and who's open to being communicated with.**

Yeah. It kind of goes back to our early days of like, a lot of Twitter came from like the AOL Instant Messenger status and just extracting that into an entire product. But the thing that we lost was the "available" signal.

**Right.**

It's interesting, the other thing that we're noticing is that …

**Which is, messaging systems have that.**

Yeah.

**Yeah.**

Twitter CEO Jack Dorsey and NYU professor Jay Rosen podcast transcript - Vox

The other thing we're noticing is that, I don't know if you've noticed this, but we have the @ name and then we have the display name.

**Yes.**

And people have been changing their display name because we increased the size.

**Yeah, I saw that.**

They do it for a lot of reasons. We see a lot of "resist" in it, we see Xs.

**I would never do that. I noticed that. I would never in a zillion years do that.**

A lot of people who think we're shadow banning them put an X in it, and you see all sorts of things. But what's really interesting is people have started to put their status in it, like "Jack in NYC" or "NYC Jack" and that's another, it's another opportunity. People are using this thing that wasn't designed for it, but they're telling us that they want to have some omnipresent status independent of the tweets that might be more ephemeral. So it's just interesting to look at these organic behaviors that emerge and whether they should be live features. But a lot of people have been utilizing this #onhere of like, "I'm up."

**Right.**

Like, "Who's around?"

**Right.**

Black Twitter is extremely conversational and very much used like we are a text messaging app but the whole world can join in. I just think that's so fascinating. That is why I say like news and entertainment are byproducts of conversation, and vice versa. Sometimes something is happening in the world and I see it outside, like a plane landing in the Hudson, and I have a conversation about it and sometimes I have a conversation, and that becomes the news.

**Yeah, I think it works both ways.**

Yeah, and they feed each other.

**Right. And I think, conversation, when it's good, also can cause people to look for news.**

Yeah. Yeah. That's a good point.

**Which is really important.**

That's a good point.

**I want to ask you about one other thing and then any questions you have for me, I'd be happy to answer. It would seem to me, if I were a CEO of Twitter, that the nightmare scenario for me, as a executive, would be something like what's been happening in Myanmar and other places where false information gets communicated over a public platform and it leads to essentially genocide or attacks on people. You don't necessarily know it because it's really hard to keep track of everything that's happening on a global platform. Does that keep you up at night? How do you handle the very real possibility that your machine could be involved in something like that?**

It definitely keeps me up, and something I've been reflecting a lot more on, in terms of just in the context of the hearings and the election interference. Like what I think is happening is much bigger than through elections. There are, as you said, bad-faith actors who have an agenda to distract and divide and to confuse. The election just happened to be a hook.

**Yeah, and they may not be evenly distributed across the political spectrum.**

Absolutely, or ...

**Bad-faith actors, they may not be.**

Or they may not be on the spectrum at all.

**Yeah.**

They may not be on the spectrum at all other than having an agenda just to ...

**To destroy public conversation.**

To divide.

**Yeah. To divide.**

To divide.

**And to, yeah, and to polarize.**

Yeah.

**Yeah.**

And just to cause a number of issues that distract us from what we really need to focus on. The organizing principles of the past are not going to serve us in the same way that we need to organize to face the challenges that are present today. Like the existential crises before us of economic inequality and the growing wealth gap, especially a racial wealth gap, the environment, and the displacement of work from artificial intelligence, those are things that an organizing principle of a nation state will not be able to solve because they're global and they face all of us.

So on the positive, I believe this is where the internet can really shine, is that we have a global organizing principle, and it is the internet, and we have an ability to build layers, like Twitter, that ours is focused on conversation, conversational layer of the internet and wanted to make it accessible to everyone. Some people will utilize that for extremely negative things and continue to look for opportunities to game us. We're never going to build a perfect antidote to that. We have to stay 10 steps ahead constantly. That means we need to be a lot more aware of how people are using the system and how people are intending to game it, and act faster.

I think the one advantage that we have against our peers is the fact that it is just completely open and completely fluid and completely public. I think when you have a join button or a subscribe button into a small community or a close community, you develop a lot of these really isolated sort of bubbles, where things can really fester quite quickly, and it's also hard to see what's going on inside. But more important … and that becomes a real issue when you have to be a small company that's trying to see as much as possible. But if everything is out in the open, then everyone in the world …

**I see what you mean by an advantage, yeah.**

… can see it and call it out and at least raise the issue so that we can identify it much faster.

**Yeah.**

So I do think we have an advantage of everything being on the surface and I would hate to lose that. So that is not something that I rest on because we have definitely been gamed, and we have definitely been utilized to manipulate people. I think that intention will only grow. I think people continue to find new ways of like we saw the Russian government during 2016. We just disclosed evidence of folks in Iran taking on similar patterns and I'm certain it'll continue to happen within the borders of this country and countries around the world. But this is where the organizing principle of a nation state doesn't work because these are going to be global issues and require global solutions. We need to prioritize those global solutions first.

