MARK D. FLANAGAN
CA Bar No. 130303
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real #400
Palo Alto, California 94306
Telephone: (650) 858-6047
Facsimile: (650) 858-6100

PETER G. NEIMAN (*pro hac vice*)
peter.neiman@wilmerhale.com
ALEX W. MILLER (*pro hac vice*)
alex.miller@wilmerhale.com
RISHITA APSANI (*pro hac vice*)
rishita.apsani@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
250 Greenwich St., 45th Floor
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (202) 663-6363

PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
ANURADHA SIVARAM (*pro hac vice*)
anuradha.sivaram@wilmerhale.com
SUSAN PELLETIER (*pro hac vice*)
susan.pelletier@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiff*

**TWITTER, INC.**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TWITTER, INC., <br><br> Plaintiff, <br><br> v. <br><br> KEN PAXTON, <br> in his official capacity as Attorney General of Texas, <br><br> Defendant. | Case No. 3:21-cv-01644-MMC <br><br> **TWITTER, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** <br><br> **Date:** **May 7, 2021** <br> **Time:** **9:00 a.m.** <br> **Courtroom: 7** |

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................. 1

BACKGROUND .............................................................................................. 1

ARGUMENT .................................................................................................. 3

I.    THIS COURT HAS PERSONAL JURISDICTION OVER AG PAXTON ........................... 3

    A.    AG Paxton Purposefully Directed His Activities Toward California..................... 4

    B.    Twitter's Retaliation Claim Has The Requisite Nexus To AG
       Paxton's California-Directed Activities.................................................. 6

    C.    Exercising Personal Jurisdiction In California Is Reasonable ........................ 7

    D.    Texas Sovereignty Is Not A Factor In This Analysis ............................... 9

II.   VENUE IS PROPER IN THE NORTHERN DISTRICT OF CALIFORNIA ....................... 11

III.  VENUE AND PERSONAL JURISDICTION ARE INDEPENDENTLY PROPER HERE
     BECAUSE AG PAXTON HAS CONSENTED TO SUIT IN THIS COURT ..................... 12

IV.   TWITTER'S FIRST AMENDMENT RETALIATION CLAIM IS RIPE NOW ................... 15

    A.    Twitter's Claim Satisfies The Requirements Of The Ripeness
       Doctrine, Warranting Immediate Adjudication ..................................... 16

        1.    Twitter Has Already Suffered Real And Concrete Injury ............................ 16

        2.    Twitter Need Not Wait For An Enforcement Action For Its
           First Amendment Challenge To Be Ripe...................................... 17

        3.    Prudential Considerations Favor Adjudicating Twitter's Claim
           Now................................................................................... 20

    B.    Twitter's Declaratory Judgement Claim Is Ripe .................................... 21

V.    ABSTENTION IS UNWARRANTED .................................................................. 22

VI.   TRANSFER TO THE WESTERN DISTRICT OF TEXAS WOULD BE
     INAPPROPRIATE............................................................................................. 24

CONCLUSION................................................................................................. 25

1

## <u>**TABLE OF AUTHORITIES**</u>

2

### **CASES**

3

Page(s)

4

*Acorda Therapeutics Inc. v. Mylan Pharmaceuticals Inc.*, 817 F.3d 755 (Fed. Cir.
2016) .......................................................................................................................5

5

6

*Alaska Right to Life Political Action Committee v. Feldman*, 504 F.3d 840 (9th
Cir. 2007) .............................................................................................................20

7

8

*American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045 (9th Cir.
1995) ...............................................................................................................17, 21

9

*Arizona Students' Association v. Arizona Board of Regents*, 824 F.3d 858 (9th
Cir. 2016) .......................................................................................................20, 21

10

11

*Atlantic Marine Construction Co. v. United States District Court for Western
District of Texas*, 571 U.S. 49 (2013) .........................................................13, 25

12

*B&G Products Co. v. Vacco*, 1999 WL 33592887 (D. Minn. Feb. 19, 1999)..............10

13

*B&G Foods North America, Inc. v. Embry*, 2020 WL 3605070 (E.D. Cal. July 2,
2020) ....................................................................................................................25

14

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)....................................................21

15

16

*Brittain v. Twitter, Inc.*, 2019 WL 8137718 (N.D. Cal. Mar. 15, 2019)......................14

*Brodheim v. Cry*, 584 F.3d 1262 (9th Cir. 2009)..................................................16, 18

17

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)..............................................4, 8

18

19

*Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC
Investment, Inc.*, 788 F.2d 535 (9th Cir. 1986)....................................................6

20

21

*Calder v. Jones*, 465 U.S. 783 (1984)...........................................................................10

22

*California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003)..............16

23

*Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*, 344 F.3d 822 (9th
Cir. 2003) .......................................................................................................15, 18

24

25

*Center for Biological Diversity v. United States Forest Service*, 925 F.3d 1041
(9th Cir. 2019).......................................................................................................23

26

*Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520 (9th
Cir. 2015) ..............................................................................................................23

27

28

*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) .................................................................................................22

*Courthouse News Service v. Planet*, 947 F.3d 581 (9th Cir. 2020) ........................22

*Courtney v. Goltz*, 736 F.3d 1152 (9th Cir. 2013) ..................................................23

*Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834 (9th Cir. 1986).........24

*Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020)...................................9, 10

*Doe 1 v. AOL LLC*, 552 F.3d 1077 (9th Cir. 2009) .................................................15

*Dole Food Co. v. Watts*, 303 F.3d 1104 (9th Cir. 2002)...........................................7

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................................21

*Ex parte Young*, 209 U.S. 123 (1908) .......................................................................8

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021) ...............................................................................................1, 6, 7

*Freestream Aircraft (Bermuda) Ltd. v. Aero Law Group*, 905 F.3d 597 (9th Cir. 2018) .................................................................................................4

*Global Commodities Trading Group., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101 (9th Cir. 2020) .....................................................................4

*Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016)..............................................19, 21

*Hawaii Housing Authority v. Midkiff*, 467 U.S. 229 (1984).....................................23

*In re Coleman*, 560 F.3d 1000 (9th Cir. 2009) ........................................................16

*In re Orange*, 818 F.3d 956 (9th Cir. 2016)............................................................15

*Insurance Co. of North America v. Marina Salina Cruz*, 649 F.2d 1266 (9th Cir. 1981) .................................................................................................9

*Kalman v. Cortes*, 646 F. Supp. 2d 738 (E.D. Pa. 2009) ........................................11

*Kentucky v. Graham*, 473 U.S. 159 (1985)...............................................................7

*Kidstar v. Facebook, Inc.*, 2020 WL 4382279 (D.N.J. July 31, 2020).......................14

*Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012).......................................21

*Laird v. Tatum*, 408 U.S. 1 (1972)...........................................................................17

*Leroy v. Great Western United Corp.*, 443 U.S. 173 (1979) ...................................................12, 15

*Loomer v. Facebook, Inc.*, 2020 WL 2926357 (S.D. Fla. Apr. 13, 2020) ....................................14

*McNeese v. Board of Education*, 373 U.S. 668 (1963)....................................................................19

*Meyer v. Fifth Third Bank*, 2021 WL 195029 (9th Cir. Jan. 20, 2021) .......................................13

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d
    1174 (6th Cir. 1992)....................................................................................................................9

*Monroe v. Pape*, 365 U.S. 167 (1961) ..........................................................................................19

*Morningside Church, Inc. v. Rutledge*, 2020 WL 5077255 (W.D. Mo. Aug. 27,
    2020) ..........................................................................................................................................10

*Murphy v. Schneider National, Inc.*, 362 F.3d 1133 (9th Cir. 2004).............................................12

*Myers v. Bennet Law Offices*, 238 F.3d 1068 (9th Cir. 2001) .......................................................11

*Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 726 (1998)....................................20, 21

*Olagues v. Russoniello*, 770 F.2d 791 (9th Cir. 1985)...................................................................21

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).........................................................................24

*Pralinksy v. Mutual of Omaha Insurance*, 2008 WL 4532563 (N.D. Cal. Oct. 9,
    2008) ..........................................................................................................................................24

*Publius v. Boyer-Vine*, 237 F. Supp. 3d 997 (E.D. Cal. 2017) ......................................................20

*Railroad Commision of Texas v. Pullman Co.*, 312 U.S. 496 (1941)............................................22

*Rhodes v. Robinson*, 408 F.3d 559 (9th Cir. 2005)........................................................................21

*Rich v. Fox News Network LLC*, 2020 WL 6276026 (S.D.N.Y. Sept. 15, 2020)............................8

*Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1991)..................................................................5

*Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191 (9th Cir. 1988) .............................................5, 7

*San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996).......................17

*Service Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082 (N.D. Cal.
    2018) ..........................................................................................................................................11