**One point to recognize about that, Jack, is that if it's true that nation states won't be able to solve these problems, but we have the internet, which is global and does have the scale … that means that the companies that own that global scale become very much like a world government. That's a problem because they don't have the same accountability that elected governments have. So that, that is a huge issue.**

Yuval's new book "21 Lessons," I'm halfway through right now, but he's exploring a lot of these, especially like do we need a need a global world government? His answer is no. What we need is, and I might be getting this wrong because I'm halfway through the chapter, but what we need is a lot more of this kind of open communication around how these things interact, but also that the nation states prioritize, and even local governments like New York City prioritize global concerns over the local concerns.

Take the environment as an example. What are we doing to reduce our own impact on the environment? So I do believe that a lot of these services, and ours, there's a growing concern of the power that we have over this public square that we're serving and there's a natural distrust of it and a natural fear of it because people fear losing their voice. People fear losing their ability to participate. People fear losing their job.

**Yeah.**

Because they hear "Twitter" and then they hear, they go in the timeline and they hear "algorithm," and algorithm is displacement of work, and then five years down the line, where am I? I don't think we've done enough to address some of those fears. I think the only way we can do it is more openness and more transparency.

**Well, on that point, one of the things that I would really love to see Silicon Valley, you and your peers turn to, is innovation on these kinds of questions. Innovation in public explanation, innovation in transparency …**

Or terms of service.

**Innovation in terms of service, perfect example. Terms of service are completely opaque, nobody knows what they're signing up for. That requires innovation. It's not technology, right? It's practice.**

Policies.

**Innovation in listening, innovation in public criticism and feedback. It's amazing to me that in Silicon Valley all these people who see themselves as disruptors and innovators when it comes to, for example, explaining the company, they act like the same old PR merchants from the 1950s, like absolutely *zero* innovation, and nobody thinks that's a contradiction at all. I do. So I would like to see a lot more innovation in public communication and explanation because without it, as you become these global forces, if you don't have global accountability, you're in for a lot of trouble.**

I agree.

**What questions do you have for me, if any, as a user since 2008?**

If you could point to one positive impact of our work and one negative impact of our work, what would rise to the top in each?

**Well for me, as a journalism professor, the most positive thing about Twitter is it allows me to practice journalism school extension, which means not just teaching the people who come to NYU and can afford the tuition and show up in my classes, but anyone who is interested and allowing me to develop a constituency for my ideas, that includes journalists for sure, but also lots of people who are concerned about the**

quality of journalism, and to do so without gatekeepers in a way that allows me to control my own message, has been amazing.

The bad thing is the same thing that people much more vulnerable than I am complain about, which is that anybody can walk over to me in Washington Square Park and scream how much they hate me at me and to reply to them would actually bring more of that upon me. So this sort of the openness to attack ...

And the velocity.

... and the velocity of it and the scale of it sometimes. Like when a big account decides that it's going to unload on something that I said, usually in criticism of me being part of a "liberal media," which I'm not but they think I am, that which again, I only experience a fraction of it compared to other people who are much more vulnerable than I am, and I'm a privileged character. I have a blue check next to my name, I have tenure at NYU, so I have all these protections, but that would be the thing that dissatisfies me the most. Along with some opacity in some of the changes that you introduced. That really bothers me. Like what is the algorithm doing to my feed? I don't actually know. I don't know where to go to find out.

Well, that's another fascinating area of research as well. The algorithm doesn't know either, sometimes.

Yes, exactly.

There's this research field in AI around explainability, and the intention is to encourage more functionality that allows, especially deep-learning algorithms, to explain the criteria, the decision-making criteria they're using, because right now they can't.

That's a big issue. Big problem.

So if you don't know why a decision is being made by an algorithm ...

Then you literally don't know what you're doing.

... and we're moving more and more of our decisions through it. Like I'm wearing an Apple Watch, it tells me to stand every now and then. I have offloaded a decision around my physical health to this thing, and if it can't tell me why it's making that particular

point, I know that it happens 10 minutes to the top of the hour, but that may change over time and that may impact something in a fundamental way that I can't predict.

**It's like the new frontier is in opacity.**

Yeah.

<><

# Recode Daily

Email (required)

By signing up, you agree to our Privacy Notice and European users agree to the data transfer policy.

SUBSCRIBE

*This article originally appeared on Recode.net.*

---

Millions turn to Recode to understand how technology and the companies behind it are shaping our world — and what's at stake as we rely on technology more than ever before. Financial contributions from readers help support our journalism and enable our staff to continue to offer our articles, podcasts, and newsletters for free. Please consider making a contribution today from as little as $3.