*Smith v. Pacific Properties & Development Corp.*, 358 F.3d 1097 (9th Cir. 2004)......................17

*Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008)................................................10

*Thomas v. Anchorage Equal Rights Commision*, 220 F.3d 1134 (9th Cir. 2000) ..................16, 17

*United States v. State Water Resources Control Board*, 988 F.3d 1194 (9th Cir. 2021) ................................................................................................................22

*Vu v. Ortho-McNeil Pharmaceutical, Inc.,* 602 F. Supp. 2d 1151 (N.D. Cal. 2009)....................24

*Walden v. Fiore*, 571 U.S. 277 (2014)..................................................................................5

*Wolfson v. Brammer*, 616 F.3d 1045 (9th Cir. 2010) ............................................18, 22

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006)..........................................................................................4, 19, 20

*Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081 (9th Cir. 2018) .........................14

*Zimmer v. Connett*, 640 F.2d 208 (9th Cir. 1981)..........................................18, 19, 21

*Zinermon v. Burch*, 494 U.S. 113 (1990)...................................................................19

## DOCKETED CASES

*Arizona Democratic Party v. Hobbs*, No. 20-16759 (9th Cir. Sept. 22, 2020)...............................9

*California v. Little Sisters of the Poor*, No. 19-15072 (9th Cir. Mar. 4, 2019) .............................9

*Jones v. Shinn*, No. 18-99006 (9th Cir. Dec. 23, 2019) .......................................................9

*Sierra Club v. McCarthy*, No. 15-15894 (9th Cir. Aug. 10, 2015)...................................9

*United States v. California*, No. 18-16496 (9th Cir. Sept. 25, 2018) ............................................9

*Young v. Hawaii*, No. 12-17808 (9th Cir. June 4, 2020) ............................................9

## STATUTES, RULES, AND REGULATIONS

28 U.S.C. § 1391...............................................................................................11

28 U.S.C. § 2201...............................................................................................21

28 U.S.C. § 2202...............................................................................................21

42 U.S.C. § 1983 ……………………………………………………………….. 16, 19, 23

Tex. Bus. & Com. Code Ann. § 17.61.................................................................14

Tex. Bus. & Com. Code Ann. § 17.62(b) ..........................................................14

1

**OTHER AUTHORITIES**

2

Svitek, Patrick, *Gov. Greg Abbott Says He's Rescinding Statewide Mask Mandate and Capacity Limits on Businesses*, TEXAS TRIBUNE (March 2, 2021)............................24

3

4

U.S. District Court for the Northern District of California, General Order No. 72-6 (Sept. 16, 2020) ...............................................................................................9

5

6

U.S. District Court for the Western District of Texas, Fourteenth Supplemental Order Regarding Court Operations (Mar. 17, 2021) ........................................24

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## INTRODUCTION

Twitter has stated a straightforward First Amendment retaliation claim, amply supported by the United States Constitution, controlling federal precedent, and AG Paxton's own prior words and actions.  In fact, in his amicus brief supporting Exxon's challenge in federal court in Texas of an allegedly unconstitutional civil investigative demand ("CID") issued by a different state's attorney general, Paxton himself provided many reasons for denying his current motion to dismiss. Then, Paxton claimed that "open and candid discussions" protected by the Constitution were unlawfully "threatened by the chill of subpoenas . . . hanging in the air," and urged the court to enjoin enforcement of the CID.  Paxton Am. Br. 6.  Now, when his own CID is at issue, he sees Twitter's federal suit as an affront to his authority and hypothesizes a host of procedural reasons why this Court should not even hear Twitter's arguments.

Each of AG Paxton's procedural objections fail.  He issued the CID to a California-based company, Twitter, to retaliate against content moderation decisions it had made in California—aiming to unconstitutionally influence decisions the company will make in California about how to moderate content in the future.  And he expressly consented to jurisdiction and venue here. Under these circumstances, California has a "significant interest[]" in "providing [its] residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1030 (2021).  No additional factual development or misconduct on his part is required to ripen this dispute because, as AG Paxton explained in the *Exxon* case, the First Amendment harms flow directly from the issuance of his retaliatory CID. Nor is there a basis for the Court to abstain in favor of a Texas court, because Twitter's constitutional claim does not depend on any question of state law.  AG Paxton's arguments for dismissal of this case ignore what he has actually said and done and the real and present First Amendment harms his conduct has already caused.  The motion to dismiss should be denied.

## BACKGROUND

The First Amendment guarantees Twitter's right to make decisions about what content will appear on its platform free from the threat that government officials who disagree with its choices will use their authority to retaliate.  Twitter exercised this constitutionally protected editorial

discretion when it suspended President Trump's Twitter account following the January 6, 2021 Capitol attack.[1]  Compl. ¶ 38.  Other companies made similar decisions.  Facebook, for example, also suspended President Trump's account on its platform.  *Id.* ¶ 41.  And Amazon, Google, and Apple took steps to restrict the availability of Parler, a social media platform used by (among others) the rioters.  *Id.*

AG Paxton disagreed with these decisions.  On January 9, he posted a Tweet criticizing "Twitter/Facebook [for] closing conservative accts," and asserting that "BigTech hates free speech" and "stand[s] ready/willing to be the left's Chinese-style thought police."  Compl. ¶ 42.  AG Paxton then declared:  "As AG, *I will fight them with all I've got*."  *Id.* (emphasis added).  Four days later, he issued civil investigative demands to Twitter and each of the other Northern California "Big Tech" companies he had just pledged to "fight" with "all I've got."  Compl. ¶ 43. The CID that his office mailed to Twitter's San Francisco headquarters openly asserts that AG Paxton had begun an investigation into Twitter's "practices regarding what can be posted on its platform."  *Id.*, Ex. 1 at 2.  The CID seeks, among other things, "all . . . policies and procedures related to content moderation on your platform, including any policies or procedures that limit the reach or visibility of content intended for public viewers."  *Id.* at 9.  The CID also demands that Twitter produce "a copy of all communications, internal and to third parties, you have had, between January 1, 2019, and the present regarding the social media platform Parler.com or Parler Inc."  *Id.*

When he issued the CID, AG Paxton distributed a press release through his official Twitter account, knowing it would reach Twitter and other internet platform operators in California. Compl. ¶ 46.  His press release made his motives plain:  It expressly linked the CIDs to Twitter and Facebook's suspension of President Trump's accounts and other companies' actions against Parler.  *Id.* ¶ 47.  And in a subsequent interview distributed online, he stated that his office is undertaking "an investigation . . . related to the whole issue of the President being de-platformed," and described his goal of ensuring that content moderation decisions made by online platforms—

---

[1] As explained in Twitter's motion for preliminary injunction, this case does not rest on Section 230 of the Communications Act of 1934, and analysis of Twitter's status under Section 230 is distinct from the analysis of the protections to which it is entitled under the First Amendment.  *See* Mot. for Preliminary Injunction at 4 n.1.

including Twitter—be "regulated." *Id*. ¶ 49.  The clear import of these statements is that AG Paxton is seeking to impose his political views on the internal content moderation decisions of what he calls the "Big Tech" industry in Northern California.

Twitter attempted to negotiate with AG Paxton over the scope and timing of the CID, but to no avail.  Compl. ¶¶ 53-58.  Left with the choice of complying with a plainly retaliatory and unconstitutional CID or being sued for not doing so, Twitter filed this case.

## ARGUMENT

This Court has authority to hear this case.  Because AG Paxton purposefully directed his retaliatory investigation toward Twitter and other online companies in California, this Court has personal jurisdiction over him, and venue is proper.  Moreover, AG Paxton has consented to jurisdiction and venue in this court, twice.  And Twitter need not have waited for AG Paxton to enforce his CID before asserting its First Amendment retaliation claim.  As AG Paxton expressly recognized in his *Exxon* amicus brief, the pendency of a retaliatory CID itself imposes concrete harms on Twitter by exerting an ongoing chill on its First Amendment activities.  Nor is abstention warranted; Twitter's First Amendment retaliation claim does not rely on state law and presents a federal question that a federal court is uniquely positioned—and obligated—to resolve.

## I.   THIS COURT HAS PERSONAL JURISDICTION OVER AG PAXTON

The content moderation policies AG Paxton is investigating were developed in California.  The specific moderation decisions that triggered his retaliation were made in California—including the decision to suspend President Trump's account.  Williams Decl. ¶ 13 (Dkt. 5-1).  The highly sensitive internal documents and communications he is demanding are located in California.  Williams Decl. ¶ 10.  And the future content moderation decisions he hopes to influence through his unconstitutionally retaliatory investigation will be made in California.  In short: every aspect of Twitter's claim—from its initial protected activity to AG Paxton's unconstitutional retaliation to the ongoing harm of his investigation—centers on this forum.

Personal jurisdiction over AG Paxton straightforwardly follows.  His actions aimed toward California, taken with the intention of influencing conduct and causing harm here, create "minimum contacts with the relevant forum such that the exercise of jurisdiction 'does not offend

traditional notions of fair play and substantial justice.'" *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020).  Each of the three factors the Ninth Circuit considers when assessing this requirement are met: (1) AG Paxton "purposefully direct[ed] his activities [toward] the forum"; (2) Twitter's claim "arise[s] out of or relate[s] to the defendant's forum-related activities"; and (3) exercising jurisdiction here is "reasonable."  *Id.* at 1107.

### A.     AG Paxton Purposefully Directed His Activities Toward California

AG Paxton's unlawful acts were sufficiently directed toward California to establish personal jurisdiction because they were "calculated to cause injury to a plaintiff in the forum." *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 604 (9th Cir. 2018).  He intentionally aimed his threats of legal sanction toward, and transmitted a retaliatory CID to, Twitter in the Northern District of California (where the company's headquarters are located) for the purpose of injuring Twitter in California in three ways:  First, AG Paxton is attempting to penalize Twitter for exercising its First Amendment rights in California—namely for editorial decisions Twitter made at its headquarters in California to remove certain content from its platform.  Second, his CID would require Twitter employees to expend significant time and resources within California to produce the troves of material that he demands.  Third, his efforts are intended to chill Twitter's future First Amendment-protected activity in California, by intimidating the company into changing the moderation decisions it makes here.  That AG Paxton "contemplated" his actions would have these "consequences" in this forum matters "in determining whether [he] purposefully established minimum contacts within the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985).

Contrary to AG Paxton's assertion, it is immaterial that he initiated these actions, and "formed" his "motive," to do so, from his office in Texas, Mot. 5-6, 11.  Actions intended to cause "effects inside the forum state" constitute purposeful direction even if some of the conduct causing them "takes place outside the forum." *Freestream Aircraft,* 905 F.3d at 604.  The focus of the Court's inquiry is where "the defendant's actions [are] felt, whether or not the actions themselves occurred within the forum." *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433

1   F.3d 1199, 1206 (9th Cir. 2006) (en banc).  AG Paxton may have drafted the CID in Texas,

2   purportedly relying on Texas-based authority.  But his intimidation tactics and threats of legal

3   sanctions were directed at Twitter in California.

4         This distinguishes the present case from those in which the defendant had no aim of

5   affecting conduct in the forum state, but engaged elsewhere with a plaintiff who merely happened

6   to reside in that forum. *See Walden v. Fiore*, 571 U.S. 277 (2014).  In *Walden*, the Supreme Court

7   found that an official's seizure of money in Georgia from a traveler who happened to reside in

8   Nevada was not purposely directed at Nevada, but instead was directed at the traveler himself.

9   That meant that the traveler (i.e., the plaintiff) was "the only link between the defendant and the

10  forum," and the defendant official thus had not established minimum contacts there.  Mot. 5

11  (quoting *Walden*, 571 U.S. at 285).  Here, by contrast, AG Paxton is not just interacting with a

12  company that happens to be headquartered in California.  His investigation takes issue with, and

13  seeks to alter, past and future constitutionally protected activities undertaken *in California* by a

14  California-headquartered company.  In fact, he specifically explained his investigation as being

15  "related to the whole issue of the President being de-platformed"—an action that Twitter took in

16  California, not Texas.  *Supra* at 2.  Accordingly, AG Paxton's "contacts with the forum are

17  attributable to his own actions [not] solely the actions of the plaintiff."  *Sinatra v. Nat'l Enquirer,*

18  *Inc*., 854 F.2d 1191, 1195 (9th Cir. 1988).

19        *Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1991), is instructive.  There, the court

20  found personal jurisdiction over a Mexico City-based defendant who had licensed his book to

21  allow the California plaintiff to produce a film, in substantial part, in California. The Ninth

22  Circuit's decision turned on the contemplated future action that "would have been performed"

23  (primarily *by the plaintiff*) in the forum *as a consequence* of the defendant's actions.  *Id.* at 622.

24  Applied here, that principle establishes jurisdiction in California, where the intended past and

25  future consequences of AG Paxton's continued retaliatory investigation include the chilling of

26  Twitter's speech in California.   The investigation, CID, press statements, and any future

27  enforcement action all focus "upon activities in California."  *Id.*; *see Acorda Therapeutics Inc. v.*

28

*Mylan Pharm. Inc.*, 817 F.3d 755, 759 (Fed. Cir. 2016) (personal jurisdiction found where defendant took initial steps to set into motion future action that would injure plaintiff in the forum).

AG Paxton also attacks a straw man in pointing to decisions establishing that mere "use of the mails," without more, "[does] not qualify as purposeful activity." Mot. 6. As explained, the relevant "effects inside the forum state" here reach far beyond Twitter's receipt of the CID. They include the protected moderation decisions that triggered the AG's unconstitutional investigation and the future protected moderation decisions that the investigation seeks to unconstitutionally chill and shape. AG Paxton's cases concerning mere "use of the mails," "correspondence," and "cease and desist letter[s]" do not address these sorts of significant effects. Mot. 6, 7-10.

This case is thus not about whether "merely communicating with a company across state lines," Mot. at 1, constitutes purposeful direction. AG Paxton is conducting an unconstitutional retaliatory investigation of a California company, in response to the company's past activities in California, that aims to influence future actions in California. If the Texas AG wants to target and control California conduct and violate the First Amendment rights of a California company, there is nothing at all unfair in asking him to defend that conduct in a federal court in California.[2]

## B.   Twitter's Retaliation Claim Has The Requisite Nexus To AG Paxton's California-Directed Activities

Twitter's First Amendment claim has a much more than sufficient nexus to the activities AG Paxton directed to California to support personal jurisdiction. The Supreme Court's "most common formulation . . . demands that the suit 'arise out of or relate to the defendant's contacts with the forum.'" *Ford*, 141 S. Ct. at 1026 (emphasis omitted). That standard is easily satisfied here: The heart of this lawsuit is AG Paxton's wrongful intrusion into Twitter's protected editorial decisions. California is where that intrusion occurred and continues to be felt.

AG Paxton asks the Court to ignore all this on a theory that Twitter's suit "is designed to

---

[2] While AG Paxton's own statements and actions already amply demonstrate his intent, to the extent the Court determines it needs more information to rule on personal jurisdiction, Twitter respectfully requests leave to take expedited jurisdictional discovery. *See Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) ("Discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.").

1  prevent" him "from taking action in Texas," namely, from initiating an enforcement action in

2  Texas state court. Mot. 10. But that misunderstands the inquiry. Under Supreme Court precedent,

3  the question is not whether the plaintiff's desired remedy would affect or preclude action in some

4  other jurisdiction (here Texas). Rather, it is simply "whether [the defendant's] contacts [with the

5  forum] are related enough to the plaintiffs' suit[]." *Ford*, 141 S. Ct. at 1031. And "the place of a

6  plaintiff's injury and residence" are "a key part" of "assessing th[at] link between the defendant's

7  forum contacts and the plaintiff's suit." *Id.* at 1031-32.[3]

8     **C.    Exercising Personal Jurisdiction In California Is Reasonable**

9        Because the harm from AG Paxton's retaliatory scheme has been inflicted and (absent

10  prompt injunctive relief) will continue to be inflicted on Twitter in California, and because

11  California has a significant interest in protecting its citizens' First Amendment rights, it is

12  reasonable and efficient for this Court to exercise jurisdiction. *See Dole Food Co. v. Watts*, 303

13  F.3d 1104, 1117 (9th Cir. 2002). To assess reasonableness, the Ninth Circuit considers several

14  factors: (1) the extent of the defendant's purposeful interjection into the forum state's affairs;

15  (2) the burden on the defendant; (3) conflicts of law between the forum and defendant's home

16  jurisdiction; (4) the forum's interest in adjudicating the dispute; (5) the most efficient judicial

17  resolution of the dispute; (6) the plaintiff's interest in convenient and effective relief; and (7) the

18  existence of an alternative forum. *Sinatra*, 854 F.2d at 1199–1201. AG Paxton bears the burden

19  of demonstrating that jurisdiction would be unreasonable, *id.*, and he has not done so.

20        The first, third, fourth, and sixth factors plainly favor jurisdiction. As to the first, the Ninth

21  Circuit treats a defendant's purposeful direction of injury toward a plaintiff in the forum as

22  weighing in favor of jurisdiction. *See Dole Food Co*., 303 F.3d at 1114. As to the third, because

23  Twitter's claim turns solely on federal constitutional law, there is no relevant conflict of law. And,

24  contrary to AG Paxton's assertion, Mot. 12, this suit in no way threatens any sovereign interest.

25  This suit is not against Texas; it seeks to enjoin AG Paxton individually, in his official capacity.

26  Such suits "are not treated as actions against the State," *Kentucky v. Graham*, 473 U.S. 159, 167

27

28  ————————————

[3] In any event, the relief sought *will* affect conduct in California, by barring AG Paxton from demanding documents located in California and committing further constitutional violations here.

1  n.14 (1985), because "the use of the name of the state to [take] an unconstitutional act . . . is a

2  proceeding without the authority of, and one which does not affect, the state in its sovereign or

3  governmental capacity," *Ex parte Young*, 209 U.S. 123, 159 (1908); *see also infra*, at 9-10.

4         As to the fourth factor, California has a strong interest in protecting the First Amendment

5  rights of its residents. *See Burger King Corp.*, 471 U.S. at 473–74 ("A State generally has a

6  'manifest interest' in providing its residents with a convenient forum for redressing injuries

7  inflicted by out-of-state actors."). That is particularly true here, because AG Paxton has targeted

8  and seeks to control the protected speech activities of not only Twitter but also of several other

9  California companies in an industry that is largely based in California. For the same reason, the

10 sixth factor weighs in Twitter's favor. Twitter has a strong interest in convenient and effective

11 relief, rather than being forced to litigate over AG Paxton's retaliation in a forum, and at a time,

12 of his choosing. AG Paxton errs in asserting that Texas has a strong interest because this case is

13 about "enforcement of a Texas statute." Mot. 12. The validity of Texas law is not at issue. Rather,

14 this is a case about AG Paxton's violation of the federal Constitution.

15        No other factor tilts the scale. As to the fifth factor, suit in Texas would be no more efficient

16 than in California; there are potential witnesses and parties in both places, and injunctive relief

17 would be equally effective if issued from either court. So while it is true that the case potentially

18 could have been brought in Texas (relevant to the seventh factor), there is no reason to prefer that

19 forum over this one, particularly when a motion for preliminary relief has already been fully

20 briefed in this Court. Starting over would be the opposite of efficient. *See DIRECTV v. EQ Stuff,*

21 *Inc.*, 207 F. Supp. 2d 1077, 1082 (C.D. Cal. 2002) ("The most efficient resolution will be achieved

22 by a court that is already 'familiar with the facts and procedural history of the litigation.'"). AG

23 Paxton relies on the second factor, but fails to explain how he is burdened by having to litigate in

24 California. Of course, he would prefer to have this case heard in Texas, but mere preference does

25 not constitute a burden sufficient to weigh against jurisdiction. *E.g., Rich v. Fox News Network*,

26 2020 WL 6276026, at *6 (S.D.N.Y. Sept. 15, 2020). AG Paxton has demonstrated that he is fully

27 capable and willing to litigate in California courts—indeed, he has an extensive record of doing

28

so.  He has, for example, filed many amicus briefs here.[4]  His office has intervened as a plaintiff in an action filed in this district, and he litigated the resulting appeal.  *See Sierra Club v. McCarthy*, No. 15-15894, Dkt. 16 (9th Cir. Aug. 10, 2015).  And anyway, this district has for months operated under General Order No. 72-6, which states that all civil "[h]earings will be held via telephone or videoconference," U.S. District Court for the Northern District of California, General Order No. 72-6 (Sept. 16, 2020), alleviating any travel-based burden that might otherwise apply.

### D. Texas Sovereignty Is Not A Factor In This Analysis

In various places, AG Paxton's motion suggests that this Court should not exercise personal jurisdiction over him because of supposed implications for Texas's "state sovereignty."  Mot. 1, 6-8, 12.  But this suit is not against Texas—it is against AG Paxton in his official capacity.  *See supra* at 7-8.  Moreover, the fact that he is seeking to use state authority to achieve his retaliatory goals does not affect the personal jurisdiction analysis.  The effects test does not turn on the mechanism a defendant uses to take aim at the forum state; it depends instead on the intent and result of those actions.  *See supra* at 4-5.  And there is no special exception to the ordinary rules of personal jurisdiction for state officials alleged to have wielded their authority unlawfully.

The cases Paxton cites do not provide otherwise.  *See* Mot. 6-9.  Each involved very different scenarios—such as an attempt to sue the Mexican Navy in Alaska solely because a boat allegedly negligently repaired at one of its shipyards in Mexico later sank in Alaska, *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1272 (9th Cir. 1981)—that courts reasonably found did not constitute purposeful direction toward the forum state.  *See also Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174 (6th Cir. 1992) (finding no jurisdiction in Michigan over officials from other states who had refused to accept radioactive waste originating in Michigan).

AG Paxton consigns to a footnote a recent decision from his home circuit finding personal jurisdiction over an out-of-state Attorney General.  Mot. 8 n.3.  In that case, *Defense Distributed*

---

[4] *E.g.*, *Young v. Hawaii*, No. 12-17808, Dkt. 235 (9th Cir. June 4, 2020); *Arizona Dem. Party v. Hobbs*, No. 20-16759, Dkt. 5 (9th Cir. Sept. 22, 2020); *Jones v. Shinn*, No. 18-99006, Dkt. 75 (9th Cir. Dec. 23, 2019); *California v. Little Sisters of the Poor*, No. 19-15072, Dkt. 44 (9th Cir. Mar. 4, 2019); *United States v. California*, No. 18-16496, Dkt. 23 (9th Cir. Sept. 25, 2018).

*v. Grewal*, 971 F.3d 485, 493 (5th Cir. 2020), *cert. denied sub nom.*, No. 20-984, 2021 WL 1163750 (U.S. Mar. 29, 2021), the Fifth Circuit found jurisdiction in Texas over the New Jersey Attorney General, who had sent a cease-and-desist letter demanding that a Texas corporation stop offering 3D-printable gun information online. *Id.* The court explained that the New Jersey Attorney General's investigation sought to prevent the dissemination of information not just in New Jersey, but also in Texas, and that such an effort to target First Amendment rights in Texas constituted purposeful direction toward the forum. *Id.* at 495-96. The court also reasoned that "[c]ensorship . . . is damaging not just to the speaker, but to surrounding audiences. And like libel, censorship's harm occurs not just where it originates, but where it arrives." *Id.* at 495 n.9; *see also Calder v. Jones*, 465 U.S. 783, 788-89 (1984) (jurisdiction over out-of-state publishers of a libelous article because the article "concerned the California activities of a California resident" and "the brunt of the harm . . . was suffered in California").

*Grewal* confirms that, contrary to AG Paxton's assertion, Mot. 6-9, there is no rule that a state regulator may engage in unconstitutional conduct aimed at another state—in retaliation for protected activity in that other state by a citizen of that other state, and for the specific purpose of affecting that citizen's future protected activity in that same state—yet avoid jurisdiction there. As was true in *Grewal*, AG Paxton "has projected himself across state lines and asserted a pseudo-national executive authority," creating a "chilling effect" that affects Twitter (and other California companies), as well as its users in California. *Grewal*, 971 F.3d at 493, 496. That "statewide impact . . . created contacts with [California] and not just [Twitter]." *Id.* at 495.

Twitter's claim here is thus quite unlike ordinary challenges to a state Attorney General's efforts to gather information from out-of-state companies about whether their conduct in the Attorney General's own state violates state law. Those routine cases involve neither retaliation against speech in another state nor efforts to shape speech in another state going forward.[5] Where,

---

[5] The AG's cases fall into the routine category. *See Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008) (Arizona AG demanded Texas company comply with an Arizona licensing law with respect to Arizona properties and customers); *Morningside Church, Inc. v. Rutledge*, 2020 WL 5077255 (W.D. Mo. Aug. 27, 2020) (Los Angeles prosecutor sent a subpoena to a Missouri televangelist requesting information about advertisements for bogus COVID-19 cures shown to Los Angeles audiences); *B&G Products Co. v. Vacco*, 1999 WL 33592887 (D. Minn.

1    as here, both those factors are present, the state where the retaliated-against and chilled speech

2    occurs is the most appropriate forum.  In these narrow circumstances, the happenstance that the

3    retaliating official resides elsewhere is no reason to require speakers to litigate far from home to

4    vindicate their constitutional rights.

5    **II.    VENUE IS PROPER IN THE NORTHERN DISTRICT OF CALIFORNIA**

6          Venue is proper here under 28 U.S.C. § 1391(b)(2), which provides that a suit may be filed

7    in a judicial district "in which a substantial part of the events or omissions giving rise to the claim

8    occurred.[6]  The bulk of the events giving rise to Twitter's claim in this case occurred in this district.

9    This is where AG Paxton directed and served the CID, where he directed his threats of legal

10   sanctions, where Twitter engaged in the protected First Amendment activity against which he is

11   retaliating, and where Twitter continues to engage in other protected First Amendment activity

12   that he seeks to chill and control.

13         In addition, for the reasons discussed above, the harms Twitter has suffered and will suffer

14   (absent injunctive relief) on account of the AG's actions are suffered here.  "[T]he locus of the

15   injury [is] a relevant factor" in the venue analysis, with venue lying where "[t]he brunt of the harm

16   . . . was suffered" or "felt."  *Myers v. Bennet Law Offices*, 238 F.3d 1068, 1074-76 (9th Cir. 2001).

17   Where, as here, a case is "brought on First Amendment grounds, [this] impact becomes the most

18   important part" of the analysis because "[t]he suppression itself is a more 'substantial' event than

19   the decision to suppress the speech."  *Kalman v. Cortes*, 646 F. Supp. 2d 738, 742 (E.D. Pa. 2009);

20   *see also Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1088 (N.D. Cal. 2018)

21   (emphasizing the importance of place of injury in addressing venue for constitutional claims).  This

22   focus makes sense:  the aim and intended effect of AG Paxton's actions was and is to punish

23   Twitter's past protected activities in this district, and to affect its future activities here as well.

24   Because this case turns on Twitter's assertion that this purpose and effect violate its exercise of its

25

26   Feb. 19, 1999) (New York AG enforced New York environmental law related to sales in New
     York).  None of these cases involved retaliation for protected speech in the forum and an effort to
27   censor future speech in the forum.

28   [6] Twitter assumes that the citations in AG Paxton's motion to Cal. Civ. Proc. Code § 1391(b) are
     meant to reference the federal venue statute, 28 U.S.C. §1391.  *See* Mot. 16-17.

First Amendment rights in this district, venue is proper here.

As explained, *supra* at 7 & 9-10, AG Paxton is wrong to assert that adjudicating this case in this district implicates Texas's sovereign interests and would subject ordinary regulatory activity to litigation in far-flung forums. Mot. 16-17. This suit is about unconstitutional action AG Paxton took to interfere with Twitter's expressive conduct *in this district*, and is brought against AG Paxton himself. And although he purports to be enforcing Texas law, the entire premise of Twitter's claim is that his true purpose is retaliation for Twitter's exercise of First Amendment rights *in this district* in excess of his lawful authority. The fact that he purports to use Texas-based authority to carry out these unlawful aims does not change that analysis. This is nothing like a challenge to routine application of state regulations, and taking the allegations in the complaint as true (as required at this stage), this Court should not proceed as though it were. *See Murphy v. Schneider Nat'l, Inc*., 362 F.3d 1133, 1138 (9th Cir. 2004).

As a result, the cases on which the AG relies to contest venue are inapposite. Twitter is not challenging a Texas law, or ordinary application of a Texas law to Twitter's conduct in Texas. *See Leroy v. Great W. United Corp.,* 443 U.S. 173, 185 (1979). Twitter instead seeks to stop AG Paxton from using the powers of his office to punish it for its past First Amendment-protected editorial decisions *in this district* and to intimidate it into conforming its future editorial decisions *here* to his political predilections. Unlike in the cited cases, all of the conduct that spurred AG Paxton's retaliation and all of the conduct that his investigation seeks to control occurred or will occur in this district—not in Texas.

## III.   VENUE AND PERSONAL JURISDICTION ARE INDEPENDENTLY PROPER HERE BECAUSE AG PAXTON HAS CONSENTED TO SUIT IN THIS COURT

While both jurisdiction and venue are proper here for the reasons explained above, the motion to dismiss on these grounds *independently* fails because AG Paxton and the Office of the Texas Attorney General consented—and thus waived any objection—to jurisdiction and venue in this Court by agreeing to the Twitter User Agreement. The User Agreement provides both that "[a]ll disputes related to these Terms or the Services" will be litigated "solely in the federal or state courts located in San Francisco County, California, United States," and that the parties "consent

1    to personal jurisdiction and waive any objection as to inconvenient forum." Sivaram Decl., Ex. K

2    at 9 (Dkt. 5-3). "When parties agree to a forum-selection clause," like this one, "they waive the

3    right to challenge the preselected forum as inconvenient or less convenient for themselves or their

4    witnesses, or for their pursuit of the litigation." *Atl. Marine Const. v. U.S. Dist. Ct. for W. Dist. of*

5    *Texas*, 571 U.S. 49, 64 (2013). This includes consenting to personal jurisdiction and venue in the

6    preselected forum. *See Meyer v. Fifth Third Bank*, 2021 WL 195029, at *1 (9th Cir. Jan. 20, 2021).

7    AG Paxton has held a Twitter account since 2009, which he currently operates under the

8    name "Attorney General Ken Paxton." Compl. ¶ 9. He opened this account before taking office,

9    but now frequently uses it to carry out or promote his official governmental actions. *Id.* For

10   instance, he used it to announce he would "fight" Twitter with "all I've got" after Twitter

11   suspended President Trump's account, to issue the press release announcing the CID and related

12   investigation, and to post Tweets. *Id.* ¶¶ 9, 46. The Texas Attorney General's Office has, since

13   2009, separately maintained and used a Twitter account. *Id.* ¶ 9. To sign up for and use these

14   accounts, both AG Paxton and his office had to agree to Twitter's User Agreement, including its

15   forum selection clause. Sivaram Decl., Ex. K at 9 ("By continuing to access or use the Services

16   . . . you agree to be bound by the . . . Terms.").

17   This forum selection clause applies to government entities and officials. Twitter's User

18   Agreement specifically contemplates that it will bind government actors by expressly providing a

19   lone, narrow exception to the clause's application to some governmental officials and entities—an

20   exception that, contrary to the AG's contention, Mot. 14, does not apply here. The provision of

21   the User Agreement that immediately follows the forum selection clause states that "a federal,

22   state, or local governmental entity in the United States using the Services in your official capacity"

23   consents to the "jurisdiction" and "venue" provisions *unless* it can show that it is "legally unable

24   to accept [them]." *See* Sivaram Decl., Ex. K at 10. AG Paxton has identified nothing in Texas

25   law that prohibited him or his office from accepting these jurisdiction and venue terms. The Texas

26   statutes he cites, Mot. 14, merely provide procedures for parties to "petition to extend the return

27   date for, or to modify or set aside" a CID, and for state officials to file an action to enforce the

28   CID. *See* Tex. Bus. & Com. Code Ann. §§ 17.61(g), 17.62(b). Those statutes do nothing to limit

1   the AG's authority to consent to suit in California, and so the forum-selection clause's narrow

2   exception for certain government officials or agencies is inapplicable.

3        AG Paxton's other attempts to escape the plain terms of the forum-selection clause are

4   meritless.  The CID and retaliatory investigation target Twitter's moderation decisions, which are

5   exercises by Twitter of its authority under the User Agreement.  Sivaram Decl., Ex. K at 4-5

6   (Twitter may "remove or refuse to distribute any Content on the Services, limit distribution or

7   visibility of any Content on the service, suspend or terminate users, and reclaim usernames without

8   liability to [users]").  Twitter, in turn, seeks to enjoin AG Paxton from retaliating against and

9   interfering with these decisions about enforcing its terms and managing its services.  *See, e.g.*,

10  Compl. ¶¶ 65, 66.  This dispute thus "relate[s] to" both Twitter's "Terms" and its "Services."

11  Sivaram Decl., Ex. K at 9.  Indeed, courts have applied Twitter's forum selection clause and other

12  similar clauses to disputes, like this one, arising out of content moderation decisions.  *See, e.g.*,

13  *Brittain v. Twitter, Inc.*, 2019 WL 8137718, at *2 (N.D. Cal. Mar. 15, 2019) (applying clause to

14  suit challenging Twitter's suspension of Trump's account).[7]

15       AG Paxton attempts to narrow the clause's reach, arguing that because the Terms of

16  Service "govern [users'] access to and use of [Twitter's] services," and this suit is "not about

17  Defendant's 'access to and use of [Twitter's] services," the clause does not apply.  Mot. 13.  But

18  AG Paxton's focus on the scope of the User Agreement *terms generally*, rather than on the scope

19  of the *forum selection clause* itself, misses the point.[8]  This clause applies to "[a]ll disputes *related*

20  *to* these Terms *or* Services."  Sivaram Decl., Ex. K at 9 (emphasis added).  And the Ninth Circuit

21  has held that when a forum selection clause uses the term "relating to," it encompasses "any

22  disputes that reference . . . or have some 'logical or causal connection'" to the covered subject

23  matter.  *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1086 (9th Cir. 2018).

24  Applying that construction here, the clause covers any dispute "that references" or has "some

25

26  [7] *Accord Kidstar v. Facebook, Inc.*, 2020 WL 4382279, at *1-*5 (D.N.J. July 31, 2020) (applying
    Facebook's similar forum selection clause to dispute arising out of deactivation of a Facebook

27  account); *Loomer v. Facebook, Inc.*, 2020 WL 2926357, at *3 (S.D. Fla. Apr. 13, 2020) (same).

28  [8] Even so, this suit *does* involve Paxton's use of Twitter's services, including because he used
    those services in carrying out his unlawful retaliation.  *See, e.g.*, Compl. ¶¶ 42, 46.

logical . . . connection to" Twitter's Terms *or* Services.  This dispute unquestionably does.  It references and is connected to both Twitter's Services and its Terms, in that (1) the CID explicitly demands documents pertaining to, (2) AG Paxton expressly issued the CID and commenced the investigation in direct reaction to, and (3) his retaliation seeks to influence going forward, how Twitter operates its Services and enforces its Terms.

Finally, AG Paxton is wrong to suggest that *In re Orange*, 818 F.3d 956, 962 (9th Cir. 2016), creates a rule against applying forum selection clauses in suits claiming constitutional and statutory—as opposed to contractual—violations.  Mot. 13.  That case interpreted a clause limited to disputes "arising from or relating to *the agreement*" at issue, *id.* (emphasis added), whereas here the clause (as noted) applies to all disputes "*related to* [Twitter's] Terms *or Services*."[9]

## IV.   TWITTER'S FIRST AMENDMENT RETALIATION CLAIM IS RIPE NOW

Where state action is taken "in retaliation for [a plaintiff's] exercise of . . . First Amendment rights," the plaintiff already has "suffered harm" and need not "await further action" before bringing suit.  *Carpinteria Valley Farms, Ltd. v. Cty. of Santa Barbara*, 344 F.3d 822, 830 (9th Cir. 2003).  Twitter's First Amendment retaliation claim is therefore ripe.  The events and facts required to adjudicate this claim have occurred:  AG Paxton has issued a transparently retaliatory CID, and Twitter has suffered First Amendment "chill" and financial injuries as a result.

Ignoring the events and facts that are already in the past, as well as the basic nature of a First Amendment retaliation claim, AG Paxton insists that Twitter must wait until he enforces the CID to have its day in Court.  He contends, in other words, that Twitter must suffer *further* retaliatory harm before it can challenge the retaliation it has already suffered.  That is wrong under Ninth Circuit law; Twitter's constitutional claim satisfies the requirements for both constitutional

---

[9] AG Paxton's other arguments concerning the forum selection clause are far afield.  A valid forum selection clause forecloses his venue argument, Mot. 17, since venue "may be waived."  *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979).  In addition, Twitter's production of a copy of its Terms in response to the CID, Mot. 14, in no way affects the application of the forum selection clause, or changes the relationship between the AG's investigation and Twitter's Terms and Services.  Nor could he contest the forum selection clause's enforceability: such clauses are "presumptively valid" unless a party satisfies its "heavy burden" to establish the clause is unenforceable.  *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009).  AG Paxton does not attempt to make that showing here.

and prudential ripeness, and as Twitter brings its claim under Section 1983, it need not exhaust state remedies before proceeding in federal court.  Twitter sought relief in this Court after AG Paxton repeatedly declined to narrow the scope of his requests, and only when its response to the CID was due.  Compl. ¶¶ 53-58.  It need not wait any longer to defend its constitutional rights.

### A.    Twitter's Claim Satisfies The Requirements Of The Ripeness Doctrine, Warranting Immediate Adjudication

The ripeness inquiry has two components: constitutional ripeness and prudential ripeness. *In re Coleman*, 560 F.3d 1000, 1004 (9th Cir. 2009).  Twitter satisfies both.  First, it has already suffered concrete harms from the retaliatory CID that will only intensify absent the Court's intervention, satisfying the constitutional ripeness standard.  Second, Twitter's First Amendment claim would not benefit from further factual development, and so prudential considerations also warrant review now.

### 1.    Twitter Has Already Suffered Real And Concrete Injury

In assessing whether a claim is ripe as a constitutional matter, courts analyze whether "the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000).  This inquiry mirrors that for showing injury-in-fact for Article III standing, *id.* at 1138. And in the "First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003).

Twitter has experienced concrete injuries from the CID.  *First*, the CID has chilled and continues to chill Twitter's speech by constraining its content moderation decisions and deliberations.  Compl. ¶¶ 64-65.  As AG Paxton himself put it, the ability to hold constitutionally protected "open and candid discussions . . . is threatened by the chill of subpoenas . . . hanging in the air."  Paxton Am. Br. 6 (Sivaram Decl., Ex. A).  That is because "[t]he power of a threat lies not in any negative actions eventually taken, but in the apprehension it creates in the recipient of the threat."  *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009).  Twitter already has been, and continues to be, harmed by that apprehension now.  To be sure, mere allegations of subjective chill arising not from "specific action[s]" against a plaintiff but rather from "the existence and operation

1    of the intelligence gathering and distributing system" are insufficient to constitute Article III

2    injury. *Laird v. Tatum*, 408 U.S. 1, 13 (1972). But Twitter is not complaining about the general

3    prospect of investigation, but about "specific actions" against it: the CID that AG Paxton has

4    already served, and the threats he has already made, which are already chilling its speech.

5        The CID is particularly chilling because it is "continuing in nature," requiring production

6    of not only existing responsive documents, but also any new responsive documents that Twitter

7    may create. Compl., Ex. 1 at 8. That means that any time a Twitter employee thinks about writing

8    something related to content moderation, the employee knows that AG Paxton has already

9    demanded production of whatever the employee chooses to write. *Id.* Knowing that a State AG

10   is all but looking over one's shoulder as one begins to type would lead a person of "ordinary

11   firmness" to think twice about what to write or what editorial decisions to make and document,

12   and that chilling impact is a ripe—and both past and ongoing—First Amendment injury. *Am.-*

13   *Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1058 (9th Cir. 1995) (holding that the

14   "perpetual threat" of harmful consequences for engaging in First Amendment activity is "the kind

15   of irreparable injury that is relevant to the ripeness inquiry").

16       *Second*, the CID forced Twitter to hire external counsel to negotiate with the AG and divert

17   employee time and additional financial resources to preserving and collecting thousands of

18   responsive documents. Compl. ¶¶ 8, 64. Economic injury establishes constitutional standing.

19   *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (diversion of finite

20   resources constitutes Article III injury); *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121,

21   1130 (9th Cir. 1996) ("Economic injury is clearly a sufficient basis for standing."). Twitter has

22   thus suffered yet another "real and concrete" injury from the AG's retaliatory campaign,

23   independently rendering its claim ripe. *Anchorage Equal Rights Comm'n*, 220 F.3d at 1139.

24       ### 2.    Twitter Need Not Wait For An Enforcement Action For Its First Amendment Challenge To Be Ripe

25

26       In a First Amendment action such as this, Twitter need not wait for AG Paxton to bring an

27   enforcement action before challenging the CID. That is because delaying adjudication would

28

continue to constrain its constitutionally protected content moderation activities.  AG Paxton's arguments to the contrary are unavailing.

Relying on the inapposite case of *Zimmer v. Connett*, 640 F.2d 208, 209 (9th Cir. 1981), AG Paxton claims there is a bright-line rule that the recipient of a non-self-executing CID may not affirmatively challenge the CID, and can object only after the government brings an enforcement proceeding.  Mot. 2.  But *Zimmer* was a narrow decision about tax procedure, addressing whether taxpayers may challenge an information request *before* a summons is even issued.  It does not apply to this First Amendment challenge to a retaliatory CID that *has* been issued. 640 F.2d at 209.

*First*, the only injury the taxpayers in *Zimmer* sought to avoid was compelled production of documents, which could not have occurred until much later in the administrative process.  By contrast, Twitter here seeks to avoid First Amendment injury—chilling of its speech—that has already occurred and is continuing to occur and that is inflicted by the *threat* of compelled production, whether or not that threat is ever consummated.  *Brodheim,* 584 F.3d at 1271 (9th Cir. 2009).  In such cases, the Ninth Circuit has affirmed a party's right to seek immediate relief by filing suit.  *Carpinteria*, 344 F.3d at 830.  And the Ninth Circuit has also repeatedly explained that a person "need not await 'consummation of threatened injury'"—like an enforcement action— before bringing a First Amendment challenge.  *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (citing cases).  It follows, therefore, that a party, like Twitter, that has already suffered concrete First Amendment harms from retaliatory conduct is entitled to sue immediately.

*Second*, the present case is much closer to an ultimate enforcement proceeding than *Zimmer* was.  There, taxpayers sought an injunction barring the IRS from re-examining books and records related to an already-audited tax year.  They sued after the IRS district director had indicated a re-review would go forward, but before the IRS had even issued a summons, much less rejected any objections to the summons or sought to enforce it in court.  The Ninth Circuit explained the case was not ripe "because the taxpayers had an adequate remedy at law"—an opportunity to raise objections before producing documents if any summons were actually issued and sought to be enforced.  Plainly, the inquiry here has proceeded well past the inquiry in *Zimmer.* AG Paxton has issued his CID, has rejected Twitter's objections to it, and Twitter filed this action on the deadline

for producing documents or challenging the CID in Texas state court.  Compl. ¶¶ 53-58.

*Third*, and finally, the rationale of *Zimmer*—that an "adequate remedy at law" (640 F.2d at 209) in the form of an opportunity to challenge a demand at a later date bars injunctive relief— is categorically inapplicable here.  This is a § 1983 action asserting that AG Paxton retaliated against Twitter for its exercise of First Amendment rights, and the supposedly "adequate remedy" that he posits is an opportunity to raise objections in a Texas court.  But the whole point of § 1983—as the Supreme Court has repeatedly held—is to provide a *federal* forum even for wrongs addressable in state court.  The possible availability of a remedy, adequate or not, in state court is irrelevant to whether this § 1983 action may proceed.  *See, e.g., Monroe v. Pape*, 365 U.S. 167, 183 (1961) ("The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked."); *McNeese v. Board of Education*, 373 U.S. 668, 672 (1963) ("We would defeat those purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court.").  Rather, "the constitutional violation actionable under § 1983 is complete when the wrongful action is taken" and "plaintiff . . . may invoke § 1983 regardless of any state-tort remedy that might be available to compensate him for the deprivation of these rights."  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

AG Paxton fares no better in relying on the Fifth Circuit's ruling in *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016).  First, *Hood* is not controlling here.  Second, *Hood* relied on a line of cases outside the First Amendment context that concluded that a pre-enforcement challenge to a routine administrative subpoena was unripe because the plaintiff faced no immediate hardship from non-compliance.  *Id.* at 224-25 ("This follows from our cases considering federal administrative subpoenas . . . .").  But as the Ninth Circuit has emphasized, the ripeness analysis is highly contingent on the precise legal issue presented, *see Yahoo!*, 433 F.3d at 1206.  Here there is immediate harm that is past, present, and ongoing:  the chilling effect of AG Paxton's pending and retaliatory demand, which pressures the company to modify the protected exercise of its editorial discretion when making content moderation decisions, and which applies not only to existing documents, but to every new document Twitter may create responsive to the subpoena.

Compl. ¶¶ 64-65; *id.* Ex. 1 at 8.  This Court should follow the multiple Ninth Circuit authorities recognizing that suits like this one, challenging a law-enforcement official's past and ongoing retaliation for the exercise of First Amendment rights, are ripe.[10]

### 3.    Prudential Considerations Favor Adjudicating Twitter's Claim Now

The prudential ripeness inquiry asks whether "further factual development would significantly advance [a court's] ability to deal with the legal issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998).  Courts consider two factors in determining whether a case satisfies prudential requirements for ripeness: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Yahoo!*, 433 F.3d at 1211.  Both considerations support adjudicating Twitter's claim now.

Whether a dispute is fit for judicial consideration depends on the "state of the factual record" and the "substantive legal question to be decided." *Yahoo!*, 433 F.3d at 1206.  Here, Twitter's First Amendment retaliation claim is based entirely on acts that have already occurred; thus, its claim presents a "concrete factual situation" ripe for adjudication now.  *Alaska Right to Life PAC v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007).  Specifically, Twitter's First Amendment retaliation claim turns on whether AG Paxton possessed a retaliatory motive for issuing the CID.  *See Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 869 (9th Cir. 2016).  Adjudicating this claim requires analyzing past conduct:  AG Paxton's threats to investigate Twitter's decision to suspend President Trump's account, Compl. ¶¶ 24, 42-47; the timing of the CID he issued to Twitter, *id.* ¶¶ 38, 42, 43; the contents of his simultaneous press release, *id.* ¶¶ 46-47; and his refusal to tailor his demands to legitimate law enforcement purposes, *id.* ¶¶ 53-54.

While AG Paxton tries to make much of the fact that he has not moved to enforce the CID, Mot. 2, Twitter's retaliation claim was complete when he issued the CID.  That he has not yet taken additional steps to put even more pressure on Twitter hardly makes this case unripe.  *E.g.*,

---

[10] AG Paxton claims that *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1027 (E.D. Cal. 2017), embraced the reasoning of *Hood*, but that decision took pains to distinguish *Hood* as "not on all fours with the facts of this case," *id.* at 1026, and adjudicated the plaintiff's First Amendment claim pre-enforcement.  *Publius* thus supports Twitter's position—not AG Paxton's.

1   *Lacey v. Maricopa County*, 693 F.3d 896, 917 (9th Cir. 2012) (citing cases holding that an

2   investigation is sufficient to chill the exercise of First Amendment rights); *Bantam Books, Inc. v.*

3   *Sullivan*, 372 U.S. 58, 68 (1963) (reasoning, in First Amendment case, that "[p]eople do not lightly

4   disregard public officers' thinly veiled threats to institute criminal proceedings against them if they

5   do not come around").   Adverse action has already occurred, and, as discussed, Twitter has

6   suffered and continues to suffer constitutional injury.  Deprivation of First Amendment rights, "for

7   even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427

8   U.S. 347, 373 (1976).  The Ninth Circuit has thus recognized that the duration of a prosecution or

9   trial is an "'intolerably long' period during which to permit the continuing impairment of First

10  Amendment rights." *Reno*, 70 F.3d at 1058.  The Court should not wait for the AG to retaliate

11  further. *See Ohio Forestry*, 523 U.S. at 737.

12          **B.      Twitter's Declaratory Judgment Claim Is Ripe**

13          AG Paxton's ripeness argument erroneously proceeds as if Twitter seeks only injunctive

14  relief.  But Twitter seeks declaratory relief as well, and that claim is plainly ripe.  Compl. ¶¶ 1, 5,

15  7, 68.  The central purpose of the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, is to provide

16  parties with a declaration of their rights before incurring actual injury.  *Olagues v. Russoniello*,

17  770 F.2d 791, 803-04 (9th Cir. 1985).  Accordingly, the Ninth Circuit has held that "declaratory

18  relief may be appropriate even when injunctive relief is not [because] [t]here is a considerable

19  difference between ordering a government official to conduct his activities in a certain manner,

20  and simply pronouncing that his conduct is unlawful and should be corrected." *Id.* at 803.  And

21  even in *Hood*, the centerpiece of AG Paxton's ripeness argument, the Fifth Circuit "express[ed]

22  no opinion on Google's claims for declaratory relief regarding future enforcement actions."  *Hood*,

23  822 F.3d at 228 n.14.  While the *Zimmer* plaintiffs (who raised no First Amendment claims) were

24  found not to have advanced a sufficient basis for declaratory relief, 640 F.2d at 209, the Ninth

25  Circuit routinely contemplates that such a remedy may be awarded to First Amendment retaliation

26  plaintiffs.  *E.g.*, *Arizona Bd. of Regents*, 824 F.3d at 865 (affirming that declaratory relief could be

27  awarded for a First Amendment retaliation claim); *Rhodes v. Robinson*, 408 F.3d 559, 565 (9th

28  Cir. 2005).  Given that Twitter has adequately alleged retaliation by AG Paxton, its application for

1    declaratory relief is unquestionably ripe.

2    **V.   ABSTENTION IS UNWARRANTED**

3        AG Paxton proposes this Court abstain from exercising federal jurisdiction based on the

4    *Pullman* doctrine, or pursuant to its discretion under the Declaratory Judgment Act.  *See* Mot. 19-

5    21; *see also R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 498 (1941).  Neither ground

6    justifies abstention, which is an "extraordinary and narrow exception to the duty of a . . . court to

7    adjudicate a controversy." *Wolfson v. Brammer*, 616 F.3d 1045, 1066 (9th Cir. 2010).

8        *Pullman* abstention is not a basis to dismiss a case—the correct relief, in the narrow

9    circumstances where *Pullman* abstention is warranted, is a stay—and such a stay could be imposed

10   only after, not before, ruling on the motion for preliminary injunction.  *See Chez Sez III Corp. v.*

11   *Twp. of Union*, 945 F.2d 628, 634 n.4 (3d Cir. 1991) ("Although the district court decided to

12   abstain in this action, it was still obliged to consider appellants' request for preliminary relief.").

13       In any event, *Pullman* abstention is unwarranted here.  *First and foremost*, the Ninth Circuit

14   has determined that "*Pullman* abstention 'is generally inappropriate when First Amendment rights

15   are at stake.'" *Courthouse News Serv. v. Planet*, 947 F.3d 581, 587 (9th Cir. 2020).  That is so

16   because "the first requirement for *Pullman* abstention—that 'the case touches on a sensitive area

17   of social policy upon which the federal courts ought not to enter'—'is almost never satisfied in

18   First Amendment cases because the guarantee of free expression is always an area of particular

19   federal concern.'" *Id*.  Here, the entire basis for Twitter's action is the First Amendment injuries

20   it has already suffered and continues to suffer as a result of AG Paxton's retributive campaign,

21   carried out through his investigation and issuance of the CID.   As such, *Pullman* abstention is

22   plainly "inappropriate," *Courthouse News*, 947 at 587, and would represent an abdication of this

23   Court's "virtually unflagging obligation" to resolve this federal-law controversy, *Colo. River*

24   *Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

25       *Second*, *Pullman* abstention can be appropriate only where, unlike in this case, "the

26   resolution of a federal constitutional question might be obviated if the state courts were given the

27   opportunity to interpret ambiguous state law." *United States v. State Water Res. Control Bd.*, 988

28   F.3d 1194, 1209 (9th Cir. 2021).  Where there is no ambiguity, *Pullman* abstention is inappropriate.

1   *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 528 (9th Cir. 2015) (en

2   banc); *see also Hawaii Housing Authority v. Midkiff*, 467 U.S. 229 (1984). *Pullman* applies only

3   if "constitutional adjudication plainly can be avoided if a definite ruling on the state issue would

4   terminate the controversy." *Courtney v. Goltz*, 736 F.3d 1152, 1163 (9th Cir. 2013).

5        Here, Twitter's suit raises no issue of Texas law and AG Paxton has identified no obvious

6   ambiguity of Texas law that if resolved would obviate the need for a ruling on Twitter's federal

7   constitutional claim.   Rather, he argues a Texas court might resolve in his favor the central *factual*

8   question in this case—whether he acted with a retaliatory motive.  *See* Mot. 19 (arguing that were

9   a state court to conclude that "the consumer protection division" in fact "believes that [Twitter]

10  may have documents relevant to the subject matter of [its] investigation," there would be no

11  retaliatory motive, rendering federal intrusion unnecessary and inappropriate).   That is simply not

12  a basis for *Pullman* abstention, and it would violate core principles of § 1983 to hold this federal

13  case in abeyance to give a state court the chance to first decide the facts.  *See supra* at 19.

14       As for the discretion that this Court has under the Declaratory Judgment Act, AG Paxton's

15  argument that this Court exercise that discretion "to refrain from deciding this case" (at 20) is

16  wrong from the get-go, as any such discretion could apply not to the whole case but only to

17  Twitter's request for declaratory relief.  *Ctr. for Biological Diversity v. United States Forest Serv.*,

18  925 F.3d 1041, 1050 (9th Cir. 2019).   Moreover, where, as here, "other claims are joined with an

19  action for declaratory relief . . . the district court should not, as a general rule, . . . decline to

20  entertain the claim for declaratory relief."  *Government Employees Ins. Co. v. Dizol*, 133 F.3d

21  1220, 1225 (9th Cir. 1998) (en banc).  *See also Vasquez v. Rackauckas*, 734 F.3d 1025, 1040-41

22  (9th Cir. 2013) (affirming district court's decision to hear declaratory relief claim where plaintiff

23  also sought injunctive relief and no parallel state proceeding pending).

24       Beyond that, AG Paxton's argument rests on the illogical premise that Twitter improperly

25  "wrest[ed]" the choice of forum from him because he is the "natural plaintiff."  Mot. 20.  Not so.

26  Twitter—whose First Amendment rights are at stake—is the natural plaintiff.

27

28

1

**II      TRANSFER TO THE WESTERN DISTRICT OF TEXAS WOULD BE INAPPROPRIATE**

2       AG Paxton's alternative request for transfer to federal court in Texas should also be denied.

3   First, he cannot overcome the "strong presumption in favor of [Twitter's] choice of forum," *Piper*

4   *Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981).  That choice receives even "greater deference

5   when the plaintiff," as here, "has chosen [its] home forum."  *Id*.  To defeat that presumption, AG

6   Paxton would have to show that the relevant "private and public interest factors clearly point

7   towards" his preferred forum.  *Id*.  And although he bears the burden of proof, he has failed to

8   make the "strong showing of inconvenience" that would be needed to "warrant upsetting

9   [Twitter's] choice of forum."  *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843

10  (9th Cir. 1986).  In fact, he has offered *no evidence at all* to support his request.

11      But even putting that default aside, AG Paxton's arguments otherwise fail.  As explained

12  above, *supra* 8-9, his professed concern about traveling to this forum rings hollow given his

13  repeated insertion of himself into California litigation in the past and because travel is unlikely to

14  be necessary due to this Court's pandemic-related standing orders.  And even if those orders are

15  lifted before this case ends, the restrictions on travel to California that AG Paxton cites would

16  likely be relaxed by then as well.[11]  Further, while AG Paxton and his staff may be in Texas, he

17  has not offered an affidavit or otherwise committed to providing evidence in this case, and the

18  staffers who submitted declarations do not claim personal knowledge of his motives.  Moreover,

19  witnesses and evidence related to the impact on Twitter, as well as to Twitter's editorial decisions,

20  are located in California.  And any inconvenience to AG Paxton's counsel is irrelevant.  *See Vu v.*

21  *Ortho-McNeil Pharm., Inc.,* 602 F. Supp. 2d 1151, 1157 (N.D. Cal. 2009) (location of parties'

22  counsel "is not an appropriate factor for the Court to consider"); *Pralinksy v. Mutual of Omaha*

23  *Ins.*, 2008 WL 4532563, at *2 (N.D. Cal. Oct. 9, 2008) (same).

24

25

26  [11] These restrictions exist to protect the health and safety of Californians; the absence of protective
    regulations in Texas weighs against subjecting Twitter and its employees to suit there (where some

27  hearings and trials are apparently occurring in person).  *See* Svitek, *Gov. Greg Abbott Says He's*
    *Rescinding Statewide Mask Mandate and Capacity Limits on Businesses*, TEXAS TRIBUNE (March

28  2, 2021), https://tinyurl.com/38yk6bkr; U.S. District Court for the Western District of Texas,
    Fourteenth Supplemental Order Regarding Court Operations (Mar. 17, 2021).

Nor do any public interest considerations favor transfer.  As discussed, California has a strong interest in protecting the First Amendment rights of a company and an industry based primarily in California.  *Supra* at 8.  And this case does not turn on application or interpretation of any Texas statute, removing any significant interest that Texas courts have in adjudicating this dispute.  *See supra* at 8; *contra* Mot. 19.  That this court's average trial time is slightly longer than the Western District of Texas's does not meaningfully change the analysis.  *See B&G Foods N. Am., Inc. v. Embry*, 2020 WL 3605070, at *2 (E.D. Cal. July 2, 2020) ("[R]elying on caseload weights alone is overly simplistic and does not provide a fair resolution of the questions properly raised regarding transfer of venue.").

In any case, as discussed, AG Paxton agreed to litigate here through a forum selection clause.  *Supra* at 13-14.  When, as here, "the parties have agreed to a valid forum-selection clause," that "clause should be given controlling weight in all but the most exceptional cases."  *Atl. Marine*, 571 U.S. at 62-63 (alteration omitted).  AG Paxton has not made anything close to that showing. To the contrary—nearly all of his arguments are foreclosed, because the Court "must deem the private-interest factors to weigh entirely in favor of the preselected forum" and may not consider arguments about convenience to the parties.  *Id.* at 64.  So he must carry his burden solely by reference to the public interest factors, which "rarely" and only in "unusual cases" support transfer from the agreed-to forum.  *Id.*  And as just noted, those factors clearly do not favor transfer.

## CONCLUSION

Each of AG Paxton's arguments in favor of dismissal fails to contend with Twitter's actual claim.  Contrary to his characterization, this is no ordinary challenge to routine enforcement of state law; it is instead a suit to stop the retaliatory actions of a state official seeking to punish and influence the exercise of First Amendment protected rights with which he disagrees.  That retaliation is directed toward and has already been felt by Twitter in California, and it is actionable now.  The Court should deny AG Paxton's motion and address the merits of Twitter's claim.

Respectfully submitted,

/s/ *Patrick J. Carome*

MARK D. FLANAGAN
CA Bar No. 130303
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

PETER G. NEIMAN (*pro hac vice*)
peter.neiman@wilmerhale.com
ALEX W. MILLER (*pro hac vice*)
alex.miller@wilmerhale.com
RISHITA APSANI (*pro hac vice*)
rishita.apsani@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
250 Greenwich St., 45 Floor
New York, New York 10007
Telephone:  (212) 295-6487
Facsimile:  (202) 663-6363

PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
ANURADHA SIVARAM (*pro hac vice*)
anuradha.sivaram@wilmerhale.com
SUSAN PELLETIER (*pro hac vice*)
susan.pelletier@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

**Attorneys for Plaintiff**

**TWITTER, INC.**